UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| HORROR, INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership,<br><br>                               Plaintiffs,<br><br>       - against -<br><br>VICTOR MILLER, an individual; and DOES 1 through 10, inclusive,<br><br>                         Defendants. | Case No.: _____<br><br>**COMPLAINT** |

Plaintiffs, HORROR, INC., a Massachusetts corporation, and MANNY COMPANY, a Connecticut limited partnership (the "Plaintiffs"), by and through their attorneys, Greenberg Glusker Fields Claman & Machtinger LLP and Ferdinand IP, LLC, allege as follows:

**PRELIMINARY STATEMENT**

1.      This lawsuit seeks, among other things, a declaration that Plaintiff Horror, Inc. ("Horror") is the exclusive owner of the copyright in and to the screenplay on which the original horror film entitled *Friday the 13th* (the "Film") was based.

2.      In 1979, Sean S. Cunningham ("Cunningham") had the idea to capitalize on the success of the then-recently released and hugely successful horror film *Halloween*. Through the Manny Company, in which he was a general partner, Cunningham hired defendant Victor Miller ("Miller"), a writer with whom he had previously worked, to work with him in developing ideas for a new horror film and to thereafter draft a screenplay based on the jointly developed ideas.  Miller had never written a horror screenplay prior to his being hired by Cunningham and was guided in the process, and

directly supervised, by Cunningham.  Accordingly, Miller entered into an employment agreement with the Manny Company pursuant to which Miller wrote a screenplay for the Film as a work for hire (the "Screenplay").

3.      Thereafter, Georgetown Productions, Inc. ("Georgetown"), Horror's predecessor in interest, took a bold risk and financed the entire production budget of the Film in exchange for the Manny Company's assignment of all its rights in and to the Screenplay, including without limitation any and all copyrights therein.  Released in 1980, the Film was a breakout hit and spawned many sequels over the past 36 years.

4.      In spite of the fact that he voluntarily executed an employment agreement and for 36 years has accepted the benefits flowing therefrom, Miller has now repudiated his employment agreement and has improperly and deceptively purported to terminate Horror's copyright ownership in and to the Screenplay under Section 203(a) of the United States Copyright Act.  He cannot do so.  Because the Screenplay was written as a work for hire, Miller does not have any right to terminate Horror's copyright interests thereto and is not entitled to recapture any rights therein.

5.      As a result of Miller's improper actions, a cloud has been placed on Horror's rights in and to the popular and lucrative *Friday the 13th* movie franchise and has caused, and will continue to cause, both Horror and the Manny Company significant damages.  In addition to seeking a declaration of the parties' respective rights, the Manny Company seeks a determination that Miller has materially breached the Employment Agreement, has slandered Horror's title in *Friday the 13th*, and has engaged in unfair trade practices.

6.      Since the initial release of the Film in 1980, Horror has invested substantial time, money and effort developing and growing this singular independent horror film into one of the most successful and iconic film franchises of all time.  Miller's attempt to re-characterize his initial work for hire efforts as an independent project 36 years after the fact is nothing more than a transparently disingenuous money grab.

## JURISDICTION AND VENUE

7.      This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, and the United States Copyright Act, 17 U.S.C. §§ 101 *et seq*.  Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1338(a), and the principles of pendent jurisdiction pursuant to 28 U.S.C. § 1367(a).

8.      Venue in this Judicial District is proper under 28 U.S.C. §§ 1391(b) and (c), and § 1400(a) because a substantial part of the events giving rise to the plaintiffs' claims occurred in this Judicial District, one of the plaintiffs resides and may be found in this Judicial District, and defendants are subject to personal jurisdiction in this Judicial District by virtue of their transacting and/or soliciting business in this Judicial District.

## THE PARTIES

9.      Horror Inc. ("Horror") is a corporation organized and existing under the laws of Massachusetts, with its principal place of business located in Newton, Massachusetts.  Horror is the owner of certain rights in and to the *Friday the 13th* movie franchise, including without limitation the copyright in the Screenplay.  Horror acquired its rights in the Screenplay, among other things, from its predecessors-in-interest, Georgetown Productions, Inc. ("Georgetown"), Jason Productions Inc., Friday Four Inc. and Terror Inc.

