# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

**Horror Inc. and The Manny Company,**

      **Plaintiffs,**

**vs.**

**Victor Miller & Does 1 through 10,**

      **Defendants.**

**Case No.: No. 3:16-cv-01442-SRU**

**October 22, 2016**

## [CORRECTED] MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE

Marc Toberoff (FBN phv08515)
  *mtoberoff@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Rd, Suite 50-363
Malibu, California, 90265
Telephone: (310) 246-3333
Fax: (310) 246-3101

Attorneys for Defendant, Victor Miller

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 2

STATUTORY BACKGROUND .......................................................................... 5

ARGUMENT ....................................................................................................... 8

I.    PLAINTIFF'S SECOND, THIRD, AND FOURTH COUNTS SHOULD BE
      STRUCK UNDER CALIFORNIA'S ANTI-SLAPP LAW ........................... 8

      A.    California's Anti-SLAPP Statute Applies ....................................... 8

            1.    Federal Courts Sitting in Diversity Routinely Apply
                  State Anti-SLAPP Laws ........................................................ 8

            2.    Connecticut's Choice-of-Law Rules Require Application of
                  California's Anti-SLAPP Statute. ......................................... 10

            3.    California's Anti-SLAPP Statute ......................................... 17

            4.    Plaintiff's Second, Third, and Fourth Counts "Arise" from Protected
                  Activity ................................................................................ 18

                  a.    The Termination Notices Are Protected Under Both Cal. Civ.
                        Proc. Code § 425.16(e)(1) and (2) .......................... 18

                  b.    The Service and Filing of Termination Notices Is Also
                        Protected as Litigation-Related Activity ................. 21

                  c.    The Termination Notices Are Protected Communication
                        Concerning An Issue of Public Interest .................... 22

      B.    Plaintiffs Cannot Show A Reasonable Probability of Succeeding on Their
            Second, Third, and Fourth Counts ................................................ 23

            1.    Plaintiffs Have No Reasonable Probability of Succeeding on Their
                  "Work for Hire" Defense ..................................................... 23

                  a.    Hiring Party's Right to Control Manner and
                        Means of Creation ................................................... 26

                  b.    The Skill Required ................................................... 27

i

c.      The Right to Assign Additional Projects
        to the Hired Party .......................................................27

d.      The Provision of Employee Benefits .......................................27

e.      The Tax Treatment of the Hired Party ...................................28

2.    Plaintiffs' State-Law Counts Are Pre-empted ....................................28

a.      Count II For Breach of Contract Is Preempted .......................32

b.      Count III for Slander of Title is Preempted ...........................35

c.      Count IV for Unfair Competition is Preempted.......................36

3.    Plaintiffs' State-Law Counts Fail for Additional Reasons .................37

4.    Defendants Are Entitled to Their Legal Fees ......................................39

CONCLUSION.................................................................................................40

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Adelson v. Harris*,
774 F.3d 803 (2nd Cir. 2014)..........................................................................9, 17

*Am. Movie Classics Co. v. Turner Entm't Co.*
922 F. Supp. 926, 931 (S.D.N.Y. 1996)..................................................33

*Arawana Mills Co. v. United Techs. Corp.*,
795 F. Supp. 1238 (D. Conn. 1992)........................................................39

*Arpaia v. Anheuser-Busch Companies, Inc.*,
55 F. Supp. 2d 151, 162 (W.D.N.Y. 1999)...........................................33

*Aymes v. Bonelli*,
980 F.2d 857 (2d Cir. 1992)....................................................................25

*Batzel v. Smith*,
333 F.3d 1080 (9th Cir. 2003) ........................................................*passim*

*Birker v. Lam*,
156 Cal. App. 4th 275, 282 (2007) ........................................................22

*Blanchard v. DIRECTV, Inc.*,
123 Cal. App. 4th 903, 918 (2004) ........................................................22

*Blue Nile, Inc. v. Ice.com, Inc.*,
478 F. Supp. 2d 1240, 1250 (W.D. Wash. 2007)...................................36

*Brandewiede v. Emery Worldwide*,
890 F. Supp. 79 (D. Conn. 1994)...........................................................38

*Briggs v. Eden Council for Hope & Opportunity*,
19 Cal. 4th 1106 (1999) ............................................................18, 19, 21

*Cabral v. Martins*,
177 Cal. App. 4th 471 (2009) ................................................................21

*Carter v. Helmsley-Spear Inc.*,
71 F.3d 77 (2nd Cir. 1995)......................................................................27

*CKE Restaurants, Inc. v. Moore*,
159 Cal. App. 4th 262 (2008) ................................................................22

*Chi v. Loyola University Medical Center*,
787 F.Supp.2d (N.D. Ill. 2011) .....................................................*passim*

*Classic Media v. Mewborn*
532 F.3d 978 (9th Cir. 2008) ............................................................................. 21

*Community for Creative Non-Violence v. Reid,*
490 U.S. 730 (1989) .................................................................................... *passim*

*Competitive Technologies v. Fujitsu Ltd.,*
286 F.Supp.2d 1118, 1158 (N.D. Cal. 2003) ..................................................... 16

*Computer Assocs. Int'l v. Altai, Inc.,*
93 Cal. App. 4th 993 (2001) ........................................................................ *passim*

*Computer Horizons Corp. v. Factorum, Inc.,*
No. CV 980584758S, 1999 WL 1126311, (Conn. Super. Ct. Nov. 1 2001) ............ 39

*ComputerXpress, v. Jackson,*
982 F.2d 693, 716 (2d Cir. 1992) ...................................................................... 19

*Containment Techs. Grp., Inc. v. Am. Soc'y of Health Sys. Pharmacists*
No. 1:07-cv-0997-DFH- TAB, 2009 WL 838549, at *8 (S.D. Ind. Mar. 26, 2009) ................ 9

*Cramer v. Crestar Fin. Corp.,*
67 F.3d 294 (4th Cir. 1995) ............................................................................... 35

*Cusano v. Klein,*
2012 WL 2154358 (9th Cir. June 14, 2012) ....................................................... 23

*Dawe v. Corrections USA*
No. CIV. S-07-1790 LKK/EFB, 2009 WL 1420969, (E.D. Cal. May 20, 2009) .................... 13

*DeCarlo v. Archie Comic Publications, Inc.,*
127 F. Supp. 2d 497 (S.D.N.Y. 2001) ............................................................... 34

*Del Madera Properties v. Rhodes and Gardner, Inc.,*
820 F.32d 973, 976 (9th Cir. 1987) ............................................................ 30, 31, 36

*Dixon v. Superior Court,*
30 Cal. App. 4th 733 (1994) ............................................................................. 17

*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman,*
47 Cal. App. 4th 777 (1986) ............................................................................. 22

*Duffy v. Godfread,*
No. 13-cv-1569, 2013 WL 4401390, (N.D. Ill. Aug. 14, 2013) ............................ 16

*Endemol Entm't v. Twentieth Television Inc.,*
48 U.S.P.Q.2d 1524 (C.D.Cal. 1998) ................................................................ 32

*Feldman v. Park Lane Associates*,
160 Cal. App. 4th 1467 (2008) ........................................................................ 22

*Gen. Acc. Ins. Co. v. Mortara*,
52 Conn.Supp. 522 (2012) ............................................................................... 10

*Global Relief Found. v. New York Times Co.*,
No. 01-8821, 2002 WL 31045394 (N.D. Ill. Sept. 11, 2002) ........................... 12, 13

*Godin v. Schenks*,
629 F.3d 79 (1st Cir. 2010) ............................................................................ 9, 10

*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*,
742 F.3d 414 (9th Cir. 2014) ............................................................................ 18

*Guaranty Trust Co. v. York*
326 U.S. 99 (1945) ............................................................................................ 8

*G.S. Rasmussen & Associates, Inc. v. Kalitta Flying Serv., Inc.*,
958 F.2d 896 (9th Cir. 1992) ............................................................................ 29

*Harper & Row Publishers Inc. v. National Enterprises*,
723 F. 2d 195 (2nd Cir. 1983) .......................................................................... 30

*Henry v. Lake Charles American Press, LLC*,
566 F.3d 164 (5th Cir. 2009) ........................................................................... 10

*Hilton v. Harllmark Cards*,
580 F.3d 874 (9th Cir. 2009) ............................................................................ 23

*Idema v. Dreamworks, Inc.*,
162 F. Supp. 2d 1129 (C.D. Cal. 2001) ............................................................ 31

*Intercon Solutions, Inc. v. Basel Action Network*,
969 F.Supp.2d 1026 (N.D. Ill. 2013) ................................................................. 14

*In re Helicopter Crash Near Wendle Creek, British Columbia on Aug. 8, 2002*,
485 F. Supp. 2d 47, 57 (D. Conn. 2007) ........................................................... 4, 12

*Jaiguay v. Vasquez*,
287 Conn. 323, 353 (2008) .............................................................................. 11

*JobPro Temp. Servs., Inc. v. Giftcorp, Inc.*,
No. HHDCV126030121S, 2014 WL 341895, (Conn. Super. Ct. Jan. 7, 2014) ......... 12

*Kashian v. Harriman*,
98 Cal. App. 4th 892 (2002) ............................................................................. 21

*Kearney v. Foley & Lardner*,
553 F. Supp. 2d 1178 (S.D. Cal. 2008) .............................................................. 39, 40

*Ketchum v. Moses*,
24 Ca 4th 1122 (2001) ........................................................................... 39, 40

*Kregos v. Associated Press*,
3 F.3d 656  (2d Cir. 1993)....................................................................... 31, 36

*Larry Spier, Inc. v. Bourne Company*,
953 F.2d 774 (2d Cir. 1992)........................................................................ 21

*Liberty Synergistics, Inc. v. Microflo, Ltd*,
718 F.ed 138 (2d Cir. 2013)................................................................... 8, 9, 12

*Ludwig v. Superior Court*,
37 Cal. App. 4th 8 (1995) ............................................................................. 17

*Makaeff v. Trump Univ*,
715 F.3d 254 (9th Cir. 2013) ..................................................................... 8, 23

*Manufactured Home Communities, Inc. v. County of San Diego*,
655 F.3d 1171 (9th Cir. 2011) ...................................................................... 18

*Martinez v. Metabolife Int'l, Inc.*,
113 Cal. App. 4th 181 (2003) .................................................................. 18, 20

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002).................................................................... 6, 21

*Marvel Worldwide, Inc. v. Kirby*,
777 F. Supp. 2d 720 (S.D.N.Y. 2011)............................................................. 22

*Maxient, LLC v. Symplicity Corp.*,
63 F. Supp. 3d 592 (E.D. Va. 2014) .............................................................. 36

*Mayer v. Josiah Wedgwood & Sons, Ltd.*,
601 F. Supp. 1523, 1535 (S.D.N.Y. 1985)...................................................... 35

*MEECO Mfg. Co. v. True Value Co.*,
2007 U.S. Dist. LEXIS 25986 (W.D. Wash. Apr. 3, 2007)................................ 36

*Medley v. Sandals Resorts Intern.*,
2001 WL 34349043 (Cal. Super. Ct. Apr. 12, 2001).......................................... 30

*Milne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) ...................................................................... 21

*Mindys Cosmetics, Inc. v. Dakar*,
611 F.3d 590 (9th Cir. 2010) ................................................................... 19, 20

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992).................................................................................29

*Motown Record Corp. v. George A. Hormel & Co*,
657 F. Supp. 1236 (C.D. Cal. 1987) .........................................................36

*National Car Rental Sys., Inc. v. Computer Assocs. Int'l Inc.*,
991 F.2d 426 (8th Cir. 1993) ..............................................................33, 35

*Netzer v. Continuity Graphic Associates, Inc.*,
963 F. Supp. 1308 (S.D.N.Y. 1997)..........................................................30