10.      The Manny Company is a limited partnership organized and existing under the laws of Connecticut, with its principal place of business located in the state of Connecticut.  Sean S. Cunningham Films, Ltd. ("SSCF") is the general partner of the Manny Company, and its principal is Sean S. Cunningham ("Cunningham").  Horror and the Manny Company are sometimes referred to herein as "Plaintiffs."

11.      Plaintiffs are informed and believe, and based thereon allege, that Miller is an individual who, at all times relevant to the events at issue herein, was a citizen of and

resided in the state of Connecticut.  Plaintiffs are further informed and believe, and based thereon allege, that Miller currently is a citizen of and resides in the state of California.

12.     Plaintiffs are unaware of the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive, and therefore sue these defendants by fictitious names.  Plaintiffs will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained.  Plaintiffs are informed and believe, and based thereon allege, that each fictitiously named defendant is responsible in some way for the acts, occurrences and events alleged in this Complaint, and is liable to Plaintiffs therefor.  Defendant Miller and Does 1 through 10 are sometimes referred to collectively herein as "Defendants."

13.     Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein, each of the Defendants was the agent, servant, or employee of each other Defendant, and at all times relevant herein was acting within the scope of such agency.

## FACTS COMMON TO ALL COUNTS

14.     Miller and Cunningham first began working together in or about 1976 on a series of motion picture projects.  The first motion picture on which they worked together was entitled *Here Come the Tigers*.  Although both of them jointly worked on developing the ideas for the story line, Cunningham produced *Here Come the Tigers* and Miller wrote the screenplay.  Shortly thereafter, and in keeping with their prior method of working together, Cunningham and Miller began development on another motion picture, entitled *Manny's Orphans*.  For *Manny's Orphans*, Cunningham hired Miller through his newly created company, the Manny Company, which was a signatory to the Writer's Guild of America, Inc. ("WGA").  Regardless of the hiring entity, however, their method of working together remained the same – they met frequently to develop ideas for *Manny's Orphans* and Cunningham produced the film while Miller, under Cunningham's

supervision and direct control, wrote the screenplay which embodied their joint ideas. Neither of these family friendly films performed well at the box office.

15.     In or about 1979, the low-budget horror film *Halloween* became a huge box office success.  The surprising success of *Halloween* prompted Cunningham to focus on the horror films genre for his next project.  Having worked on two film projects together already, Cunningham and Miller embarked on this next film project using the same method of script development.  They met several days a week to discuss potential ideas for a horror film with the intention of Cunningham going on to produce the film and Miller writing the Screenplay for the Manny Company under Cunningham's supervision and direct control.  Cunningham had previously produced a horror film, whereas Miller had no previous experience in the horror genre.  Eventually, Cunningham came up with the idea to make a horror film called *Friday the 13th*.  Cunningham began investigating whether the title was available for use and hired Miller to write the Screenplay based on the ideas they had been and were continuing to discuss.

16.     Accordingly, on or about June 4, 1979, the Manny Company and Miller entered into a Writer's Flat Deal Contract, pursuant to which the Manny Company employed Miller to "write a complete and finished screenplay for a proposed motion picture . . . presently entitled or designated Friday 13" (the "Employment Agreement").

17.     The Employment Agreement was entered into and executed in the state of Connecticut, both parties to the Employment Agreement were residents of the state of Connecticut at the time of its execution, and all of the writing services performed by Miller pursuant to the Employment Agreement were performed in the state of Connecticut.  A true and correct copy of the Employment Agreement is attached hereto as Exhibit 1.

18.     In the Employment Agreement, Miller expressly warranted and represented that he was a member in good standing of the WGA, and that he would maintain his membership in the WGA in good standing "during the term of this employment."  The

Employment Agreement is the standard WGA short form complete screenplay agreement issued by the WGA at the time, and provides that it is to be governed by the provisions of the WGA 1977 Theatrical and Television Basic Agreement (also known as the "Minimum Basic Agreement" or "MBA").  Plaintiffs are informed and believe, and based thereon allege, that under the terms of the Employment Agreement (which incorporated the MBA requirements), Miller collected employee benefits, including without limitation pension, health and welfare benefits.  In addition, as a result of the Employment Agreement, on information and belief, Miller has collected residual payments in accordance with the MBA over the past thirty-six (36) years.