*No Doubt v. Activision Publishing, Inc.*,
192 Cal. App. 4th 1018 (2011) .................................................................23

*N.Y. Times v. Tasini*,
533 U.S. 483 (2001)....................................................................................7

*Neville v. Chudacoff*,
160 Cal. App. 4th 1255 (2008) ......................................................17, 18, 21

*Nygard, Inc. v. Uusi-Kerttula*,
159 Cal. App. 4th 1027 (2008) .................................................................23

*Pacific Gas Elec. Co. v. Energy Resources Conservation and Dev. Comm'n*,
461 U.S. 190 (1983)...................................................................................29

*Partman v. Budget Rent-A-Car of Westchester, Inc.*,
43 Conn. Supp. 239 (Super. Ct. 1994) ......................................................12

*Penguin Group (USA) Inc. v. Steinbeck*,
537 F.3d 193 (2d Cir. 2008).......................................................................21

*Plumley v. Mockett*,
164 Cal. App. 4th 1031 (2008) ..................................................................19

*Pergament v. Green*,
32 Conn.App. 644 (1993) ..........................................................................38

*Powertech Tech., Inc. v. Tessera, Inc.*,
2012 WL 1835699 (N.D. Cal. May 21, 2012) ...........................................20

*Quimby v. Kimberly Clark Corp.*,
28 Conn. App. 660 (1992) ..........................................................................38

*Ray Charles Foundation v. Robinson*,
919 F.Supp.2d 1054 (C.D. Cal. 2013) .............................................19, 20, 37

*Reichhold Chemicals, Inc. v. Hartford Accident & Indem. Co.*,
252 Conn. 774 (2000) ................................................................................11

*Ritchie v. Williams*,
395 F.3d 283 (6th Cir. 2005) ................................................................. 29

*Rogers v. Grimaldi*,
875 F.2d 994 (2nd Cir. 1989)................................................................. 10

*Ruiz v. Harbor View Community Association*,
134 Cal. App. 4th 1456 (2005) ............................................................. 22

*Sarver v. Hurt Locker, LLC*,
No. 2:10-cv-9034-JHN-JCX, 2011 WL 11574477 (C.D. Cal. Oct. 13, 2011) ........ 13

*Scorpio Music S.A. v. Willis*,
2012 U.S. Dist. LEXIS 63858 (S.D. Cal. May 7, 2012)....................... 22

*Selby v. New Line Cinema Corp.*,
96 F. Supp. 2d 1053 (C.D. Cal. 2000) .................................................. 34

*Seltzer v. Barnes*,
182 Cal. App. 4th 953 (2010) ................................................................ 18

*Sharif v. Sharif*,
No. 10- 10223, 2010 WL 3341562 (E.D. Mich. Aug. 24, 2010).......... 13, 14

*Sherrod v. Breitbart*,
843 F.Supp.2d 83(D.D.C. 2012) ............................................................. 9

*Siegel v. Warner Bros. Entertainment*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ...................................... 20, 21, 22

*Stewart v. Abend*,
495 U.S. 207 (1990)................................................................................ 5, 6

*Thomas v. Fry's Electronics, Inc.*,
400 F.3d 1206 (9th Cir. 2005) ................................................................. 9

*Trenton v. Infinity Broad. Corp.*,
865 F. Supp. 1416 (C.D. Cal. 1994) ................................................. 31, 35

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*,
277 F.3d 253 (2d Cir. 2002)................................................................. 7, 36

*Underground Solutions, Inc. v. Palmero*,
41 F. Supp. 3d 720 (N.D. Ill. 2014) .............................................. 13, 14, 17

*United States v. Lockheed Missiles & Space Co.*,
190 F.3d 963 (9th Cir. 1999). ......................................................... 9, 17

*USANA Health Sciences, Inc. v. Minkow*,
No. 2:07-cv-159 TC,2008 WL 619287 (D. Utah Mar. 4, 2008)........................................ 10, 16

*U.S. Ex Rel. Berge v. Board of Trustees of Univ. of Ala.*,
104 F.3d 1453 (4th Cir.) ........................................................................................... 30

*W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*,
322 Conn. 541 (2016) ................................................................................................ 10

*Warner Bros., Inc. v. American Broadcasting Co's*,
720 F.2d 231 (2d Cir. 1983)............................................................................ 20, 21, 36

*Web Press Services Corporation v. New London Motors, Inc.*,
203 Conn. 342 (1987) ................................................................................................ 38

*Wells Fargo Bank, N.A., Tr. v. Konover*,
322 Conn No. 3:05CV01924(CFD)(WIG, 2010 WL 814894
(D. Conn. Mar. 5, 2010 ) ........................................................................................... 10

*Wilbanks v. Wolk*,
121 Cal. App. 4th 883 (2004) .................................................................................... 22

*Wolff v. Inst. of Elec. & Elecs. Engineers, Inc.*,
768 F. Supp. 66 (S.D.N.Y. 1991) .............................................................................. 33

*Worth v. Universal Pictures, Inc.*,
5 F.Supp.2d 816 (C.D.Cal. 1997) .............................................................................. 34

*Wrench LLC v. Taco Bell Corp.*,
256 F.3d 446, 457 (6th Cir. 2001) ............................................................................. 33

*XPO Logistics, Inc. v. C.H. Robinson Worldwide, Inc.*,
No. FSTCV156024751S, 2015 WL 5893815, at *2 (Conn. Super. Ct. Sept. 8, 2015) ............ 12

## **Statutes**

Cal. Civ. Proc. Code § 425.16 (c) ................................................................... passim

Cal. Civ. Proc. Code § 425.16 (e) ................................................................... passim

Connecticut General Statutes § 42-110a ...................................................................8

Connecticut General Statutes § 42-110b...............................................................8, 38

17 U.S.C. § 101 ........................................................................................... passim

17 U.S.C. § 102 ........................................................................................... passim

17 U.S.C. § 304(c) ....................................................................................... passim

17 U.S.C. § 203(a) ....................................................................................... passim

17 U.S.C. § 301 ........................................................................................................ passim

28 U.S.C. § 2201(a) .........................................................................................................4

**Other Authority**

37 C.F.R. § 201. ................................................................................................. 4, 7, 19

H.R. Rep. No. 105-452, 105th Congress, 2d Sess., at 8 (1998).................................... 4

H.R. Rep. No. 94-1476 at 140 (1990),
*reprinted in* 1976 U.S.C.C.A.N. at 5756 .........................................................*passim*

1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 1.01 .............................*passim*

3 M. Nimmer & D. Nimmer, *Nimmer On Copyright*, §9.02 ............................*passim*

3 Am.Jur.2d *Agency* § 19 (2002) ............................................................... 9, 27

Restatement (Second) of Conflict of Laws § 6. ..................................................... 10

Restatement (Second) of Conflict of Laws § 145. .........................................*passim*

## INTRODUCTION

Defendant Victor Miller, a novelist and freelance screenwriter, authored an original treatment and screenplay (incorporating his treatment), initially entitled "The Long Night at Camp Blood" on which the first "Friday the 13th" movie was based.  Plaintiffs assert in their Second, Third and Fourth Claims, respectively, that Mr. Miller breached his freelance screenwriting contract, libeled their copyrights and engaged in unfair competition, by filing and serving, pursuant to the Copyright Act, 17 U.S.C. § 203(a), notices of termination of copyright transfer regarding his screenplay. Plaintiffs' state-law claims seek to punish Mr. Miller for exercising his federally mandated termination right.

Miller is a long-time resident of California.  California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16(e), which protects its citizens such as Miller, applies under Connecticut's choice of law rules and accepted "depecage" principles. As shown below, Miller's filing with the U.S. Copyright Office of a termination notice pursuant to the Copyright Act and the regulations promulgated thereunder constitutes petition activity protected under California's anti-SLAPP statute. Accordingly, Plaintiffs bear the burden of demonstrating a reasonable probability that they will prevail on their state-law claims, or such claims must be struck at this juncture under the anti-SLAPP law.  Each of Plaintiffs' state-law counts rests on their singular assertion that Miller's statutory notices of termination are invalid because his screenplay was purportedly a "work for hire" under Section 101 of the Copyright Act. Plaintiff, however, cannot meet its burden, as a matter of law, because at most the screenplay is a "work specially … commissioned for use … as part of a motion picture" under Section 101(2), requiring that "the parties expressly agree in a written instrument … that the work shall be considered a work made for hire." Here Miller's contract relied upon by Plaintiffs and attached as Exhibit 1 to their complaint plainly

contains no such statement.  Given this absolute barrier, Plaintiffs apparently seek to qualify the

Screenplay as "work for hire" under Section 101(1) applicable to a traditional "employee" even

though Miller was obviously a freelancer.  But this tact also implodes as Plaintiffs cannot meet

their burden under *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) of

demonstrating that Miller is an "employee" under the federal common law of agency factors

governing such determination.  Notwithstanding these failures, Plaintiffs also cannot demonstrate

a probability of success as to their state-law claims because each is preempted as a matter of law

under Section 301(a) of the Copyright Act, in addition to other intrinsic infirmities. For these

reasons, the Court should strike Plaintiff's Second Third and Fourth Claims and award

Defendant attorney's fees and costs pursuant to the anti-SLAPP statute.

## FACTUAL BACKGROUND

Plaintiff Victor Miller ("Miller"), a Yale graduate, is the author of numerous novels,

screenplays and teleplays, including the original *Friday the 13th* movie (1980) (the "Film").

Declaration of Victor Miller ("Miller Decl."), ¶¶ 3-4.  Miller's best friend was an independent

film producer/director named Sean Cunningham ("Cunningham"). Miller Decl., ¶ 5. In early

1979 Cunningham suggested to Miller that they do a movie together like the low-budget slasher

hit *Halloween* (1978). Miller Decl., ¶ 6. After seeing "Halloween" Miller swiftly wrote a detailed

film treatment entitled "The Long Night at Camp Blood" (the "Treatment").  Miller Decl., ¶ 7.

A couple weeks thereafter he wrote an original screenplay, incorporating his Treatment, also

titled "The Long Night At Camp Blood." (the "First Draft") Miller Decl., ¶ 8.  Miller wrote his

Treatment and First Draft screenplay at home on his typewriter, essentially on spec without

compensation or even a contract at that time. Miller Decl. ¶ 14.

Cunningham came up with a more commercial title, first "Friday 13," later "Friday the

13th." Miller Decl., ¶ 9. Miller wrote a second draft screenplay (the "Second Draft") and used the title "Friday 13." Miller Decl., ¶ 11. Cunningham presented Miller with a short-form writing contract (the "Agreement," Complaint, Ex. 1)[1] between Miller and Plaintiff The Manny Company ("Manny"), an alleged limited partnership of which Cunningham was the alleged general partner. Miller Decl. ¶ 10. Miller promptly signed the Agreement in early June, 1979. *Id.* On information and belief, by this time Miller had completed or substantially completed his Second Draft. Miller Decl. ¶ 11. Miller thereafter made only minor revisions to the Second Draft with the exception of revising the ending (Final Draft). Miller Decl. ¶ 12. The Treatment, First Draft, Second Draft and Final Draft are collectively referred to as the "Screenplay."

It is important to note that the above facts referencing Miller's creation of the Treatment, First Draft and all or most of the Second Draft prior to entering into the Agreement are stated simply for the record but are unnecessary to this motion to strike which, as show below, succeeds even if, as Plaintiffs assert, Miller wrote the Screenplay *after* signing the Agreement.

On July 4, 1979, Cunningham took a full page advertisement in Variety for Friday the 13th which helped him to attract and secure financing. Miller Decl. ¶ 13.  Pre-production was conducted in July – August, 1979 and principal photography of the Film began in early October, 1979, lasting about a month. Complaint, ¶¶ 22-23.  The Film's budget totaled approximately $500,000. Complaint, ¶¶ 22.  The Film was released in the U.S. by Paramount Pictures on May 9, 1980, was highly successful and launched a lucrative franchise. Complaint, ¶ 25. Miller received sole writing credit on the Film. Miller Decl., ¶ 18.  Cunningham and his successors reaped tens of millions; his best friend Miller, the author and creator, received $9,282.  *See* Dkt.