19.     As an employee of the Manny Company, Cunningham met with Miller several times a week to discuss ideas and to develop the script and story line of the Film. Sometimes Miller would pitch ideas for the film to Cunningham, and Cunningham would either approve or veto the ideas.  Other times, Cunningham would direct Miller to incorporate certain ideas into the Screenplay even when Miller did not approve of those ideas.

20.     Before a draft of the Screenplay was completed, and based solely on Cunningham's idea to produce a horror film entitled *Friday the 13th*, Cunningham took an ad out in Daily Variety to determine if there was sufficient interest to secure funding for the proposed film.  The ad stated, in pertinent part, "*Friday the 13th*, The Most Terrifying Film Ever Made! Available December 1979."  Immediately, Cunningham began receiving calls from distributors who were interested in distributing the film based solely on the title.

21.     Thereafter, Cunningham and Miller began furiously working on the development of the Screenplay.  At all times, Cunningham exercised control and authority over the development of the story line, scenes, characters, plots, themes, and other creative elements of the Screenplay.

22.     One of the people who responded to Cunningham's Daily Variety ad was Phil Scuderi ("Scuderi"), a principal of Georgetown.  On behalf of Georgetown, Scuderi offered to finance a portion of the Film's budget, but at this time Cunningham did not have a completed draft of the Screenplay.  Thereafter, in or about mid-August 1979, when Cunningham was able to provide an early draft of the Screenplay, Georgetown offered to invest the entire $500,000 budget for the Film, on the condition that Georgetown would have complete control over the Screenplay and the Film. Cunningham agreed.

23.     The Film began pre-production in mid-August 1979 and principal photography occurred in or about October 1979.  Beginning in mid-August 1979 and throughout the pre-production and production process, Scuderi, on behalf of Georgetown, provided extensive notes, mark-ups and ideas which were incorporated into the final shooting script and Film itself – many of which never appeared in any drafts of the Screenplay written by Miller.

24.     Pursuant to an agreement dated as of May 7, 1980, Georgetown documented its investment in the Film and the Manny Company sold to Georgetown all of its right, title, and interest in and to the Screenplay (the "Rights Agreement"), including without limitation its copyright in the Screenplay.  Among other things, the Rights Agreement specifically states that Miller wrote the Screenplay "as author for The Manny Company" and provides that Georgetown may copyright the Screenplay in its own name.

25.     The Film was released on or about May 9, 1980, and was an immediate hit, enjoying unprecedented box office success for a horror film.

26.     On or about September 4, 1980, Georgetown filed with the U.S. Copyright Office an application for copyright registration of the Film, in which it claimed, *inter alia,* authorship of the Film and the Screenplay.  This application matured into U.S. copyright registration no. PA 81-093, for which the U.S. Copyright Office issued a

certificate of registration having an effective date of September 26, 1980.  A true and correct copy of the Certificate of Registration is attached hereto as Exhibit 2.  Because this certificate of registration was issued within five years of the first publication of the Film, in accordance with 17 U.S.C. § 410(c), the certificate constitutes prima facie evidence of the validity of the underlying copyright as well as the facts stated in the certificate, including, without limitation, Georgetown's exclusive ownership of copyright in and to the Film, and Georgetown's original authorship of the Film and the Screenplay.

27.     Horror, as the successor-in-interest to Georgetown, currently holds all right, title, and interest, in and to the Screenplay, the Film, and any and all elements contained within the Film.  Although Georgetown and/or its successors in interest, including Horror, have licensed certain distribution rights to third parties in and to the Film, at no time has Horror assigned to any third parties any of its copyright(s) in and to the Screenplay and/or the Film.

28.     Notwithstanding that the Employment Agreement was governed by the WGA and that Miller's screenwriting services were therefore provided to the Manny Company as an employee on a work-for-hire basis, and on information and belief, that Miller has received employee benefits as a result of performing his screenwriting services on the Screenplay, on January 26, 2016, Miller issued a purported Notice of Termination of the copyright(s) in and to the Screenplay under Section 203(a) of the United States Copyright Act (17 U.S.C. § 203(a)) (the "Termination Notice").  However, although the Termination Notice was directed to the Manny Company and several of Horror's licensees, it was not served on Horror, the current copyright holder, and was therefore defective on its face.  On June 27, 2016, Miller re-issued his purported Notice of Termination (the "First Amended Termination Notice"), which included Horror and purported to be effective on July 1, 2018.  Further, on July 14, 2016, Miller once again re-issued his purported Notice of Termination, modifying some of the recipients' addresses ("Second Amended Termination Notice").  The Second Amended Termination

Notice purported to take effect on July 15, 2018.  The Termination Notice, the First Amended Termination Notice and the Second Amended Termination Notice are sometimes referred to collectively herein as the "Termination Notices."