---

[1] Although paragraph 1 of the form contained a box to be checked for writing a "Treatment," this box was not checked.  Complaint, Ex. 1.

1 ("Complaint"), Ex. 1, ¶ 3.

On January 21, 2016, Miller availed himself of his statutory right to recover the U.S. copyright in his Screenplay under Section 203(a) of the U.S. Copyright Act, 17 U.S.C. § 203 (a)[2] by serving a statutory notice of termination on Manny and Cunningham, with an effective termination date of January 25, 2018. Complaint, ¶ 28. On June 27, 2016, Miller served an amended notice of termination, with an effective termination date of July 1, 2018, revised to include as recipients Plaintiff Horror, Inc. ("Horror") and other of Manny's alleged assignees whose assignments were not reflected in the U.S. Copyright Office records. Complaint, ¶ 28.  In an abundance of caution, when the notice to one recipient was returned, Miller, on July 14, 2016, reissued the notice of termination with an effective date of July 15, 2018, and modified some recipient's addresses. Complaint, ¶ 28. Miller and his counsel went to great lengths to comply with the procedures set forth in 17 U.S.C. § 203 (a) and in 37 C.F.R. §201.10, the regulations promulgated thereunder.  Shortly after each of the three notices of termination (collectively, the "Termination Notices" or "Termination") was served, each was filed and recorded with the U.S. Copyright Office in 2016. Miller Decl., ¶ 22. Although Miller wrote the Screenplay in Connecticut, he moved to California shortly thereafter, and has resided in California for decades. Miller Decl., ¶ 19. The Termination Notices were drafted, served and filed in/from California by his California counsel. Miller Decl., ¶ 22.

Within weeks after Horror was served, Plaintiffs filed their Complaint.  Plaintiffs' First Claim is for declaratory relief under 28 U.S.C. § 2201(a) and challenges the validity of the Termination on the ground that the Screenplay was purportedly a "work for hire." Complaint ¶¶

[2] The Copyright Act's termination provisions provide for the recovery of copyrights by authors only within statutory time windows; in Miller's case, 35-40 years after the copyright is deemed transferred (i.e., June, 2014 to June, 2019). 17 U.S.C. § 203(a)(3).

32-34.  The Second Count (*Id.*, ¶¶ 35-42), by Manny alone, alleges that Miller's exercise of his statutory termination right constituted a breach of the Agreement under state law.  The Third Count (*Id.*, ¶¶ 43-48), by Horror, alleges that the Termination Notices slander Horror's "right, title and interest" in Miller's Screenplay under state law.  The Fourth Count (*Id.*, ¶¶ 49-54), by Horror, alleges that the Termination Notices violate the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110 ("CUTPA").  The Complaint makes plain that the gravamen of its three state-law counts is Miller's exercise of his termination right under the Copyright Act.

## STATUTORY BACKGROUND

"The economic philosophy behind the [Copyright] clause … is the conviction that encouragement of individual effort by personal gain is the best way to advance the public welfare through the talents of authors [] in '[] useful Arts.'"  *Mazer v. Stein*, 347 U.S. 201, 219 (1954). Under the Constitution, "it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors." *Sony Corp. v. Universal Studios*, 464 U.S. 417, 429 (1984). Commencing with the Copyright Act of 1831, Congress has used this power to provide authors with the right to recover transferred copyright interests and has strengthened those rights over time. *See Stewart v. Abend*, 495 U.S. 207, 217-20 (1990).

Under the Copyright Act of 1909, copyright protection was divided into two separate 28-year terms:  the "initial" and "renewal" terms. 17 U.S.C. §24 (1976 Ed.). Congress intended the renewal copyright to benefit authors and their families. *See Stewart*, 495 U.S. at 219. Effective January 1, 1978, the Copyright Act of 1976 significantly enhanced authors' rights. 17 U.S.C. § 101 *et seq*. It extended the renewal term under the 1909 Act from 28 to 47 years. 17 U.S.C. § 304(a).  Congress intended to give the benefit of these additional years to authors rather than to grantees for whom the automatic grant of the extension would be a windfall.  *See* H.R. Rep. No.

94-1476 at 140 (1976).  It therefore provided authors and their families with a new right to recapture their copyrights by terminating decades-old copyright transfers "notwithstanding any agreement to the contrary."  17 U.S.C. § 304(c)(5); *see also* 17 U.S.C. § 203(a)(5). The clear Congressional purpose was to prevent authors from waiving their termination right by contract, directly or indirectly. *Marvel Characters, Inc. v. Simon* ("*Simon*"), 310 F.3d 280 (2d Cir. 2002) (Marvel cannot bar the termination right by contractually re-characterizing works as "for hire"); *Stewart,* 495 U.S. at 230 ("1976 Copyright Act provides … an inalienable termination right.").

Sections 304 (c) and (d) [3] apply to pre-1978 works. A closely analogous and related termination provision in the 1976 Act, 17 U.S.C. § 203(a), applicable to Miller's Termination Notices governs transfers after January 1, 1978, and allows the author or his statutory heirs to terminate any copyright transfer by the author, 35 years after such transfer.

The Supreme Court has elucidated the intent and purpose behind the termination provisions of the 1976 Act as follows:

> The principal purpose of the [termination right] was to provide added benefits to authors. The ... concept of a termination right itself, w[as] obviously intended to make the rewards for the creativity of authors more substantial. More particularly, the termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product. That general purpose is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself.

*Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985) (footnote omitted) (interpreting § 304(c)[applicable to pre-1978 transfers] which is comparable to § 203(a) [applicable to post-1977 transfers]). The termination right lies in stark contrast to ordinary contract principles, as it

---

[3] In the Copyright Term Extension Act, Pub. L. 105-298 (1998), Congress reaffirmed its objectives with respect to the 1976 Act's termination provisions by coupling a further renewal term extension with a second termination right in 17 U.S.C. §304(d). *See* H.R. Rep. No. 105-452, 105th Congress, 2d Sess., at 8 (1998).

empowers authors and their statutory heirs to terminate grants of copyright transfers without cause, regardless of the contracting parties' promises, intent or expectations when the transfer was made.  17 U.S.C. § 304(c)(5); § 203(a)(5).

Congress recognized that publishers held far greater bargaining power and that consequently, authors commonly agreed to one-sided grants which precluded them from sharing in the success of their works.  *Id*.  The results were often supremely unfair, as when a work proved to have enduring commercial value, but enriched only the grantee.  Congress thus created termination rights to "safeguard[] authors against unremunerative transfers" made before their works were commercially exploited, and to give authors and their families a second chance to obtain a more equitable portion of a copyright's value when it is no longer conjectural.  H.R. Rep. No. 94-1476, at 124 (1976); *see N.Y. Times v. Tasini,* 533 U.S. 483, 496 n.1 (2001) (recognizing Congress' intent to re-adjust "the author/publisher balance" by providing an "inalienable authorial right to revoke a copyright transfer").

Termination is carried out by serving advance notice of termination on the original grantee or its successor in compliance with the Copyright Act, 17 U.S.C. §§ 304(c)(4)(A), 203(a)(4), and the Register of Copyright's regulations, 37 C.F.R. § 201.10 .  Authors and their heirs may terminate post-January 1, 1978 transfers during a five-year window beginning thirty-five years after the transfer. 17 U.S.C. §304(c)(3). The termination provisions reflect a deliberate balance of competing interests determined by Congress.[4]

---

[4] For instance, the 1976 Act gives a terminated grantee a competitive advantage in reacquiring copyrights recaptured under its termination provisions.  *See* 17 U.S.C. §304(c)(6)(D); 3 Melville Nimmer and David Nimmer, *Nimmer on Copyright* (*"Nimmer"*) §11.08[A], n.6.  As the Act has no extraterritorial application, termination applies only to the U.S. copyright, *id.* §11.02[B][2] at 11-19. This makes exploitation independent of a terminated grantee practically impossible. A terminated grantee may also continue to distribute pre-termination derivative works, 17 U.S.C. §304(c)(6)(A).

"Works for hire" are the sole exemption from the 1976 Act's termination provisions. 17 U.S.C. §§ 304(c), 203(a). Section 101 governs whether a work is a "work for hire."

<u>**ARGUMENT**</u>

**I.     PLAINTIFF'S SECOND, THIRD AND FOURTH CLAIMS SHOULD BE STRUCK UNDER CALIFORNIA'S ANTI-SLAPP LAW**

**A.     California's Anti-SLAPP Statute Applies.**

Connecticut's choice-of-law principles require the Court to apply California's anti-SLAPP statute, Cal. Code of Civil Procedure ("CCP") § 425.16, because Miller is a long-time California resident, his Termination Notices at issue were drafted, served and filed in/from California and the communication and petition activity protected by California's anti-SLAPP statute occurred in California.

**1.     Federal Courts Sitting in Diversity Routinely Apply State Anti-SLAPP Laws.**

As anti-SLAPP laws are substantive in nature, federal courts routinely apply state anti-SLAPP statutes. Further, even if anti-SLAPP statutes were purely procedural, they do not materially conflict with the Federal Rules of Civil Procedure.

The *Erie* doctrine stands for the proposition that "state law, rather than federal common law, applies to matters of substance." *Makaeff v. Trump Univ.*, 715 F.3d 254, 272 (9th Cir. 2013) (Kozinski, A., concurring) (citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78–79 (1938)). Federal courts will not apply state procedural rules that conflict with federal procedural rules. *Id.* Labels like "substance" and "procedure," however, are not controlling for purposes of the *Erie* doctrine. *Guaranty Trust Co. v. York*, 326 U.S. 99, 108-09 (1945); *see also Liberty Synergistics, Inc. v. Microflo, Ltd.*, 718 F.3d 138, 152 (2d Cir. 2013) (in deciding whether a state law is substantive, courts look "not to the *labels* but to the *content* of state rules of decision").

Anti-SLAPP laws are substantive because they affect a litigant's right to be free from

retaliatory litigation for exercising rights of free speech and/or petition. *See Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014)(holding that an anti-SLAPP statute "is substantive within the meaning of *Erie,* since it is consequential enough that enforcement in federal proceedings will serve to discourage forum shopping and avoid inequity and [] does not squarely conflict with a valid federal rule"); *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 144 (2d Cir. 2013) (holding that "California anti-SLAPP rule [is] considered substantive by federal law" and applied to action in New York); *Batzel v. Smith*, 333 F.3d 1080, 1025-26 (9th Cir. 2003) ("Because California law recognizes the protection of the anti-SLAPP statute as a substantive immunity from suit, this court . . . will do so as well."); *Godin v. Schenks*, 629 F.3d 79, 88 (1st Cir. 2010) (holding that Maine's anti-SLAPP statute is "a supplemental and substantive rule"); *Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 (D.D.C. 2012) (holding that the District of Columbia's anti-SLAPP statute is substantive in nature); *Chi v. Loyola University Medical Center*, 787 F. Supp. 2d 797, 808-09 (N.D. Ill. 2011) (holding that Illinois' anti-SLAPP statute is substantive); *Containment Techs. Grp., Inc. v. Am. Soc'y of Health Sys. Pharmacists*, No. 1:07-cv-0997-DFH-TAB, 2009 WL 838549, at *8 (S.D. Ind. Mar. 26, 2009) (describing an anti-SLAPP law as having a "distinctively substantive flavor").