29.     When Miller issued the purported Termination Notices, Miller knew and understood that he had been employed by the Manny Company to write the complete and finished Screenplay on a work-for-hire basis, knew or should have known that Horror was the copyright owner of the Screenplay, and therefore knew or should have known that the purported Termination Notices were false and without legal basis.

30.     Horror and the Manny Company dispute the validity of the Termination Notices, dispute that Miller has any termination rights under Section 203(a) of the United States Copyright Act or otherwise, and dispute that Miller has the right to seek to terminate Horror's copyright(s) in and to the Screenplay.

31.     Moreover, Miller's Termination Notices constitute a material breach and repudiation of his Employment Agreement with the Manny Company, and accordingly have placed a cloud on Horror's copyrights in the Screenplay, which has caused damage to Horror and the Manny Company.  Unless and until this dispute is resolved and the Court issues a declaration regarding the parties' respective rights in and to the Screenplay, including whether Miller is entitled to terminate Horror's copyright interests therein, Horror will no longer be able to exploit its copyrights in and to the Screenplay.

**CAUSES OF ACTION**

**COUNT I – DECLARATORY JUDGMENT**

**(By All Plaintiffs Against All Defendants)**

32.     Plaintiffs repeat and reallege, and incorporate herein by reference, the allegations contained in paragraphs 1 through 31, above, as though fully set forth herein.

33.     By reason of the foregoing facts, an actual controversy has arisen between the parties as to whether Miller has the right to terminate Horror's copyright interests in

and to the Screenplay pursuant to Section 203(a) of the United States Copyright Act (17 U.S.C. § 203(a)) or otherwise, and whether Miller's Termination Notices are valid. Specifically:

a.      Horror and the Manny Company contend, and Miller disputes, that the Screenplay was written as a work-for-hire pursuant to the Employment Agreement;

b.      Horror and the Manny Company contend, and Miller disputes, that Miller does not have any right to terminate Horror's copyright interests in the Screenplay pursuant to Section 203(a) of the United States Copyright Act (17 U.S.C. § 203(a)) or otherwise, nor to otherwise interfere with Horror's exclusive rights in connection with the Screenplay;

c.      Horror and the Manny Company contend, and Miller disputes, that Miller's Termination Notices are improper, invalid, and of no force and effect;

d.      Horror and the Manny Company contend, and Miller disputes, that Horror is entitled to continue to exclusively exploit the copyright in and to the Screenplay throughout the entirety of the copyright term;

e.      Horror and the Manny Company contend, and Miller disputes, that Miller's Termination Notices constitute a material breach and repudiation of the Employment Agreement; and

f.      Horror and the Manny Company contend, and Miller disputes, that even if Miller's Termination Notices or any of them are deemed valid (which plaintiffs dispute), that Miller's termination is limited solely to the creative elements contained in the Screenplay which were created by Miller, and not the entirety thereof, which will be determined after discovery in this matter.

34.     In view of the foregoing, an actual controversy has arisen and exists between Horror and the Manny Company, on the one hand, and Miller, on the other hand, within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.  Accordingly, Horror and the Manny Company hereby request a declaration of this Court under the provisions of 28 U.S.C. § 2201, setting forth the respective rights and other legal relations of Plaintiffs and Miller.  In particular, Horror and the Manny Company request a declaration that:

a.     The Screenplay was written as a work-for-hire pursuant to the Employment Agreement;

b.     Miller does not have any right to terminate Horror's copyright interests in the Screenplay pursuant to Section 203(a) of the United States Copyright Act (17 U.S.C. § 203(a)) or otherwise and does not have any right to interfere with Horror's exclusive rights in connection with the Screenplay;

c.     Each of Miller's Termination Notices is improper, invalid, and of no force and effect;

d.     Horror is entitled to continue to exclusively exploit the copyright in and to the Screenplay throughout the entirety of the copyright term;

e.     Each of Miller's Termination Notices constitutes a material breach and repudiation of the Employment Agreement; and

f.     Even if any of Miller's Termination Notices is deemed valid (which plaintiffs dispute), Miller's termination is limited solely to the creative elements contained in the Screenplay which were created by Miller, and not the entirety thereof, which will be determined after discovery in this matter.