Regardless of whether anti-SLAPP laws are substantive or procedural, the majority rule is that they do not conflict with the Federal Rules of Civil Procedure.  *See United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 972 (9th Cir. 1999) (holding that anti- SLAPP laws do not conflict with the Federal Rules because "there is no indication that Rules 8, 12, and 56 were intended to 'occupy the field' with respect to pretrial procedures aimed at weeding out meritless claims" and because application of the anti-SLAPP law would not undermine any federal interests); *Thomas v. Fry's Electronics, Inc.*, 400 F.3d 1206, 1206 (9th

Cir. 2005) (noting "that California anti-SLAPP motions to strike and entitlement to fees and costs are available to litigants proceeding in federal court, and that these provisions do not conflict with the Federal Rules of Civil Procedure"); *Godin*, 629 F.3d at 88 (holding that Maine's anti-SLAPP law does not conflict with the Federal Rules); *Henry v. Lake Charles American Press, LLC*, 566 F.3d 164, 168-69 (5th Cir. 2009) (reversing an order on a motion to strike pursuant to Louisiana's anti-SLAPP statute); *USANA Health Sciences, Inc. v. Minkow*, No. 2:07-cv-159 TC,2008 WL 619287, at *2 (D. Utah Mar. 4, 2008) ("the anti-SLAPP law does not conflict with the Federal Rules of Civil Procedure");

Therefore because anti-SLAPP statutes are substantive in nature and do not, in any event, conflict with the Federal Rules of Civil Procedure, federal courts routinely apply them.

### 2. Connecticut's Choice-of-Law Rules Require Application of California's Anti-SLAPP Statute.

California's anti-SLAPP law applies to Miller's anti-SLAPP defense. "A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989). Therefore Connecticut choice of law rules apply to this action.

Connecticut has adopted the four-factor "most significant relationship" test set forth in the Restatement (Second) Conflict of Laws § 145(1)-(2) to resolve choice-of-law disputes. *See W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 322 Conn. 541, 557 (2016) ("When evaluating choice of law questions sounding in tort, courts apply the most significant relationship test.")(citing Restatement (Second) Conflict of Laws §§ 6, 145); *Gen. Acc. Ins. Co. v. Mortara*, 52 Conn. Supp. 522, 534 (2012) ("[W]e adopted the most significant relationship approach of the Restatement (Second) for analyzing choice of law issues involving contracts."); *Wells Fargo Bank, N.A., Tr. v. Konover*, No. 3:05CV01924(CFD)(WIG, 2010 WL 814894, at *1 (D. Conn.

Mar. 5, 2010) ("Under this [most significant relationship] test, Maryland substantive law on privilege would apply since Maryland clearly has the most significant ties to the communications at issue.")  The factors of the "significant relationship" test are to be evaluated according to their relative importance with respect to the particular issue. *Jaiguay v. Vasquez*, 287 Conn. 323, 353, (2008) ("It is the significance, and not the number, of [] contacts that determines the outcome of the choice of law inquiry under the Restatement [Second] approach").

The Restatement (Second) Conflicts of Laws § 145 lists several factors to take into account in determining which substantive law to apply: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."

Before Connecticut courts apply this test, however, they first separately characterize each issue because Connecticut follows "a principle known as depecage" wherein "different issues in a single case may be decided according to the substantive law of different states." *Reichhold Chemicals, Inc. v. Hartford Accident & Indem. Co.*, 252 Conn. 774, 783–84 (2000).  This is because "courts have long recognized that they are not bound to decide all issues under the local law of a single state" and the Restatement—by requiring an analysis of each separate "issue"— "makes explicit [a] selective approach to choice of the law governing particular issues." Restatement (Second) of Conflict of Laws § 145, cmt. d.

Connecticut characterizes each issue separately applying a separate choice of law rule to each issue in both tort and contract claims: "To determine which state's law applies, it is first necessary to characterize the issue properly. Although the underlying cause of action involves a contractual dispute, the rule of 'depecage' requires a separate choice of law analysis for each

issue presented. That is, the principle of depecage has been described as the framework under which different issues in a single case … may be decided according to the substantive law of different states. Thus, the fact that this case is primarily about a breach of contract does not mandate that contract choice of law rules apply to the question of successor liability and the continuity of enterprise theory." *JobPro Temp. Servs., Inc. v. Giftcorp, Inc*., No. HHDCV1260 30121S, 2014 WL 341895, at *4 (Conn. Super. Ct. Jan. 7, 2014); *XPO Logistics, Inc. v. C.H. Robinson Worldwide, Inc.*, No. FSTCV156024751S, 2015 WL 5893815, at *2 (Conn. Super. Ct. Sept. 8, 2015) ("More fundamentally, as Plaintiff XPO correctly points out, Connecticut applies the most significant relationship test to tort cases on an issue by issue basis, called depecage."); *In re Helicopter Crash Near Wendle Creek, British Columbia on Aug. 8, 2002*, 485 F. Supp. 2d 47, 57 (D. Conn. 2007) ("Connecticut courts apply the principle of *dépeçage*.").

Connecticut Courts also look to "state interest" when deciding issues of *depecag*e as to particular issues. *Partman v. Budget Rent-A-Car of Westchester, Inc.*, 43 Conn. Supp. 239, 246, (Super. Ct. 1994). ("Application of New York law on the issue of damages, however, *would* indeed impair Connecticut's interest in providing full compensation for its injured domiciliaries. Weighing the relationship of the two states to the occurrence and to the parties, it seems evident that Connecticut has a greater interest in applying its own law regarding the issues of damages owed to the plaintiff.").

Courts also routinely follow the doctrine of *depecage* in cases featuring anti-SLAPP motions. *See Global Relief Found. v. New York Times Co.*, No. 01-8821, 2002 WL 31045394, at *10 (N.D. Ill. Sept. 11, 2002) (holding that "the issue of whether a statement is defamatory … is distinct from the issue of whether that statement is privileged" under anti-SLAPP law); *Liberty Synergistics, Inc., 718* F.3d at 154-55 (holding that the New York district court should have

applied California law to an anti-SLAPP motion even though New York law governed the underlying tort); *Underground Solutions, Inc. v. Palermo*, 41 F. Supp. 3d 720, 723 (N.D. Ill. 2014) (explaining that the choice-of-law analysis for an anti-SLAPP statute is separate from the choice-of-law analysis for an underlying defamation claim because "the anti-SLAPP question involves whether a statement is privileged, not whether its content is defamatory."); *Chi*, 787 F. Supp. 2d at 803 (applying Illinois's anti-SLAPP statute to two Illinois speakers in a case otherwise governed by Arizona defamation law); *Sharif v. Sharif,* No. 10- 10223, 2010 WL 3341562, at *4 (E.D. Mich. Aug. 24, 2010) (unpublished)(applying Indiana anti-SLAPP law in a defamation case otherwise governed by Michigan law). Indeed, a comment to the Restatement— on which Connecticut choice-of-law principles are based—clarifies that, independent of the law underlying a cause of action, another state's law may be used "to determine whether one party is immune from tort liability to the other." Restatement (Second) of Conflict of Laws § 145, cmt. d.

Therefore, this Court must separate Mr. Miller's anti-SLAPP defense from the Plaintiffs' underlying state-law claims and identify the factors that are most appropriate to consider in applying the "most significant relationship" test to an anti-SLAPP defense. *See Sarver v. Hurt Locker, LLC*, No. 2:10-cv-9034-JHN-JCX, 2011 WL 11574477, at *2-3 (C.D. Cal. Oct. 13, 2011) (unpublished) (applying California's anti-SLAPP law in a case transferred from New Jersey and under New Jersey's choice of law rules); *Dawe v. Corrections USA*, No. CIV. S-07-1790 LKK/EFB, 2009 WL 1420969, at *5-8 (E.D. Cal. May 20, 2009) (unpublished) (applying California's anti-SLAPP law in a case transferred from Wyoming and under Wyoming's choice of law rules); *Global Relief Found.*, 2002 WL 31045394, at *11 (applying Illinois law to a defamation claim but California law to an anti-SLAPP defense).

The most important factors in determining which state's law governs an anti-SLAPP

defense are the defendant's domicile and the place where the protected speech took place.

*Intercon Solutions, Inc. v. Basel Action Network*, 969 F. Supp.2d 1026, 1035 (2013) ("In determining which law to apply to defenses raised pursuant to anti-SLAPP statutes, courts have found the place where the allegedly tortious speech took place and the domicile of the speaker central to the choice-of-law analysis."). This reflects "a recognition that the purpose of an anti-SLAPP law is to encourage the exercise of free speech and that states have a strong interest in having their own anti-SLAPP law applied to the speech of their own citizens, at least when that speech is initiated within the state's borders." *Id*. Accordingly, while the place of the injury may be significant in determining which *defamation* law applies, "in the anti- SLAPP context this factor is less important." *Chi*, 787 F. Supp. 2d at 803 (holding that Illinois had the most significant relationship to the anti-SLAPP defense because the defendants were citizens of Illinois and their speech occurred in Illinois.); *see also Underground Solutions*, *Inc.,* 41 F. Supp. 3d at 726 (noting that the speaker's domicile is "one of the 'central' factors to be considered" in an anti-SLAPP choice-of-law analysis and holding that "a state's acute interest in protecting the speech of its own citizens . . . counsels in favor of applying the anti-SLAPP statute of a speaker's domicile to his statements"); *Sharif*, 2010 WL 3341562, at *4 (because the book at issue was written and published in Indiana by an Indiana publisher, Indiana's anti-SLAPP statute applied to a defamation case brought in Michigan).

Here, Mr. Miller is a long-time California resident. Miller Decl., ¶ 19.  In the context of an anti-SLAPP motion, these factors—domicile and the place in which the protected activity occurred or was initiated—are the most important factors in the significant relationship test.  *See Chi,* 787 F. Supp. 2d at 803 ("Though the place of injury is a central factor in determining what law governs a tort claim, in the anti-SLAPP context this factor is less important. . . . In light of

[the policy goals of anti-SLAPP statute], the place where the allegedly tortious speech took place and the domicile of the speaker are central to the choice-of-law analysis on this issue.").  When the defendant's protected activity is "initiated within the state's borders," that state "has a strong interest in having its own anti-SLAPP law applied to the speech of its own citizens."  *Id*.

The other factors also weigh in favor of California law and the California anti-SLAPP statute applying in this case.  For fifteen years, Mr. Miller has had no connections to Connecticut (Miller Decl. ¶ 19).  Sean S. Cunningham, the principal of Sean S. Cunningham Films, Ltd., Plaintiff Manny's general partner (Complaint ¶ 10), is also a long-time resident of California. Miller Decl., ¶ 20. Manny, a film production partnership, originally formed in Connecticut, routinely did business in Los Angeles, California where the movie business is centered and Cunningham, the principal of its general partner (Sean S. Cunningham Films, Ltd.) resides. Miller Decl., ¶ 20.  It is equally clear that Plaintiff Horror, Inc. ("Horror") though incorporated in Massachusetts also routinely conducts business in Los Angeles, with respect to the *Friday the 13th* film franchise it controls. Complaint, ¶ 9. Horror is the successor in interest to Georgetown Productions, Inc. ("Georgetown") which financed the Film. Complaint, ¶ 3. Georgetown was registered with the California Secretary of State to do business in California, with a Los Angeles address, and of course, like Plaintiffs Manny and Horror, regularly conducted business in Los Angeles with respect to the Film and the Friday the 13th film franchise. *See* http://kepler.sos.ca. gov/ (search Georgetown Productions after selecting "Search Type: Corporation Name."). Unsurprisingly then, Plaintiffs lead counsel, Bonnie Eskenazi of Greenburg Glusker, like Miller's counsel, Marc Toberoff of Toberoff & Associates, is a California attorney. Finally, the Film based on Miller's Screenplay was distributed by Paramount Pictures Corporation which is headquartered in Hollywood. *See* https://en.wikipedia.org/wiki/Paramount_Pictures.