## COUNT II – BREACH OF CONTRACT

### (By Plaintiff Manny Company Against Defendant Miller)

35.     Plaintiffs repeat and reallege, and incorporate herein by reference, the allegations contained in paragraphs 1 through 34, above, as though fully set forth herein.

36.     As set forth in detail above, pursuant to the terms of the Employment Agreement, Miller was employed by the Manny Company to write the complete and finished Screenplay as a work-for-hire, and the Employment Agreement was governed by the terms of the WGA's MBA.

37.     At all relevant times herein, Miller knew and understood that he was employed by the Manny Company to write the complete and finished Screenplay on a work-for-hire basis, as a member in good standing of the WGA and pursuant to the terms of the WGA's standard employment agreement in use at the time.

38.     Further, there was at all times relevant herein, an implied covenant in the Employment Agreement that Miller would act in good faith and deal fairly with the Manny Company in all aspects of their contractual relationship, and would refrain from conduct that would result in destroying, frustrating, or injuring the Manny Company's rights under the Employment Agreement.

39.     Except as may have been excused or prevented by Miller, the Manny Company has fully performed all conditions, covenants, duties and obligations required to be performed on its part under the Employment Agreement.

40.     Miller has materially breached and repudiated the Employment Agreement by, among other things: (a) issuing the Termination Notices; (b) sending the Termination Notices to several of Horror's licensees; and (c) falsely claiming that he is entitled to terminate Horror's copyright in and to the Screenplay, thereby exceeding the scope of his rights under the Employment Agreement.

41.     For the reasons set forth hereinabove, Miller has also breached the covenant of good faith and fair dealing implied in the Employment Agreement, thus depriving the

Manny Company of the benefits for which it bargained under the Employment Agreement.

42.     As a direct and proximate result of Miller's acts of material breach and repudiation, the Manny Company has suffered damages in an amount to be proven at trial, but which the Manny Company is informed and believes, and on that basis alleges, exceeds the jurisdictional minimum of this Court.

## COUNT III – SLANDER OF TITLE
### (By Plaintiff Horror Inc. Against All Defendants)

43.     Plaintiffs repeat and reallege, and incorporate herein by reference, the allegations contained in paragraphs 1 through 42, above, as though fully set forth herein.

44.     Although Miller either knew or should have known that Horror was the copyright owner of the Screenplay, Miller intentionally served his Termination Notices on certain of Horror's licensees, including Paramount Pictures Corporation, New Line Film Productions, Inc., and Warner Brothers Entertainment, Inc. (collectively, the "Licensees"), for the purpose of disparaging and slandering Horror's right, title, and interest in and to the Screenplay.  Miller's Termination Notices are false, and constitute false statements derogatory to Horror's title in and to the Screenplay.

45.     On information and belief, Miller's acts of purposefully sending the Termination Notices to the Licensees were malicious and were intended to impugn the integrity of Horror, diminish the value of Horror's property in the eyes of its Licensees, and to slander Horror's title in and to the Screenplay.

46.     Miller's actions have, in fact, impugned the integrity of Horror, diminished the value of Horror's property, and slandered Horror's title in and to the Screenplay.

47.     As a direct and proximate result of Miller's conduct, Horror has suffered damages in an amount to be proven at trial, but which Horror is informed and believes, and on that basis alleges, exceeds the jurisdictional minimum of this Court.

48.     Furthermore, Horror is informed and believes, and based thereon alleges, that Miller's conduct as hereinabove alleged was not only knowingly false, but was also malicious and oppressive.  Accordingly, Plaintiffs are entitled to an award of punitive and exemplary damages.

## COUNT IV – CONNECTICUT UNFAIR TRADE PRACTICES ACT
### (By Plaintiff Horror Inc. against All Defendants)

49.     Plaintiffs repeat and reallege, and incorporate herein by reference, the allegations contained in paragraphs 1 through 48, above, as though fully set forth herein.