To the extent Plaintiffs have suffered any injury (e.g., loss of business revenues, reputational damage, etc.), it is far more likely to have occurred in California than in Connecticut as Los Angeles is the center of the entertainment industry.  There has never been any relationship between Horror and Miller, and Miller has had no relationship to speak of with Manny or its principal Sean S. Cunningham for more than 35 years. Miller Decl., ¶ 21.

As a citizen of California, Miller is entitled to the protection of his state's anti- SLAPP statute. *See Diamond Ranch Acad., Inc. v. Filer*, 117 F. Supp. 3d 1313, 1324 (D. Utah 2015) ("Ms. Filer's California residence, California's strong interest in protecting its citizens' free speech activities, and the court's conclusion that the record, fairly construed, shows that much of the speech likely originated in California, all weigh strongly in favor of applying California's . . . anti-SLAPP law."); *USANA Health Sciences, Inc. v. Minkow*, No. 2:07-cv-159 TC, 2008 WL 619287, at *3 (D. Utah Mar. 4, 2008) (unpublished) (concluding a California defendant "can bring a motion to strike under the California anti-SLAPP statute in this lawsuit" brought by a Utah plaintiff); *Duffy v. Godfread*, No. 13-cv-1569, 2013 WL 4401390, at *4 (N.D. Ill. Aug. 14, 2013) (unpublished) (applying forum state's law for defamation claim and the non-forum state's anti-SLAPP statute, reasoning that "[s]tates have strong interests in the application of their own anti-SLAPP laws to their own citizens' speech.) *See also Competitive Technologies v. Fujitsu Ltd.*, 286 F.Supp.2d 1118, 1158 (N.D. Cal. 2003) ("The court held that the anti-SLAPP statute applied on the basis that 'California has a great interest in determining how much protection to give California speakers such as the Chronicle.'"); *Chi*, 787 F. Supp. 2d at 803 ("Though the place of injury is a central factor in determining what law governs a tort claim, in the anti-SLAPP context this factor is less important. . . . [T]he place where the allegedly tortious speech took place and the domicile of the speaker are central to the choice-of-law analysis on this issue. A

state has a strong interest in having its own anti-SLAPP law applied to the speech of its own citizens . . . ."); *Underground Solutions, Inc.*, 41 F. Supp. 3d at 727(collecting cases).

Taking all these factors into consideration, this Court should hold that California is the state with the most significant relationship to the claims and apply California's anti-SLAPP statute.

### 3.     California's Anti-SLAPP Statute

California's anti-SLAPP law, Cal. Code of Civil Procedure ("CCP") § 425.16, provides substantive immunity from suit and the speedy dismissal of claims that interfere with the exercise of speech and petition rights, including the right to communicate with government offices. *See Ludwig v. Superior Court*, 37 Cal. App. 4th 8, 14 (1995); *Neville v. Chudacoff*, 160 Cal. App. 4th 1255, 1268-69 (2008). "These are lawsuits that 'masquerade as ordinary lawsuits' but are brought to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Batzel*, 333 F.3d at 1023–24 (citation omitted).  It is a remedy designed to quickly dispose of "lawsuits brought primarily to chill the valid exercise of constitutional rights of freedom of speech and petition . . . ." CCP § 425.16(a); *Dixon v. Superior Court*, 30 Cal. App. 4th 733, 741 (1994).  "The hallmark of a [SLAPP claim] is that it lacks merit and is brought with the goals of obtaining an economic advantage over a citizen party by increasing the cost of litigation . . . ." *United States v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970-71 (9th Cir. 1999).  The anti-SLAPP law applies to state-law claims filed in federal court, such as Plaintiff's Second, Third and Fourth Claims.  *Adelson*, 774 F.3d at 809.

An anti-SLAPP motion to strike involves a two-step process.  *First*, a defendant is required to make a prima facie showing that the plaintiff's suit arises from activity that is protected under the anti-SLAPP law.  *Second*, "[t]he burden then shifts to the plaintiff to establish a reasonable probability that the plaintiff will prevail on his or her [] claim."  *Batzel*,

333 F.3d at 1024.   As to the first prong, "it is the principal thrust or gravamen of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies." *Martinez v. Metabolife Int'l, Inc.,* 113 Cal. App. 4th 181, 188 (2003).  However, even if a claim concerns activity that is not protected under § 425.16, the cause of action will still be subject to the anti-SLAPP law so long as the protected activity is not "merely incidental" to the claim.  *Seltzer v. Barnes*, 182 Cal. App. 4th 953, 962-63 (2010).  *See also Neville*, 160 Cal. App. 4th at 1261-62.

In applying this two-step process, courts must heed the California Legislature's, the California Supreme Court's and Ninth Circuit's admonition that the anti-SLAPP statute "shall be construed broadly."  Cal. Code Civ. Proc. § 425.16(a); *Briggs v. Eden Council for Hope & Opportunity,* 19 Cal.4th 1106, 1118 (1999); ("providing that the statute shall be construed broadly"); *Manufactured Home Communities, Inc. v. County of San Diego*, 655 F.3d 1171, 1176 (9th Cir. 2011) ("The legislature instructed courts that the statute 'shall be construed broadly.'"); *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 421 (9th Cir. 2014) (noting that California's anti-SLAPP statute must be construed broadly).

### 4. Plaintiff's Second, Third and Fourth Counts "Arise" From Protected Activity

#### a. The Termination Notices are Protected Under Both Cal. Civ. Proc. Code § 425.16(e)(1) and (2)

Acts protected by the anti-SLAPP statute include:

"(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Cal. Civ. Proc. Code § 425.16(e).

"The constitutional right to petition . . . includes the basic act of filing litigation or otherwise seeking administrative action." *Briggs*, 19 Cal. 4th at 1115. To protect this conduct, the anti-SLAPP statute explicitly applies to, among other things, "any cause of action against a person arising from any statement or writing made in, or in connection with an issue under consideration or review by, an official proceeding or body." *Briggs*, 19 Cal.4th at 1113; Cal. Civ. Proc. Code § 425.16(e)(1)-(2). The courts have routinely construed this language to cover "communications to official administrative agencies." *ComputerXpress, v. Jackson*, 93 Cal. App. 4th 993, 1009 (2001).  Furthermore, "an attempt to establish a property right under a comprehensive federal statutory scheme" constitutes petition activity protected by the anti-SLAPP law. *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 597 (9th Cir. 2010) (holding that an application to the U.S. Trademark Office is protected under both § 425.16(e)(1) and (2)).[5]

In *Ray Charles Foundation v. Robinson* ("*Ray Charles*"), 919 F.Supp.2d 1054, 1061-64 (C.D. Cal. 2013) *rev'd on other grounds* 795 F.3d 1109 (9th Cir. 2015), a case directly on point, the filing of notices of termination with the U.S. Copyright Office by Mr. Charles' children, pursuant to 17 U.S.C. § 203(a) and 37 C.F.R. § 201.10, just as Defendant Miller has done here, was held to be protected activity under California's anti-SLAPP statute, § 425.16(e)(1) and (2). *See also Plumley v. Mockett*, 164 Cal. App. 4th 1031 (2008) (granting Anti-SLAPP motion to strike claims for filing with the U.S. patent office); *Briggs*, 19 Cal. 4th at 1109-10 (granting anti-SLAPP motion where lawsuit was based on filing with a government agency).

"The termination provisions under the Copyright Act are 'formalistic and complex, such that authors, or their heirs, successfully terminating the grant to the copyright in their original work of authorship' only do so 'against all odds.'" *Ray Charles*, 919 F.Supp.2d at 1063 (citing

---

[5] It is long-established that copyrights are a property right.  *See Sony Corp.*, 464 U.S. at 431 (describing copyright interests as "property").

*Siegel v. Warner Bros. Entm't Inc.*, 542 F.Supp.2d 1098, 1101–02 (C.D. Cal. 2008)).  Here,

Miller served his statutory Termination Notices on the copyright grantee and its successors and

filed these notices with the U.S. Copyright Office as required by 17 U.S.C. §§ 203(a)(4)(A), (B)

in order  "to establish a property right" under the Copyright Act's comprehensive termination

scheme.  *Mindys Cosmetics, Inc.*, 611 F.3d at 597; *Ray Charles*, 919 F. Supp. at 1063.

It is precisely this protected conduct that Plaintiffs seeks to punish with their Second,

Third and Fourth Claims.  According to Plaintiffs, by virtue of the Termination Notices, Miller

breached Manny's contract regarding the Screenplay (Second Claim); libeled Horror's alleged

copyright in the Screenplay (Third Claim); and engaged in unfair competition against Horror

(Fourth Claim).  *See* Complaint ¶ 40 ("Miller has materially breached … the Employment

Agreement by … (a) issuing the Termination Notices; (b) sending the Termination Notices");  ¶

44 (Miller's Termination Notices … constitute false statements derogatory to Horror's title in

and to the Screenplay'); ¶ 50 ("Miller's acts of knowingly sending the false Termination Notices

… violat[e] [] the Connecticut Unfair Trade Practices Act").

Defendant's statutory terminations, filed with the U.S. Copyright Office, are

unquestionably the "gravamen" of Plaintiff's state-law claims.  *Martinez,* 113 Cal. App. 4th at

188.  Plaintiffs do not allege, identify, or attempt to ground their Second, Third and Fourth

Counts in any other conduct.  Such claims do not merely "arise" from activity that is protected

under the anti-SLAPP statute; rather, they exclusively and directly target that activity.  *See*

*Powertech Tech., Inc. v. Tessera, Inc.*, 2012 WL 1835699 *7 (N.D. Cal. May 21, 2012)

(dismissing breach of contract and breach of covenant of good faith claims where "[b]ut for

[defendant's] filing" with a federal agency, plaintiff "would have no basis for the claims").

b.      The Service and Filing Of Termination Notices Is
Also Protected As Litigation-Related Activity

"As CCP § 425.16's protection extends to 'any act … in furtherance of the [] right of petition,' the statute also protects "litigation-related activities," and courts adopt an "expansive view of what constitutes litigation-related activities." *Kashian v. Harriman*, 98 Cal. App. 4th 892, 908 (2002); *Cabral v. Martins,* 177 Cal. App. 4th 471 (2009) (lawyer's revision of will before testator died was protected conduct because eventually the revised will would need to be filed with a probate court). Thus, "communications preparatory to or in anticipation of the bringing of an action" are protected. *Briggs*, 19 Cal. 4th at 1115; *see Neville*, 160 Cal. App. 4th at 1268 (if a communication "concern[s] the subject of the dispute" and is in "anticipation of litigation," it is protected); *Salma v. Capon*, 161 Cal. App. 4th 1275, 1285 (2008) ("Communications made in preparation for or in anticipation of … an action … fall within the ambit of these subdivisions.")

The service and filing of a termination notice is naturally adversarial, as it involuntarily extinguishes the grantee's ownership of a U.S. copyright.  When those copyrights are valuable, the service and filing of termination notices invariably acts as the opening salvo to a lawsuit and/or related settlement negotiations.  Absent a settlement, the terminated grantee sues to invalidate the termination, or they repudiate the termination, forcing the terminating party to go to court to enforce the termination.[6]  *See, e.g.*, *Classic Media, Inc.*, 532 F.3d 978; *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005); *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002); *Larry Spier, Inc. v. Bourne Company*, 953 F.2d 774 (2d Cir. 1992);  *Siegel*, 542 F. Supp. 2d

---

[6] Miller's counsel who drafted, filed and served the termination notices is a copyright litigator. *See, e.g.*, *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008); *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1116 (E.D. Cal. 2008).

1098; *Siegel*, 496 F. Supp. 2d 1111; *Scorpio Music S.A. v. Willis*, 2012 U.S. Dist. LEXIS 63858

(S.D. Cal. May 7, 2012); *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720 (S.D.N.Y. 2011).