50.     Miller's acts of knowingly sending the false Termination Notices offend public policy as has been established by the common law of the State of Connecticut, including, without limitation, the common law of contracts and slander of title of the State of Connecticut, and therefore constitute unfair or deceptive acts or practices in violation of the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. § 42-110 ("CUTPA").

51.     Miller's acts of knowingly sending the false Termination Notices constitute an immoral, unethical, oppressive, and unscrupulous business practice, and therefore constitute unfair or deceptive acts or practices in violation of CUTPA.

52.     Miller's acts of knowingly sending the false Termination Notices has directly and proximately caused Horror to suffer substantial and foreseeable ascertainable harm, including, but not limited to, lost licensing revenues which Horror would have realized from the exploitation of its rights in and to the Film but for Miller's aforementioned conduct, and therefore constitute unfair or deceptive acts or practices in violation of CUTPA.

53.     Furthermore, on information and belief, Miller's acts of knowingly sending the false Termination Notices constitute intentional and wanton violations of Horror's rights under the Employment Agreement and Horror's rights in and to the Film, and

exhibit a reckless indifference to Horror's aforementioned rights.  Accordingly, Horror is entitled to an award of punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

54.     Horror is entitled to recover its costs and reasonable attorneys' fees incurred in pursuing this matter pursuant to Conn. Gen. Stat. § 42-110g(d).


**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs claim relief as follows:

1.     On Count I:

    a.     For a declaration that:

    i.     The Screenplay was written as a work-for-hire pursuant to the Employment Agreement.

    ii.     Miller does not have any right to terminate Horror's copyright interests in the Screenplay pursuant to Section 203(a) of the United States Copyright Act (17 U.S.C. § 203(a)) or otherwise and does not have any right to interfere with Horror's exclusive rights in connection with the Screenplay.

    iii.     Each of Miller's Termination Notices is improper, invalid, and of no force and effect.

    iv.     Horror is entitled to continue to exclusively exploit the copyright in and to the Screenplay throughout the entirety of the copyright term.

    v.     Each of Miller's Termination Notices constitutes a material breach and repudiation of the Employment Agreement.

    vi.     Even if any of Miller's Termination Notices is deemed valid (which plaintiffs dispute), Miller's termination is limited solely to the creative elements contained in the Screenplay which were

created by Miller, and not the entirety thereof, which will be

determined after discovery in this matter.

      b.     For Plaintiffs' reasonable attorneys' fees.

2.     On Count II, for damages according to proof but which the Manny Company is informed and believes, and on that basis alleges, exceed the jurisdictional requirements of this Court;

3.     On Count III, for damages according to proof but which Horror is informed and believed, and on that basis alleges, exceed the jurisdictional requirements of this Court;

4.     On Count IV,  for compensatory damages according to proof but which Horror is informed and believed, and on that basis alleges, exceed the jurisdictional requirements of this Court, as well as punitive damages and attorney's fees as provided for by law; and

5.     On all Counts,

      a.     For Plaintiffs' costs of suit herein; and

      b.     For such other and further relief as the Court may deem just and proper.

Dated: August 24, 2016

Respectfully submitted,

FERDINAND IP, LLC

By: *Edmund J. Ferdinand, III*
    EDMUND J. FERDINAND, III (ct21287)
    jferdinand@24iplg.com
    ALEXANDER R. MALBIN (ct29419)
    amalbin@24iplg.com
    JESSICA S. RUTHERFORD (ct27273)
    jrutherford@24iplg.com
    129 Post Road East
    Westport, Connecticut 06880
    Telephone: 203.557.4224
    Fax: 203.905.6747

    and

    BONNIE E. ESKENAZI (SBN 119401)
    BEskenazi@GreenbergGlusker.com
    JULIA R. HAYE (SBN 198138)
    JHaye@GreenbergGlusker.com
    GREENBERG GLUSKER FIELDS
    CLAMAN & MACHTINGER LLP
    1900 Avenue of the Stars, 21st Floor
    Los Angeles, California  90067-4590
    Telephone:  310.553.3610
    Fax:  310.553.0687
    (Admission *Pro Hac Vice* Pending)

    *Attorneys for Plaintiffs,*
    *Horror, Inc. and Manny Company*

08226-00016/2594671.6