In this respect, notices of termination are comparable to other legal notices that courts

have consistently held are protected litigation-related activity.  *See Salma*, 161 Cal. App. 4th at

1285 (holding notice of rescission of contract protected as litigation-related activity); *CKE

Restaurants, Inc. v. Moore*, 159 Cal. App. 4th 262, 271 (2008) (holding that notice to restaurant

of health code issues was protected litigation-related activity); *Birker v. Lam*, 156 Cal. App. 4th

275, 282 (2007) (holding notice terminating tenancy is protected litigation-related activity).

Termination notices likewise resemble other sorts of *protected* communications made in

anticipation of litigation, such as pre-lawsuit demand letters.  *See Blanchard v. DIRECTV, Inc.*,

123 Cal. App. 4th 903, 918 (2004); *Feldman v. Park Lane Associates*, 160 Cal. App. 4th 1467,

1481-82 (2008).

         c.     The Termination Notices Are Protected Communications
                Concerning An Issue Of Public Interest

Cal. Civ. Proc. Code § 425.16(e)(4) extends protection to "any other conduct in

furtherance of the exercise of the constitutional right of petition or the constitutional right of free

speech in connection with a public issue or an issue of public interest." California courts have

held that this section protects not only public communications and petitions, but also "private

conversations regarding a public issue." *Ruiz v. Harbor View Community Association*, 134 Cal.

App. 4th 1456 (2005); *see also Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 897 n.4 (2004)

("Section § 425.16, therefore, governs even private communications, so long as they concern a

public issue."); *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, 47 Cal. App. 4th 777, 784

(1986) ("The fact that the communication was made to other private citizens rather than to the

official agency does not exclude it from the shelter of the anti-SLAPP suit statute").

In determining whether communications concern a "public issue," the courts adopt a "broad view." *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1041 (2008). The "issue need not be 'significant to be protected by the anti-SLAPP statute – it is enough that it is one in which the public takes an interest." *Id.* at 1042. *See Hilton v. Hallmark Cards*, 580 F.3d 874, 888 (9th Cir. 2009)(card spoofing Paris Hilton held protected under the anti-SLAPP statute as it concerned "matters of widespread public interest"); *No Doubt v. Activision Publishing, Inc.*, 192 Cal. App. 4th 1018, 1027 (2011) (use of the likenesses of the band No Doubt was a matter of public interest "because of the widespread fame No Doubt had achieved"); *Cusano v. Klein*, 2012 WL 2154358 at * 1 (9th Cir. June 14, 2012) ("The challenged activities were in connection with a public issue because they relate to KISS and its members[.]").

Here, the challenged Termination Notices concern *Friday the 13th*, which is "one of the most successful and iconic film franchises of all time." Complaint, ¶ 6. Plaintiffs would be hard pressed to assert that this is not a matter of public interest protected by CCP § 425.16(e)(4).

### B. Plaintiffs Cannot Show A Reasonable Probability Of Succeeding On Their Second, Third and Fourth Counts.

#### 1. Plaintiffs Have No Reasonable Probability of Succeeding on Their "Work For Hire" Defense.

As Plaintiff's Second, Third and Fourth Counts each attack activity protected by the anti-SLAPP statute, Plaintiff has the burden of establishing by admissible evidence that it has a "reasonable probability" of prevailing on each claim. *Batzel*, 333 F.3d at 1024.[7] Plaintiffs cannot make this showing as Miller's Termination Notices are valid under the 1976 Copyright Act, 17 U.S.C. § 101 *et seq.* (the "1976 Act" or "Act").

---

[7] Motions to strike under California's anti-SLAPP statute are not limited to the plaintiff's allegations in its complaint, and "almost invariably require consideration of matters outside the pleadings." *Makaeff*, 736 F.3d at 1180.

The 1976 Act which became effective on January 1, 1978 applies to the Screenplay written by Miller in 1979. Complaint, ¶ 22. As the author of the Screenplay Miller held the inalienable right to recover its copyright pursuant to Section 203(a). 17 U.S.C. § 203(a).

"Works for hire" are the sole exemption from the Act's termination rights. 17 U.S.C. §§ 203(a), 304(c).  Plaintiffs' entire complaint is thus based on their conclusory allegation that the Screenplay is the "work for hire" of Manny.  This is the sole alleged ground for Plaintiffs' federal count requesting a declaratory judgment that the Termination Notices are invalid (Complaint ¶¶ 29, 34), and, in turn, of Plaintiffs' three state-law counts. Complaint, ¶¶ 35-54. As Plaintiffs have no reasonable probability of succeeding on their "work for hire" defense they have no reasonable probability of succeeding on their state-law counts either.

"Work for hire" is a statutorily defined term (17 U.S.C. § 101), and is an exception to the general rule that the person who creates a work is its legally recognized author.  *Id*., § 203(a).

Section 101 of the 1976 Act provides that a work is "for hire" under two circumstances:

> (1) a work prepared by an employee within the scope of his or her employment; or
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

Plaintiffs cannot establish a "reasonable probability" of prevailing, *Batzel*, 333 F.3d at 1024, because (at best) Miller, a freelance writer, was hired by Manny as an independent contractor to write the Screenplay – a "work specially ordered or commissioned for use … as part of a motion picture." But Miller's Agreement (Complaint, Ex. 1) clearly fails to "expressly" state "that the work shall be considered work made for hire." 17 U.S.C. §101(2). With no place to turn, Plaintiffs apparently allege that Miller was Manny's "employee" under Section 101(1).

In *Community for Creative Non-Violence v. Reid* ("*CCNV*"), 490 U.S. 730, 739 (1989), the Supreme Court held:

> Although the Act nowhere defines "employee," "employment," or related terms, it must be inferred that Congress meant them in their settled, common-law sense, since nothing in the text of the work for hire provisions indicates that those terms are used to describe anything other than the conventional relation of employer and employee.

*Id*. at 731.   *CCNV* drew a clear distinction between an "employee" and an independent contractor, stating that "when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe *the conventional master-servant relationship as understood by [the] common-law agency doctrine.*" *Id*. (emphasis added).

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. See Restatement § 220(2) (setting forth a nonexhaustive list of factors relevant to determining whether a hired party is an employee). No one of these factors is determinative.

*Id.* at 750 (internal footnotes omitted).

The Second Circuit emphasizes the following five "factors [which] will almost always be relevant and should be given more weight in the analysis, because they will usually be highly probative of the true nature of the employment relationship":  "(1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party." *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992).

- 25 -

a.    Hiring Party's Right to Control the Manner and Means of Creation

First, it can hardly be said that Manny had "the right to control the manner and means of [Miller's] creation" of the Screenplay based on the Agreement (which enables Manny to approve drafts) when Mr. Miller wrote the Screenplay prior to entering into the form Agreement with Manny.  Notwithstanding this, the additional agency law factors related to control over a work's creation such as whether it was done at the employer's location or whether the employer provided the instrumentalities and tools to create the work weigh against Plaintiffs, as Mr. Miller wrote the Screenplay at his home, using his own typewriter and paper, not at Manny's "office" (a room over the garage at Cunningham's house). Miller Decl., ¶ 14. And of course Miller, not Manny, determined the days and hours he would work on his Screenplay. *Id.*, *see* Complaint (devoid of any contrary allegation). The Agreement does not even contain a schedule for Miller's completion and delivery of the Screenplay. *Id.*, Ex. 1.

Furthermore *CCNV* cautions against placing too much weight on the right of control. *CCNV*, 490 U.S. at 741-742.  In fact, the Supreme Court decided *CCNV* in response to attempts to shoe-horn specially commissioned works, covered by Section 101(2), into Section 101(1), covering traditional employees, based on alleged control, just as Plaintiffs attempt to do here.

> Because a party who hires a "specially ordered or commissioned" work by definition has a right to specify the characteristics of the product desired, at the time the commission is accepted, and frequently until it is completed, the right to control the product test would mean that many works that could satisfy § 101(2) would already have been deemed works for hire under § 101(1).

*Id.* at 741.  *CCNV* similarly disavowed any sort of actual control test.  *Id.* at 742

The reference to "Employment Agreement" in Miller's contract is equally unavailing as independent contractors are routinely "employed" to create "a specially ordered or commissioned work" (under Section 101(2)). *See Marvel*, 310 F.3d, at 291("[U]nder agency law, '[t]he manner

in which the parties designate the relationship is not controlling, … the mere use of the word 'agent' by parties in their contract does not make one an agent who, in fact, is not such."), quoting 3 Am.Jur.2d *Agency* § 19 (2002); *Carter v. Helmsley-Spear, Inc.* 71 F.3d 77, 83 (2nd Cir. 1995)("One of the factors that did not persuade us was the appellants' simplistic contention that usage of the words 'employ' or 'employment' in the agreements between the artists and SIG or the Limited Partnership establishes that the plaintiffs were employees. The use of these terms does not transform them into 'magic words' imbued with legally controlling significance.").

As to the other factors each weigh heavily in favor of the conclusion that the Miller's Screenplay is governed by Section 101(2), *not* Section 101(1).

### b.    The Skill Required

Writing a fictional screenplay is a skilled occupation that is not fungible.  *In re Brown*, 743 F.2d 664, 668 (9th Cir. 1984). *See also Carter*, 861 F. Supp. at 318; *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 258 (2d Cir. 2015).

### c.    The Right to Assign Additional Projects to the Hired Party

Manny had no right to assign Miller any additional projects. Complaint, Ex. 1.

### d.    The Provision of Employee Benefits by the Hiring Party

Manny provided Miller with *no* employee benefits; without limitation, no health insurance, no medical plan, no paid vacation, no pension, nor life insurance. Miller Decl., ¶¶ 16-17. Nor did Manny contribute on Miller's behalf to unemployment insurance or worker's compensation insurance as required for employees.  *Id*.  Notwithstanding Plaintiffs rather carefully worded allegation that "on information and belief [] Miller has received employee benefits as a result of performing his screenwriting services on the Screenplay" (Complaint, ¶ 28), Miller received no such benefits from Manny.

e.     <u>The Tax Treatment of the Hired Party</u>

Mr. Miller was likewise treated by Manny as an independent contractor, not as an employee for tax purposes.  Manny paid Mr. Miller the full flat sum set forth in paragraph 3 of the Agreement and did not withhold from such compensation any income tax, social security and medicare (nor pay an employer's matching amount), nor did Manny report or pay Federal Unemployment tax (FUTA), all as required by law for employees.  Miller Decl., ¶ 16.

None of the above is the least bit surprising given Miller's status as a freelance writer and the exigencies of micro-budget independent film production.

Even if the Screenplay had not been largely written by Miller on spec, given the above factors, the Screenplay could only qualify as Manny's "work for hire" under Section 101(2), which of course it fails to do because "the parties [did not] expressly agree in a written instrument signed by them [the Agreement] that the work shall be considered a work made for hire." 17 U.S.C. § 101(2); Complaint, Ex. 1.

The routine copyright registration certificate of the *Friday the 13th* Film (i.e., "motion picture photoplay in 90 minutes") attached as Exhibit 2 to Plaintiffs' Complaint, which lists Georgetown Productions Inc. ("Georgetown") as the "author" of the Film does nothing to resurrect Plaintiffs' "work for hire" claim.  This registration certificate is for the Film not Miller's Screenplay. More importantly, under Plaintiffs' "work for hire" theory, Manny, the hiring party would be the putative "author" of the Screenplay, <u>not</u> Georgetown, who according to Plaintiffs is Manny's assignee of the Screenplay.  Complaint, ¶¶ 2, 3.

## 2.     Plaintiffs' State-Law Counts Are Pre-empted

Plaintiffs' state-law counts are also preempted as none are based upon any conduct independent of Miller's assertion of copyright by serving and filing Termination Notices.

The Supreme Court has recognized three ways in which federal law may preempt state statutory and common law: (1) "express preemption," (2) "field preemption", or (3) "conflict preemption." *See Pacific Gas & Elec. Co. v. Energy Resources Conservation and Dev. Comm'n,* 461 U.S. 190, 204 (1983).  Express preemption refers to an explicit statutory command that state law be displaced. *See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 382.  Under field or implied preemption, state law may be displaced "if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992) (internal quotation marks omitted).  Finally, conflict preemption displaces state law when it is impossible to comply with both the state and the federal law, *see Pacific Gas,* 461 U.S. at 204, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525 (1977).

The Copyright Act contains an express preemption provision, stating in pertinent part:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 [of the Copyright Act] in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 ... are governed exclusively by this title.

17 U.S.C.A. § 301(a).  Courts and commentators have thus adopted a two-part preemption analysis encompassing (1) a "subject matter requirement" and (2) a "general scope" or "equivalency" requirement. *See National Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997); 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* ("*Nimmer*") §1.01[B][1]-[2].

The Copyright Act "broadly preempts state law claims." *Ritchie v. Williams*, 395 F.3d 283, 285 (6th Cir. 2005).  "Copyright protection is both explicit and broad: [It] prohibits state-law protection for any right equivalent to those in the Copyright Act." *G.S. Rasmussen &*

*Associates, Inc. v. Kalitta Flying Serv., Inc.,* 958 F.2d 896, 904 (9th Cir. 1992). "The Copyright

Act sets out the test for preemption of that state statutory or common law which may conflict

with the federal policies embodied in the Act." *Harper & Row Publishers Inc. v. National*

*Enterprises*, 723 F. 2d 195, 199 (2nd Cir. 1983), *rev'd on other grounds*, 105S.Ct. 2218 (1985).

Section 102 provides that "[c]opyright protection subsists, in accordance with this title, in

original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102.  As a

tangible work of authorship, the Screenplay "comes within the subject matter of section 102."

*Medley v. Sandals Resorts Intern.,* 2001 WL 34349043 at *2 (Cal. Super. Ct. Apr. 12, 2001).

Section 301(a) preempts "all legal or equitable rights that are equivalent to any of the

exclusive rights within the general scope of copyright as specified by section 106 . . . ." Thus

"[t]he Copyright Act preempts a state cause of action if the subject matter of the state law right

falls within the subject matter of federal copyright law and the state law rights are equivalent to

the rights federal copyright law protects." *Netzer v. Continuity Graphic Associates, Inc.*, 963 F.

Supp. 1308, 1321 (S.D.N.Y. 1997). "The reference to Section 106 … in Section 301 … should

be construed by way of identification not limitation. Accordingly, if a state-created right is

'within the general scope of copyright,' it is subject to pre-emption, even if the precise contours

of the right differ from any of those conferred by Section 106." *Nimmer*, § 1.01[B][1] at 1-11

(quoting H.R. Rep. No. 94-1476 (1976) at 130).  "[T]he shadow actually cast by the Act's

preemption is notably broader than the wing of its protection." *U.S. Ex Rel. Berge v. Board of*

*Trustees of Univ. of Ala.,* 104 F.3d 1453, 1463 (4th Cir.), *cert. denied,* 522 U.S. 916 (1997).

"To survive preemption, the state cause of action must protect rights that are qualitatively

different from the copyright rights." *Del Madera Properties v. Rhodes and Gardner, Inc*., 820

F.32d 973, 976 (9th Cir. 1987). The plaintiff must demonstrate that an "'extra element' changes

the 'nature of the action so that it is *qualitatively* different'" from an action under the Copyright Act. *See Kregos v. Associated Press*, 3 F.3d 656, 665–66 (2d Cir. 1993) (quoting *Computer Assocs. Int'l v. Altai, Inc.,* 982 F.2d 693, 716 (2d Cir. 1992) (emphasis in original). But preemption does not turn on the ability to articulate, in the abstract, some "extra element" in a state-law cause of action.  Instead, "the court should engage in a fact-specific inquiry into the actual allegations underlying the claims … so as to determine the 'gravamen' of the state law claim." *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1190 (C.D. Cal. 2001), citing *Entous v. Viacom International Inc.,* 58 U.S.P.Q.2d 1628, 1634-35 (C.D.Cal.2001) and *Kodadek v. MTV Networks, Inc.,* 152 F.3d 1209, 1211-13 (9th Cir.1998).

Here the gravamen of each of Plaintiffs' state-law claims is their assertion of copyright in the Screenplay.  Plaintiffs' state-law claims are "part and parcel of [its] copyright claim" and nearly indistinguishable from it. *Del Madera*, 820 F.3d at 976.  Each of Plaintiffs' state-law counts essentially duplicate its federal count, by asserting copyright in the Screenplay. *See* Complaint, ¶¶ 35-54. Plaintiffs' assertion and protection of copyright via its state-law counts naturally implicates "the exclusive rights within the general scope of copyright." 17 U.S.C.A. § 301(a).  Any other conclusion would be illogical. *See* H.R. Rep. 94-1476 (1976) at 130 ("The intention of section 301 is to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works coming within the scope of the Federal copyright law.").

*Trenton v. Infinity Broad. Corp.*, 865 F. Supp. 1416 (C.D. Cal. 1994) is illustrative. There the plaintiff, like Plaintiffs here, asserted several state-law causes of action, based on its alleged ownership of the copyright to the format for the successful "Loveline" radio program. The district court found many of these claims preempted by the Copyright Act, including unfair

competition and slander of title, holding that "they are based entirely upon plaintiff's owning the

Loveline format. … After carefully reviewing plaintiff's complaint and in particular these

property-based causes of action, this Court finds that these causes of action in essence merely

assert a protectable copyright interest in the Loveline format and defendants' unauthorized use

thereof."  *Id*. at 1428. "The fact that the state-created right is either broader or narrower than its

federal counterpart will not save it from preemption."  *Id*. (quoting *Nimmer*, § 1.01[B][1]).

a. <u>Count II for Breach of Contract Is Preempted</u>

Cases finding breach of contract claims not to be preempted employ two basic theories in

determining that the claims do not protect rights equivalent to copyright:  (i) "the promise" to

perform the contract constitutes an "extra element;" *see, e.g., Architectronics, Inc. v. Control*

*Systems, Inc.,* 935 F.Supp. 425, 438 (S.D.N.Y.1996); and (ii) the scope of rights protected by

contract is not equivalent to that protected by copyright; *see ProCD, Inc. v. Zeidenberg,* 86 F.3d

1447, 1454 (7th Cir.1996) (holding that a claim for breach of a software shrinkwrap license

under Wisconsin law is not preempted).

The problem with the first approach is that the actual "promise" at issue may in fact not

be an "additional element," but so inextricably entwined with a copyright so as to undermine

preemption of the Copyright Act. *See Endemol Entm't v. Twentieth Television Inc.*, 48

U.S.P.Q.2d 1524, 1528 (C.D. Cal. 1998) (unpublished) (holding breach of contract claim not

preempted as no additional rights other than copyright are asserted). The second approach

focuses on the difference in the scope of protection provided by copyright and contract. But as

the examples given in *ProCD* make clear this make sense only where a plaintiff sues on

contractual rights that are *qualitatively different* than those in the Copyright Act. 86 F.3d at 1455.

Without explicitly adopting a new rationale, some courts have premised their analysis not

- 32 -

on conceptual differences between contracts and copyrights, but on whether the specific

contractual provisions alleged in the complaint protect or create rights not equivalent to

copyright. *See, e.g., National Car Rental v. Computer Associates,* 991 F.2d 426, 432–433 (8th

Cir.), *cert. denied,* 510 U.S. 861 (1993) (contractual restriction on use of software license

prohibiting processing of data for a third party constitutes an additional element precluding

preemption, because "[a]bsent the parties' agreement, this restriction would not exist"). *See also

id.* at 434 n. 6 ("Because we decide that the specific contract right [counterclaimant] seeks to

enforce is not equivalent … we do not need to decide whether a breach of contract claim based

on … the exclusive copyright rights is preempted.")

    *Nimmer* lends support to this more specific method of analysis. *Nimmer* § 1.01[B][1][a]

("at times a breach of contract cause of action can serve as a subterfuge to control nothing other

than … works within the subject matter of copyright"). *See also Wrench LLC v. Taco Bell Corp.*,

256 F.3d 446, 457 (6th Cir. 2001) ("We do not embrace the proposition that all state law contract

claims survive preemption.").

    Under this more focused approach many cases have found that the actual breach of

contract claim at issue is preempted under 17 U.S.C. § 301(a). *See Am. Movie Classics Co. v.

Turner Entm't Co.*, 922 F. Supp. 926, 931 (S.D.N.Y. 1996)("[A] breach of contract claim is

preempted if it is merely based on allegations that the defendant did something that the copyright

laws reserve exclusively to the plaintiff."); *Wolff v. Inst. of Elec. & Elecs. Engineers, Inc.*, 768 F.

Supp. 66, 69 (S.D.N.Y. 1991) ("[Defendant] breached its contract with plaintiffs … by infringing

plaintiffs' copyright. It is difficult to see how the resulting claims are qualitatively different.

Accordingly the breach of contract claim is preempted."); *Arpaia v. Anheuser-Busch Companies,

Inc.*, 55 F. Supp. 2d 151, 162 (W.D.N.Y. 1999)("[T]he plaintiff's complaint clearly states that his

breach of [] contract claim is based upon the defendants' alleged use of his copyrighted works. Accordingly . . . the breach of [] contract claim is preempted."); *Selby v. New Line Cinema Corp.*, 96 F. Supp. 2d 1053, 1062 (C.D. Cal. 2000)(finding preemption in that plaintiff's breach of "contract claim falls squarely into the category of contract claims that allege no additional rights"); *Worth v. Universal Pictures, Inc.*, 5 F.Supp.2d 816, 822 (C.D. Cal. 1997) (holding "contract is preempted insofar as it relates to the copyrighted material … Movie screenplays, the subject matter at issue, are encompassed within the federal copyright law.").

This Court should adopt the pragmatic fact-specific approach.

Here, Count II alleges that Miller's Screenplay is a "work for hire" under the Copyright Act and that Miller's Termination Notices and assertion of copyright thereunder constitutes a breach of the Agreement. Complaint ¶ 40.  While the "extra element" of a "promise" may under the right set of facts render a breach of contract claim "qualitatively different" from Plaintiffs' claim under the Copyright Act this case presents no such set of facts. *Computer Assocs. Int'l. Inc..,* 982 F.2d at 716.  Indeed, it is clear from Manny's elucidation of Count II that it depends on the same alleged facts underpinning the copyright claim in Count I. Compare Complaint, ¶¶ 32-34 to ¶¶ 35-42. Nor is the scope of rights asserted in Count II qualitatively different than the scope of rights protected by copyright. In fact, Count II seeks to protect Manny's alleged copyright in the Screenplay and thus rights equivalent to exclusive copyright rights.  Manny does not allege any prohibited conduct beyond that allegedly prohibited by the Copyright Act.

 "Where a claim for breach of contract fails to assert an 'extra element' outside those necessary for a claim of copyright ownership or infringement, it 'can serve as a subterfuge to control nothing other than reproduction, adaptation, distribution, etc., of works within the subject matter of copyright' and therefore is preempted by the Copyright Act." *DeCarlo v. Archie Comic*

*Publications, Inc.*, 127 F. Supp. 2d 497, 509 (S.D.N.Y.), *aff'd*, 11 F. App'x 26 (2d Cir.

2001)(quoting *Nimmer* § 1.01[B][1][a]).  To put it another way, the same Agreement that Manny

claims was purportedly breached by Miller would be breached by Miller's assertion of "any of

the exclusive rights within the general scope of copyright," 17 U.S.C. § 301, with no qualitative

distinction between the two.  *See National Car Rental*, 991 F.2d at 431 (requiring an analysis of

whether "the right in question is 'infringed by the mere act of reproduction, performance,

distribution or display.'")

     As both parts of the Section 301(a) test are met as to Count II, it is preempted.

b.    <u>Count III for Slander of Title is Preempted</u>

     As Horror's Count III for slander of title is also solely premised on Miller's assertion of

copyright in the Screenplay (Complaint, ¶¶ 44, 45), it is preempted by the Copyright Act. The

claim of slander of title has been held preempted. *See Cramer v. Crestar Fin. Corp.*, 67 F.3d 294

(4th Cir. 1995) (unpublished) (affirming "dismissal of several other claims (specifically … the

slander of title to software claim) on the grounds that they were preempted by section 301(a) of

the Copyright Act");  *Trenton.*, 865 F. Supp. at 1428 (dismissing *two* "slander of title" causes of

action "because these property-based causes of action … in essence merely assert a protectable

copyright interest in the [radio] format and defendants' unauthorized use thereof.").

     It is true that Count III alleges malice, however, "the mere fact that a state law requires

*scienter* as a condition to liability will not save if from preemption." *Nimmer*, § 1.01[B][1] at 1-

12.  "An action will not be saved from preemption by elements such as awareness or intent,

which alter 'the action's scope but not its nature ….'" *Computer Associates Int'l, Inc.*, 982 F.2d at

717 (quoting *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F. Supp. 1523, 1535 (S.D.N.Y.

1985). "[T]he element of 'malicious intent' may alter the scope of the claim beyond that limited

by a general intent requirement, but it does not alter its nature." *Maxient, LLC v. Symplicity Corp.*, 63 F. Supp. 3d 592, 599–600 (E.D. Va. 2014) (holding that conversion claims were preempted by the Copyright Act). As Count III is solely based on alleged "malice" and this does not qualify as "an extra element" sufficient to avoid preemption, Count III is preempted.

c.    <u>Count IV for Unfair Competition Is Preempted</u>

Count IV, alleging unfair competition under the Connecticut Unfair Trade Practices Act ("CUTPA") based on "Miller … sending the false Termination Notices" (Complaint, ¶ 50), like Counts II and III, is a mere reformulation of Count I for declaratory relief under the Copyright Act. In fact, Plaintiffs "repeat and reallege, and incorporate [t]herein by reference" all of the allegations in Count I. (Complaint ¶ 49). This alone supports preemption.[8] Courts routinely preempt such unfair competition ("UCL") claims as inextricably intertwined with rights under the Copyright Act. *See Kregos v. Associated Press*, 3 F.3d 656, 666 (2d Cir. 1993)(holding UCL claim preempted because it "contains no element to qualitatively differentiate it from those areas protected by copyright."); *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 277 F.3d 253, 257 (2d Cir. 2002) (dismissing UCL claim as "preempted by the copyright laws."). *Warner Bros. Inc. v. American Broadcasting Co's*., 720 F.2d 231, 247 (2d Cir. 1983)(same).[9] As with Count III, Horror's allegation that Miller acted knowingly (Complaint ¶ 50) does not

---

[8] *See Motown Record Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236, 1239 (C.D. Cal. 1987) (dismissing California UCL claim that incorporated by reference plaintiff's copyright claim). *Blue Nile, Inc. v. Ice.com, Inc.*, 478 F. Supp. 2d 1240, 1250 (W.D. Wash. 2007) ("Plaintiff's [UCL] claim is dismissed as preempted because by incorporating the copyright claims by reference, the claim is based on rights equivalent to those protected by copyright."); *MEECO Mfg. Co. v. True Value Co.*, Copy. L. Rep. (CCH) P29,368, 2007 U.S. Dist. LEXIS 25986 at *14 (W.D. Wash. Apr. 3, 2007) (same).

[9] *See also Del Madera Properties v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987) (finding preemption of UCL claim where "[t]he argument is constructed upon the premise" of a Copyright Act violation."); *Kodadek,* 152 F.3d at 1212-13 (dismissing UCL claim where allegations were "within the 'subject matter' of the Copyright Act").

save it from preemption.  *Computer Associates Int'l, Inc.*, 982 F.2d at 717.

Notwithstanding the Copyright Act's express preemption provision, "field preemption" and "conflict preemption" likewise support dismissal of Plaintiffs' state-law counts.  As shown above, the three state-law counts are each premised on the purported invalidity of Miller's Termination Notices based on the allegation that the Screenplay is a "work-for-hire." However, both the termination right and the "work for hire" doctrine, are creatures of federal copyright law and "Congress left no room for the States to supplement" these fields. *Jones*, 430 U.S. at 525. Furthermore, Plaintiffs' aggressive state-law counts conflict with the strong federal policies embodied in the Act's termination provisions. Finally, Plaintiffs' state-law counts which *heavily* rely on the Agreement conflict with Congress's mandate that "[t]ermination … may be effected notwithstanding any agreement to the contrary." 17 U.S.C. § 203(a)(5). It also does not sit well that an author who exercises a colorable federal right to *statutorily* terminate a contractual copyright transfer can be held under state-law to have thereby breached a contract.

### 3.   Plaintiffs' State-Law Counts Fail for Additional Reasons

An author's statutory termination cannot constitute a breach of contract because, as discussed above, "[t]ermination … may be effected notwithstanding any agreement to the contrary," 17 U.S.C. § 203(a)(5). "If the [A]greement[] [is] interpreted to waive [Miller's] rights to recapture the copyrights at issue, then [it is] plainly an "agreement[] to the contrary" of the Copyright Act's termination provisions and unenforceable to that extent."  *Ray Charles*. 919 F. Supp. at 1066 (holding, in striking plaintiff's breach of contract claim under California's anti-SLAPP statute, that "the Copyright Act prevents the Court from interpreting the agreements signed by Defendants as limiting their statutory termination rights"). *See Marvel*, 310 F.3d at 290-292 (as termination may be exercised "notwithstanding any agreement to the contrary" publisher

cannot bar termination by contractually re-characterizing work as "for hire" after creation).

Manny's breach of contract claim is based on Plaintiffs' allegation that the Screenplay is a "work for hire" and that Miller is purportedly an "employee" (under Section 101(1) of the Copyright Act). But as this is a function of federal common law agency factors, *CCNV*, 490 U.S. at 739, not contract, Miller's Termination cannot constitute a breach of contract.

Count IV likewise fails to state a claim. "In order to allege a CUTPA violation properly, the plaintiff must allege, inter alia, that the acts complained of were performed in a trade or business." *Quimby v. Kimberly Clark Corp.*, 28 Conn. App. 660, 669 (1992)(citing Connecticut General Statutes § 42-110b and *Web Press Services Corporation v. New London Motors, Inc.,* 203 Conn. 342, 354 (1987)). *See also Pergament v. Green,* 32 Conn.App. 644, 655 (1993) (same). The Complaint contains no allegation that the Termination Notices, alleged to violate CUTPA, were Miller's trade or business.  *See* Complaint ¶¶ 49-54. Nor could they be. CUTPA defines a "trade or commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42–110 a(4).

First the drafting, service and filing of the Termination Notices from California were not "in this state [Connecticut]." Miller Decl., ¶ 22. Moreover, the practice complained of cannot be incidental to the true trade or business of the defendant, here, a writer.

*Brandewiede v. Emery Worldwide*, 890 F. Supp. 79, 81 (D. Conn. 1994), *aff'd* 66 F.3d 308 (2d Cir. 1995) is instructive:

> "Plaintiff has not sustained his burden of proving that defendant is engaged in the 'trade or commerce' of selling, purchasing or leasing commercial aircraft. There is no viable claim under CUTPA when the practice complained of is incidental to the true trade or business conducted. The [] complaint states that '[defendant] …

> was frequently involved in the purchase, sale and leasing of commercial aircraft.'
> … [defendant] is primarily engaged in the business of overnight freight delivery.
> In this case, defendant's conduct of leasing the aircraft was incidental to its
> primary business of providing overnight freight service."

See *Arawana Mills Co. v. United Techs. Corp.*, 795 F. Supp. 1238, 1253 (D. Conn. 1992)

(dismissing CUTPA count as "defendant's act of leasing property from plaintiff is incidental

to…its true business…the repair and servicing of aircraft engines.").

Plaintiffs simply allege that the same act (the Termination Notice) that purportedly

constitutes a breach of contract is the unfair act that violates CUTPA, but a "simple breach of

contract does not offend traditional notions of fairness, and . . . does not offend public policy to

invoke CUTPA." *Boulevard Associates v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1038-39 (2d

Cir.1995) ("the only allegations in count two different from count one are that 'the actions of the

defendant constitute violations of the [CUTPA] in that said actions were 'unfair, oppressive,

deceptive and unscrupulous ...' This is conclusory language without legal effect . . . no facts are

alleged to support the conclusions. Therefore, the allegations are an insufficient predicate upon

which to base a CUTPA claim."); *Computer Horizons Corp. v. Factorum, Inc.*, No. CV

980584758S, 1999 WL 1126311, at *2 (Conn. Super. Ct. Nov. 19, 1999) ("The plaintiff must

allege facts which allege more than a mere breach of contract.").  For all of the above additional

reasons, Count IV is deficient as a matter of law and must be struck.

### 4.    Defendants Are Entitled to Their Legal Fees and Costs

Under California Code of Civil Procedure § 425.16 (c), a defendant who prevails on an

anti-SLAPP motion to strike, "shall be entitled to recover his or her attorney's fees and costs."

This award is "mandatory." *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131 (2001) (internal

quotations and citations omitted); *see also Kearney v. Foley & Lardner*, 553 F. Supp. 2d 1178,

1181 (S.D. Cal. 2008) ("[I]t is well-settled that an award of attorney's fees and costs to a

successful anti-SLAPP movant is mandatory.")  It is intended to both "discourage . . . strategic lawsuits" and "encourage[] private representation in SLAPP cases."  *Ketchum*, 24 Cal. 4th at 1131 (internal citations and quotations omitted).

Here, Mr. Miller is entitled to an award of the attorney's fees and costs incurred in defending against Plaintiff's Second and Third Claims.  "[T]he fee should . . . include compensation for all hours reasonably spent, including those relating solely to obtaining the fee award." *Kearney*, 553 F. Supp. 2d at 1181 (internal citations, quotations, brackets omitted).

## CONCLUSION

For all the foregoing reasons, Defendants respectfully ask the Court (i) to strike Plaintiffs' Second, Third and Fourth Counts for Relief pursuant to California's anti-SLAPP statute, California Code of Civil Procedure § 425.16, because these state-law claims are based on protected petition activity under § 425.16(e), and Plaintiffs can show no probability of success as to such claims, and (ii) pursuant to § 425.16(c), to award Defendant the attorneys' fees and costs incurred in defending against such claims.

DEFENDANT,
VICTOR MILLER

By: /s/ Marc Toberoff
Marc Toberoff (FBN phv08515)
TOBEROFF & ASSOCIATES, PC
23823 Malibu Rd.Ste. 50-363
Malibu, CA 90265
Federal Bar No. phv08515
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
Email: mtoberoff@toberoffandassociates.com

His attorneys.

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

**Horror Inc. and The Manny Company,**

          **Plaintiffs,**

    **vs.**

**Victor Miller & Does 1 through 10,**

          **Defendants.**

**Case No.: 3:16-cv-01442-SRU**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing [Corrected] Memorandum of Points and Authorities in Support of Defendant's Motion to Strike, dated October 22, 2016 was served electronically by the Court's ECF system on said date, and that all interested parties in this case are registered CM/ECF users.

The undersigned declares under penalty of perjury under the laws of the United States that the above is true and correct.


Dated: October  22, 2016                /s/ Marc Toberoff