# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership,

                Plaintiffs,

    vs.

VICTOR MILLER, an individual; and DOES 1 through 10,

                Defendants.

---

VICTOR MILLER, an individual;

                Counterclaimant,

    vs.

HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership; and DOES 1 through 10,

                Counterclaim-Defendants.

Case No.: No. 3:16-cv-01442-SRU

**[CORRECTED] NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that Defendant and Counterclaimant Victor Miller ("Miller") will move this Court for summary judgment, or in the alternative partial summary judgment, that Miller's notice(s) of termination under the United States Copyright Act, 17 U.S.C. § 203(a), regarding Miller's original film treatment and screenplay underlying the 1980 motion picture "Friday the 13th" are valid and effective. The motion is made on the grounds that each of Plaintiffs' four counts rests on their assertion that Miller's screenplay was a "work made for hire" under 17 U.S.C. § 101, but Plaintiffs cannot meet their burden of proof as to this statutory exception to the Copyright Act's fundamental termination right. 17 U.S.C. § 203(a).

On settled facts, Plaintiffs' "work for hire" defense fails as a matter of law because Plaintiffs' cannot produce any "written instrument signed by [Plaintiff Manny Company and Miller]" in which they "expressly agree … that the work shall be considered a work made for hire." Plaintiffs' strained assertion that Miller was the Manny Company's conventional employee under 17 U.S.C. 101(1) equally fails as a matter of law under the common law agency test articulated in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) and applied in *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992).

Dated: June 9, 2014               By: /s/ Marc Toberoff _____
                                  Marc Toberoff (FBN phv08515)
                                  TOBEROFF & ASSOCIATES, PC
                                  23823 Malibu Rd.Ste. 50-363
                                  Malibu, CA 90265
                                  Telephone: (310) 246-3333
                                  Facsimile: (310) 246-3101
                                  Email: mtoberoff@toberoffandassociates.com

                                  *Attorneys for Defendant and Counterclaimant, Victor Miller*

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership,

                   Plaintiffs,

    vs.

VICTOR MILLER, an individual; and DOES 1 through 10,

                   Defendants.

---

VICTOR MILLER, an individual;

                   Counterclaimant,

    vs.

HORROR INC., a Massachusetts corporation; and MANNY COMPANY, a Connecticut Limited Partnership; and DOES 1 through 10,

                   Counterclaim-Defendants.

Case No.: No. 3:16-cv-01442-SRU

**[CORRECTED] NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

June 9, 2017

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT AND COUNTERCLAIMANT VICTOR MILLER'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

Marc Toberoff (Federal Bar No. phv08515)
*mtoberoff@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Rd, Ste 50-363
Malibu, California, 90265
Telephone:(310) 246-3333
Fax: (310) 246-3101

Attorneys for Defendant and
Counterclaimant Victor Miller

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

PROCEDURAL AND FACTUAL BACKGROUND ................................................. 3

STATUTORY BACKGROUND ................................................................................ 8

SUMMARY JUDGMENT LEGAL STANDARD .................................................... 11

ARGUMENT ........................................................................................................ 12

   I.    MILLER'S TERMINATION COMPLIED WITH THE COPYRIGHT ACT ........ 12

   II.   PLAINTIFFS' WORK FOR HIRE DEFENSE FAILS AS A MATTER OF LAW. 15

     A.    "Work for Hire" Analysis Under Section 101 Of The Copyright Act ..................... 15

     B.    Under *Reid*, *Aymes* And The Common Law Of Agency, Miller Was An Independent Contractor...………………………...……………………………21

        1.   Hiring Party's Right To Control The Manner And Means Of Creation ................ 21

        2.   Writing Screenplays Is A Skilled Profession ........................................................ 24

        3.   Miller Provided His Own Instrumentalities And Tools ........................................ 25

        4.   Miller Worked At Home ...................................................................................... 25

        5.   Miller Worked On The Treatment And Screenplay Over A Short Duration ......... 25

        6.   Manny Did Not Have The Right To Assign Miller Additional Projects ............... 26

        7.   Miller Determined When And For How Long He Worked ................................... 27

        8.   Miller Was Paid Discrete Sums Upon Completion Of Specific Work ................. 27

        9.   Miller Could Hire And Pay His Own Assistants If He Wished To ....................... 27

        10.  Whether Manny Was "In Business" And Whether Writing Screenplays Was Part Of That Business Is Indeterminate ...................................................................... 28

        11.  Manny Did Not Provide Miller Any Employee Benefits ...................................... 29

        12.  The Tax Treatment of the Hired Party .................................................................. 30

     C.    Miller's Treatment and First Draft Screenplay, Written "On Spec," Are Not Work For Hire" In Any Event ...................................................................................... 32

        1.   Miller's Treatment Entitled "The Long Night at Camp Blood" ........................... 32

        2.   Miller's First Draft Screenplay ........................................................................... 33

   III.   PLAINTIFFS' VAGUE REMAINING CLAIM THAT OTHERS "CREATED" MATERIAL IN THE SCREENPLAY FAILS AS A MATTER OF LAW .......... 34

CONCLUSION ..................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000) .................................................... 35

*Aldrich v. Randolph Center School Dist.*, 963 F.2d 520 (2d Cir. 1992) ............................... 11, 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................... 11, 12

*Aymes v. Bonelli*, 980 F.2d 857 (2d Cir. 1992) .................................................. passim

*Berger Transfer & Storage v. Central States*, 85 F.3d 1374 (8th Cir.1996) ............................... 21

*Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.) .................................................. 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................... 12, 17

*Christians of California, Inc. v. Clive Christian New York, LLP*, 13-CV-275 KBF, 2014 WL

4743422 (S.D.N.Y. Sept. 15, 2014) ......................................................... 26

*Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008) ...................................... 1

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ................................. passim

*Consarc v. Marine Mid. Bank*, 996 F.2d 568 (2d Cir. 1993) ............................................ 11

*FTC v. Morton Salt Co.*, 334 U.S. 37 (1948) ............................................................. 17

*Graham v. James*, 144 F.3d 229 (2d Cir.1998) ........................................................ 21, 24, 26, 30

*Griffin v. Griffin*, 327 U.S. 220 (1946) ............................................................ 12

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ............................... 34

*Hi–Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093 (6th Cir.1995) .......... 23, 30

*In re Brown*, 743 F.2d 664 (9th Cir. 1984) ................................................................ 24

*Johannsen v. Brown,* 797 F.Supp. 835 (D.Or. 1992) .................................................... 24

*Jou v. Accurate Research, Inc.*, 73 Fed.Appx. 964 (9th Cir. 2003) ................................. 17, 25, 30

*Keller v. Niskayuna Consol. Fire Dist. 1*, 51 F. Supp. 2d 223 (N.D.N.Y. 1999) ........................ 25

*Kirk v. Harter, 188 F.3d 1005* (8th Cir.1999) ........................................................ 31

*Knight v. U.S. Fire Ins. Co.*, 804 F. 2d 9 (2nd Cir. 1986) ............................................ 12

*Kunycia v. Melville Realty Co.*, 755 F.Supp. 566 (S.D.N.Y. 1990) .................................... 24

*Landman Fabrics v. Graff Californiawear Inc.*, 160 F.3d 106 (2d Cir.1998) ............................. 31

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486 (11th Cir.1990) ............................ 24

*MacLean Assocs., Inc. v. Wm. M. Mercer–Meidinger–Hansen, Inc.*,
    952 F.2d 769 (3d Cir. 1991) ........................................................................................ 24

*Marco v. Accent Publ'g Co.*, 969 F.2d 1547 (3d Cir.1992) ................................................ 23, 24

*Margo v. Weiss*, 213 F.3d 55 (2d Cir. 2000) ........................................................................ 35

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) ........................................ 9, 19

*Mazer v. Stein*, 347 U.S. 201 (1954) .................................................................................. 8

*Merchant v. Levy*, 92 F. 51, 56 (2d Cir. 1996) ..................................................................... 35

*Mills Music, Inc. v. Snyder*, 469 U.S. 153 (1985) ......................................................... 1, 10, 32

*N.Y. Times v. Tasini*, 533 U.S. 483 (2001) .......................................................................... 10

*Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549 (2d Cir. 1995) ......................................... 18

*Quintanilla vs. Texas Television, Inc.*, 139 F.3d 494 (5th Cir.1998) ..................................... 23

*Recht v. Metro Goldwyn Mayer Studio, Inc.*, 580 F.Supp.2d 775 (W.D. Wis. 2008) ........... 25, 26

*SHL Imaging v. Artisan House, Inc.*, 117 F.Supp.2d 301 (S.D.N.Y. 2000) ................... 17, 22, 26

*Sony Corp. v. Universal Studios*, 464 U.S. 417 (1984) ......................................................... 8

*Stewart v. Abend,* 495 U.S. 207 (1990) .......................................................... 1, 9, 15, 32

*Tagare v. Nynex Netowrk Sys. Co.*, 994 F. Supp. 149 (S.D.N.Y. 1997) .................................. 28

*Talbert v. Am. Risk Ins. Co.*, 405 F. App'x 848 (5th Cir. 2010) ............................................. 26

*Thibault v. Bellsouth Telecomm., Inc.*, 612 F.3d 843 (5th Cir.2010) ..................................... 26

*Ulloa v. Universal Music and Video Distribution Corp,*
    303 F.Supp.2d 409 (S.D.N.Y 2004) ..................................................... 21, 24, 26

*Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67 (2d Cir.1988) ...................................... 2, 15

*Vaad L'Hafotzas Sichos, Inc. v. Krinsky.*, 133 F.Supp.3d 527 (E.D.N.Y. 2015) ..................... 17

*Woods v. Bourne Co.*, 60 F.3d 978 (2d Cir. 1995) ............................................................... 17

**Statutes**

17 U.S.C. § 101 ................................................................................................................ passim

17 U.S.C. § 102 ................................................................................................................ 15, 21

17 U.S.C. § 102(a) .................................................................................................................. 32

17 U.S.C. § 102(b) .................................................................................................................. 34

17 U.S.C. § 201(a) ........................................................................................................ 15, 16, 32

17 U.S.C. § 201(b) .................................................................................................................. 16

17 U.S.C. § 203 (a)(3) ...................................................................................................... passim

17 U.S.C. § 203(a) ............................................................................................................ passim

17 U.S.C. § 203(a)(4) .................................................................................................. 10, 13, 14

17 U.S.C. § 203(a)(5) .............................................................................................................. 10

17 U.S.C. § 203(b)(1) .......................................................................................................... 2, 15

17 U.S.C. § 203(b)(5) .............................................................................................................. 15

17 U.S.C. § 24 (1976 Ed.) ........................................................................................................ 8

17 U.S.C. § 304(a) .................................................................................................................... 9

17 U.S.C. § 304(c) ........................................................................................................ 11, 15, 16

17 U.S.C. § 304(c)(4)(A) ........................................................................................................ 10

17 U.S.C. § 304(c)(5) ........................................................................................................... 9, 10

17 U.S.C. § 304(c)(6)(A) ........................................................................................................ 11

17 U.S.C. § 304(c)(6)(D) ........................................................................................................ 10

17 U.S.C. § 304(d) .................................................................................................................... 9

17 U.S.C. § 507(b) .................................................................................................................. 34

37 C.F.R. § 201.10 ........................................................................................................ 8, 10, 14

37 C.F.R. § 201.10(d) ...................................................................................................... 13, 14

Pub. L. 105-298 (1998) ............................................................................................................ 9

## **Other Authorities**

H.R. Rep. No. 105-452, 105th Cong., 2d Sess. (1998)...................................................................... 9

H.R. Rep. No. 94-1476 (1976).................................................................................................. 9, 10

Melville Nimmer and David Nimmer, Nimmer on Copyright  §11.08[A].................................. 11

Melville Nimmer and David Nimmer, Nimmer on Copyright §11.02[B][2] ............................ 11

## **Rules**

Fed. R. Civ. P. 56(a) ................................................................................................................... 12

Fed. R. Civ. P. 56(c) ................................................................................................................... 11

Fed. R. Civ. P. 56(d) ................................................................................................................... 11

## **INTRODUCTION**

In 1979, Victor Miller ("Miller"), a freelance novelist and screenwriter, authored an original film treatment entitled "The Long Night at Camp Blood" and thereafter the screenplay underlying the 1980 film, "Friday the 13th", for which he received sole writing credit ("Written by Victor Miller").  In 2016 Miller availed himself of his inalienable right under the United States Copyright Act to recover the copyright to his original literary material by serving the producer and his successors with statutory notice of termination, effective in 2018, and filing that notice with the Copyright Office.

The Copyright Act's vital termination provisions preempt ordinary contract principles by empowering authors after lengthy waiting periods to recapture their copyrights by statutorily terminating decades-old copyright transfers without cause. The termination right was specifically enacted by Congress in recognition of the "unequal bargaining position of authors" and to enable authors to secure "the monetary rewards of a work that may have been initially undervalued, but which later becomes a commercial success." *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983-84 (9th Cir. 2008), *citing Stewart v. Abend*, 495 U.S. 207, 218-219 (1990) and *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-173 (1985).

Plaintiffs' first count requests a declaratory judgment under the Copyright Act that Miller's statutory termination is invalid, and their three state-law counts seek to punish Miller for exercising this important federal right. Each of Plaintiffs' four counts rests on their singular assertion that Miller's screenplay was a "work for hire" under Section 101 of the Copyright Act. Plaintiffs, however, are wholly unable to meet their burden of proof as to this statutory exception to the termination right, as a matter of law. The screenplay, at most, is a "work specially …

commissioned for use … as part of a motion picture" under Section 101(2), requiring that "the parties expressly agree in a written instrument … that the work shall be considered a work made for hire," but none exists in this case.

Given that this disposes of their "work for hire" defense, Plaintiff's dubiously assert that Miller was the Plaintiff Manny Company's conventional employee under Section 101(1). This counterintuitive notion implodes, however, as Plaintiffs do not even come close to meeting their burden of demonstrating, in the analysis mandated by *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) and *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992), that Miller is an "employee" under the federal common law agency factors governing this determination.

For this reason Plaintiffs' entire Complaint fails, and Miller's Counterclaim as to the validity of his basic statutory termination, succeeds. Whereas Miller will thereby recover the U.S. copyright to his original film treatment and screenplay this does not prevent the continued exploitation by Plaintiffs or their licensees of prior derivative works, including the 1980 film and its many sequels; it solely relates to new derivative works after the effective 2018 termination date. 17 U.S.C. § 203(b)(1). Furthermore, as the U.S. Copyright Act has no extra-territorial application, the foreign rights to Miller's screenplay remain with Plaintiffs or their licensees. *Update Art, Inc. v. Modiin Pub., Ltd.,* 843 F.2d 67, 72 (2d Cir. 1988). Accordingly, Miller's exercise of his copyright termination right does not prevent the exploitation of *Friday the 13th*, it simply and effectively allows its author to, at long last, participate in the financial rewards of his creation, just as Congress intended. H.R. Rep. No. 94-1476, at 124 (1976).

## PROCEDURAL AND FACTUAL BACKGROUND

On August 24, 2016, Plaintiffs Horror Inc. ("Horror") and The Manny Company ("Manny") filed their complaint against Miller.  *See* Dkt. 1 ("Complaint"), Declaration of Marc Toberoff, Exhibit ("Ex.") A. The Complaint contains four counts, a federal count for a declaratory judgment under the Copyright Act that Miller's notices of termination notices are invalid, and three state-law counts for breach of contract, slander of title and violation of the Connecticut Unfair Trade Practices Act, respectively. The First Count (Complaint, ¶¶ 32-34) seeks a declaratory judgment that Miller's screenplay for *Friday the 13th* was a "work for hire" pursuant to his writing contract, and on that basis that the termination notices are invalid. The Second Count (Complaint, ¶¶ 35-42) alleges that Miller breached the contract by filing and serving the termination notices. The Third Count (Complaint, ¶¶ 43-48) alleges that the termination notices slander Horror's title to Miller's screenplay. The Fourth Count (Complaint, ¶¶ 49-54) alleges that the termination notices constitute unfair competition under the Connecticut Unfair Trade Practices Act ("CUTPA").

On October 17, 2016 Miller filed a Motion to Strike the three state-law counts under California's anti-SLAPP statute and a Motion to Dismiss. On October 27, 2016 Plaintiffs requested, by letter to the Court, to conduct discovery to oppose Miller's motion to strike, to which Miller responded by letters on October 28 and 31, 2016. During a November 3, 2016 telephonic hearing regarding Plaintiffs' request, the Court stayed Plaintiffs' pendent state law claims and, on that basis, denied Miller's motions *without prejudice*. The Court ordered that Plaintiffs' claim for a Declaratory Judgment, as well as Miller's contemplated counterclaim for a Declaratory Judgment be resolved prior to addressing Plaintiffs' state law claims.  On November

17, 2016 Miller filed his Answer and a Counterclaim for a Declaratory Judgment that his statutory notices of termination were valid. Toberoff Decl., Ex. B.

The specific undisputed facts in support of this motion are set forth in Miller's Local Rule 56(a)1 Statement filed concurrently.  The following is provided as an overview of the case.

Plaintiff Victor Miller ("Miller") is the author of numerous novels, teleplays and screenplays, including the original *Friday the 13th* movie (1980) (the "Film"). Declaration of Victor Miller ("Miller Decl."), ¶ 3.  Miller is a graduate of Yale University (1962 BA, English) and Tulane University (1967 MA, Theatre and Speech) and co-founded The American Shakespeare Theatre's Center for Theatre Techniques in Education.  *Id*., ¶ 2. For his writing Miller has won three Emmy awards (and was nominated for eleven Emmys) and four Writer's Guild of America awards (and was nominated for twelve). *Id*., ¶ 3; *see* http://www.imdb.com /name/nm0589485/awards?ref_=nm_awd.

In 1979, Miller's best friend was an independent film director/producer named Sean Cunningham ("Cunningham"). Miller Decl., ¶ 4. In early 1979 Cunningham suggested that they do a movie together emulating the low-budget slasher hit *Halloween* (1978). *Id*., ¶ 5; Complaint, ¶ 2. After seeing "Halloween" in early 1979, Miller swiftly wrote a detailed 15-page film treatment entitled "The Long Night at Camp Blood" (the "Treatment").  Miller Decl., ¶ 6, Ex. A. Shortly thereafter Miller wrote an original screenplay also entitled "The Long Night At Camp Blood." (the "First Draft"). Miller Decl., 7 8, Ex. B. Miller wrote the film Treatment and First Draft "on spec," without a contract or any guarantee of compensation, hoping that Cunningham could raise the financing for their horror film, based on this material. *Id*., ¶ 8; Complaint, ¶ 22.

Cunningham then came up with a more commercial title for the film – "Friday the 13th". Miller Decl., ¶ 9. Accordingly, Miller inserted multiple references to Friday the 13th in the

*second* draft screenplay he was in the process of writing (the "Second Draft"). Miller Decl., ¶ 10, Ex. C at pp. 6 (00023); 7(00024) and 67(00085). Cunningham was fearful, however, that use of the "Friday the 13th" title might elicit a legal challenge so he used the working title – "Friday 13" – instead. Miller Decl., ¶ 10, Ex. C at p.1 (Cunningham's "Friday 13" title page).

Cunningham finally filled out and presented Miller with a form "Writer's Flat Deal Contract" between Miller and Plaintiff The Manny Company ("Manny"), an alleged limited partnership of which Cunningham's company, Sean S. Cunningham Films, Ltd., was the general partner. Complaint, Ex. 1 (the "Agreement"), ¶ 10, Miller Decl. ¶ 11, Ex. D. The Agreement pertains to "a proposed motion picture … entitled … Friday 13". Miller Decl., Ex. D, ¶ 1. Paragraph 1 of the Agreement purports to commission the writing of specified material, but the only boxes checked are:  "[x] First draft screenplay" and "[x] Final draft screenplay"; whereas the boxes, "[  ] Treatment" and "[  ] Original Treatment," are not checked. *Id.*, Ex. D, ¶ 1. Similarly Paragraph 3 of the Agreement pertaining to Miller's compensation only provides for lump sum payments of $5,569 for a first draft screenplay and $3,713 for a final draft screenplay, totaling $9,282. *Id.*, ¶ 3.

The Agreement was executed by Manny and Miller on or about June 4, 1979.  Miller Decl., ¶ 11; Complaint, ¶ 16. By this time, Manny was well into writing the Second Draft and once Miller completed it, Cunningham created a title page for it using the "Friday 13" title. Miller Decl., ¶ 10, Ex. C.[1]  On July 4, 1979, Cunningham took a full page advertisement in *Variety* using the title "Friday the 13th" to flush out whether anyone would make a legal claim against him regarding it, and as no one did, Cunningham started using the title "Friday the 13th."

---

[1] It is important to emphasize that Miller's writing of the Treatment, First Draft and much of the Second Draft *prior to* entering into the Agreement with Manny are facts unnecessary to the central grounds for this motion set forth in Section II of Miller's Argument, below.

Miller Decl., ¶ 14, Ex. E.

 Miller thereafter made only minor revisions to the Second Draft with the exception of writing a new ending (the "Final Draft"). Miller Decl. ¶ 13. Miller's First Draft, Second Draft and Final Draft revisions are collectively referred to herein as the "Screenplay." Miller and Cunningham collaborated creatively during Miller's writing of the Screenplay as Cunningham was to direct the Film. *Id*., ¶ 19.  During this process they naturally bounced ideas off one another, but Cunningham did not purport to dictate, control or closely supervise Miller's creative writing. *Id*.  Miller wrote the Treatment and Screenplay in the study of his own home, using his own IBM Selectric typewriter, typewriter ribbon and paper, and Miller determined the days and hours he would write. Miller Decl., ¶¶ 15, 16.  Miller was accorded *sole* screenwriting credit on the Film (*i.e*., "Written by Victor Miller") by Cunningham and his assignee Georgetown Productions, Inc. Miller Decl., ¶ 26, Ex. G; Complaint, ¶¶ 3, 24.

 Miller was never paid for his Treatment. Miller was simply paid the lump sum amounts set forth in the Agreement (where the "Treatment" box was not checked) for the First Draft and Final Draft screenplay, but did not receive these amounts until long after Miller provided his drafts to Manny, purportedly due to delays in Manny's receipt of financing from his investors. Miller Decl., ¶ 21, Ex. D., Complaint, ¶ 22. From these lump sum payments to Miller, Manny did not withhold or deduct any federal or state income tax, social security and/or medicare (nor did Manny pay an employer's matching amount), nor did Manny report or pay Federal Unemployment tax (FUTA) or FICA taxes.  Miller Decl., Ex. F.

 Unsurprisingly, Manny also did not provide Miller with any employee benefits in connection with the Agreement or Miller's writing of the Treatment or Screenplay; without limitation:  no health insurance, medical or dental plan, no paid vacation, and no pension. *Id*., ¶

24. Nor did Manny contribute on Miller's behalf to unemployment insurance or worker's compensation insurance. *Id.* Nor did Manny, Georgetown or anyone else make any contributions to the Writer's Guild of America ("WGA") pension and health fund on Miller's behalf in connection with Miller's writing of the Treatment and Screenplay and/or the Film. Toberoff Decl., ¶ 4, Ex. C; Miller Decl., ¶ 25.

Pre-production for the Film was conducted in July – August, 1979 and principal photography of the Film began in early September, 1979. Complaint, ¶ 23. The Film's budget totaled approximately $500,000. *Id.*, ¶ 22. On May 7, 1980, Manny sold all rights in the *Friday the 13th* Screenplay to Georgetown Productions, Inc. in a purchase agreement dated May 7, 1980 (the "Manny-Georgetown Rights Agreement"), to which Miller's Agreement was attached.  In the Manny-Georgetown Rights Agreement, Manny "represent[ed] and warrant[ed] to [Georgetown]" among other things "[t]hat Victor Miller is the sole author of the Screenplay;" and "[t]hat the Screenplay is original". Toberoff Decl., Ex. D, p. 2, ¶ 2.  Nowhere in the Manny-Georgetown Rights Agreement, like in Miller's Agreement is it alleged that the Screenplay is a purported "work made for hire." Toberoff Decl., Ex. D.

The Film, released in the U.S. by Paramount Pictures on May 9, 1980, was a huge hit and launched a lucrative franchise.  Complaint, ¶¶ 3, 25.  Miller received sole writing credit on the Film. Miller Decl., ¶ 26, Ex. G. Cunningham, his successors reaped tens of millions from the Film and resulting film franchise; his good friend Miller, who had thrown in his lot in authoring the Film, received relatively minor sums.  Miller Decl., Ex. D.

On January 21, 2016, Miller availed himself of his statutory right under Section 203(a) of the U.S. Copyright Act, 17 U.S.C. § 203(a), to recover the U.S. copyright in his Treatment and Screenplay by serving a statutory notice of termination with an effective termination date of

January 25, 2018 (the "Termination Notice"). [2] Toberoff Decl., ¶ 9, Ex. H; Complaint, ¶ 28. On

June 27, 2016, out of an abundance of caution, Miller served an amended notice of termination,

with an effective termination date of July 1, 2018 (the "First Amended Termination Notice"),

revised to include as recipients Plaintiff Horror, Inc. ("Horror") and other of Manny's alleged

successors whose assignments were not reflected in the U.S. Copyright Office records. Toberoff

Decl., ¶ 11, Ex. J; Complaint, ¶ 28. On July 14, 2016, when the notice to one recipient was

returned, Miller reissued and re-served the notice of termination with an effective date of July

15, 2018, modifying some recipients' addresses (the "Second Amended Termination Notice").

Toberoff Decl., ¶ 13, Ex. L; Complaint, ¶ 28. Shortly after each of the notices of termination

(collectively, the "Termination Notices" or "Termination") was served, each was duly filed with

the U.S. Copyright Office in 2016. Miller Decl., ¶ 22, Toberoff Decl., ¶¶ 10, 12, 15, Exs. I, K, N.

With respect to the above, Miller and his counsel went to great lengths to comply with the

procedures in 17 U.S.C. § 203(a) and 37 C.F.R. §201.10, the regulations issued thereunder.

## STATUTORY BACKGROUND

"The economic philosophy behind the [Copyright] clause … is the conviction that

encouragement of individual effort by personal gain is the best way to advance the public welfare

through the talents of authors [] in '[] useful Arts.'" *Mazer v. Stein*, 347 U.S. 201, 219 (1954).

Under the Constitution, "it is Congress that has been assigned the task of defining the scope of

the limited monopoly that should be granted to authors." *Sony Corp. v. Universal Studios*, 464

U.S. 417, 429 (1984). Commencing with the Copyright Act of 1831, Congress has used this power

to provide authors with the right to recover transferred copyright interests and has strengthened

---

[2] The Copyright Act's termination provisions provide for an author's recovery of his/her copyrights only within statutory time windows; in Miller's case, 35-40 years after the copyright is deemed transferred (i.e., June 4, 2014 to June 4, 2019). 17 U.S.C. § 203(a)(3).

those rights over time. *See Stewart v. Abend*, 495 U.S. 207, 217-20 (1990).

Under the Copyright Act of 1909, copyright protection was divided into two separate 28-year terms:  the "initial" and "renewal" terms. 17 U.S.C. § 24 (1976 Ed.). Congress intended the renewal copyright to benefit authors and their families. *See Stewart*, 495 U.S. at 219. Effective January 1, 1978, the Copyright Act of 1976 significantly enhanced authors' rights. 17 U.S.C. § 101 *et seq*. It extended the renewal term under the 1909 Act from 28 to 47 years. 17 U.S.C. § 304(a). Congress intended to give the benefit of these additional years to authors rather than to grantees for whom the automatic grant of the extension would be a windfall.  *See* H.R. Rep. No. 94-1476 at 140 (1976). It therefore provided authors and their families with a new right to recapture their copyrights by terminating decades-old copyright transfers "notwithstanding any agreement to the contrary."  17 U.S.C. § 304(c)(5); *see also*  17 U.S.C. § 203(a)(5). The clear Congressional purpose was to prevent authors from waiving their termination right by contract, directly or indirectly. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) (Marvel cannot bar the termination right by contractually re-characterizing works as "for hire"); *Stewart*, 495 U.S. at 230 ("1976 Copyright Act provides … an inalienable termination right.").

Sections 304 (c) and (d) [3] apply to pre-1978 works. A closely analogous and related termination provision in the 1976 Act, 17 U.S.C. § 203(a), applicable to Miller's Termination Notices governs transfers after January 1, 1978, and allows the author or his statutory heirs to terminate any copyright transfer by the author, 35 years after such transfer.

The Supreme Court has elucidated the intent and purpose behind the termination provisions of the 1976 Act as follows:

---

[3] In the Copyright Term Extension Act, Pub. L. 105-298 (1998), Congress reaffirmed its objectives as to the Act's termination provisions by coupling a further renewal term extension with a second termination right in 17 U.S.C. § 304(d). *See* H.R. Rep. No. 105-452, 105th Congress, 2d Sess., at 8 (1998).

> The principal purpose of the [termination right] was to provide added benefits to authors. The ... concept of a termination right itself, w[as] obviously intended to make the rewards for the creativity of authors more substantial. More particularly, the termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product. That general purpose is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself.

Mills Music, Inc. v. Snyder, 469 U.S. 153, 172-73 (1985) (footnote omitted) (interpreting §

304(c)[applicable to pre-1978 transfers] which is comparable to § 203(a) [applicable to post-

1977 transfers]). The termination right lies in stark contrast to ordinary contract principles, as it

empowers authors and their statutory heirs to terminate grants of copyright transfers without

cause, regardless of the contracting parties' promises, intent or expectations when the transfer

was made.  17 U.S.C. § 304(c)(5); 203(a)(5).

Congress recognized that publishers held far greater bargaining power and that consequently, authors commonly

agreed to one-sided grants which precluded them from sharing in the success of their works.  Id.  The results were often

supremely unfair, as when a work proved to have enduring commercial value, but enriched only the grantee.  Congress

thus created termination rights to "safeguard[] authors against unremunerative transfers" made

before their works were commercially exploited, and to give authors and their families a second

chance to obtain a more equitable portion of a copyright's value when it is no longer conjectural.

H.R. Rep. No. 94-1476, at 124 (1976); see N.Y. Times v. Tasini, 533 U.S. 483, 496 n.1 (2001)

(recognizing Congress' intent to re-adjust "the author/publisher balance" by providing an "inalienable authorial

right to revoke a copyright transfer").

Termination is carried out by serving advance notice of termination on the original

grantee or its successor in compliance with the Copyright Act, 17 U.S.C. §§ 304(c)(4)(A),

203(a)(4), and the Register of Copyright's regulations, 37 C.F.R. § 201.10. Authors and their

heirs may terminate post-January 1, 1978 transfers during a five-year window beginning thirty-

five years after the transfer. 17 U.S.C. § 203(a)(3). The termination provisions reflect a

deliberate balance of competing interests determined by Congress.[4]

"Works for hire" are the sole exemption from the 1976 Act's termination provisions. 17 U.S.C. §§ 304(c), 203(a). 17 U.S.C. § 101 governs whether a work is a "made for hire."

## SUMMARY JUDGMENT LEGAL STANDARD

Miller is entitled to the entry of summary judgment in his favor if it appears from the pleadings and evidence on file that "there is no genuine issue as to any material fact and that ["Miller"] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Partial summary judgment," or summary adjudication, where the Court disposes of some but not all claims or issues within a claim, is also permitted.  Fed. R. Civ. P. 56(c), (d). A fact is "material" only if it affects the outcome of the suit under the governing substantive law. *Consarc v. Marine Mid. Bank,* 996 F.2d 568, 572 (2d Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). In determining whether there is a genuine issue of material fact, a Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Center School Dist.,* 963 F.2d 520, 523 (2d Cir. 1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849 (1991.  The non-moving party, however, may not rely on "speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F. 2d 9, 12 (2nd Cir. 1986), *cert. denied,* 480 U.S. 932 (1987). *See also Griffin v. Griffin,* 327 U.S. 220, 235-36 (1946).

---

[4] For instance, the 1976 Act gives a terminated grantee a competitive advantage in reacquiring copyrights recaptured under its termination provisions.  *See* 17 U.S.C. § 304(c)(6)(D); 3 Melville Nimmer and David Nimmer, *Nimmer on Copyright* (*"Nimmer"*) §11.08[A], n.6.  As the Act has no extraterritorial application, termination applies only to the U.S. copyright, *id.* §11.02[B][2] at 11-19. This makes exploitation independent of a terminated grantee practically impossible. A terminated grantee may also continue to distribute pre-termination derivative works, 17 U.S.C. § 304(c)(6)(A).

"[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original).  Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to show the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). *Aldrich*, 963 F.2d at 523.

This motion presents a classic issue of law ripe for summary judgment; namely the validity of Miller's Termination under 17 U.S.C. § 203(a). There are no genuine issues of material fact because the basic facts of the statutory Termination are undisputed, and Plaintiffs do not meet their burden as a matter of law under 17 U.S.C. § 101, and binding Supreme Court and Second Circuit precedent, as to their sole purported "work for hire" defense.

## <u>ARGUMENT</u>

## I.    MILLER'S TERMINATION COMPLIED WITH THE COPYRIGHT ACT

Plaintiffs fully satisfied the requirements for statutory termination set forth in 17 U.S.C. § 203(a) ("Section 203(a)"):

• Under Section 203(a), "the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination …", 17 U.S.C. § 203(a), and "[i]n the case of a grant executed by one author, termination of the grant may be effected by that author." *Id*.  It is undisputed that Miller executed the Agreement with Manny regarding his Screenplay on or about June 4, 1979.

• Under Section 203(a),  termination "may be effected at any time during a period of  five

years beginning at the end of thirty-five years from the date of execution of the grant" (in this case, June 4, 2014 to June 4, 2019). 17 U.S.C. § 203(a)(3). "The termination shall be effected by serving an advance notice in writing signed by [the author]… or his duly authorized agent(s), upon the grantee or the grantee's successor in title. *Id*., § 203(a)(4). "The notice shall state the effective date of the termination which shall fall within the five-year period" and it "shall be served not less than two or more than ten years" before the effective date of termination. 17 U.S.C. § 203(a)(4)(A). Accordingly, the deadline for Miller to serve a notice of termination under Section 203(a) was June 4, 2017.

Miller's Termination Notice sets forth an effective termination date of January 25, 2018 which falls within the June 4, 2014 to June 4, 2019 five-year termination window; was served on January 21, 2016 by First Class Mail, postage pre-paid (per 37 C.F.R. § 201.10(d)) to Manny and its general partners, Sean S. Cunningham and Sean S. Cunningham, Ltd., and its January 21, 2016 service date is "not less than two or more than ten years" before its January 25, 2018 termination date. Toberoff Decl., ¶ 9, Ex. H; 17 U.S.C. §§ 203(a)(3), 203(a)(4)(A).

Plaintiff's argument that this Termination Notice is "defective on its face" because "although the Termination Notice was directed to the Manny Company and several of Horror's licensees, it was not served on Horror, the current copyright holder" (Complaint, ¶ 28) is without merit. As shown above, "The termination shall be effected by serving an advance notice in writing … upon the grantee <u>or</u> the grantee's successor in title. *Id*., § 203(a)(4).

Miller's First Amended Termination Notice, served solely as a precaution, set forth an effective termination date of July 1, 2018 which falls within the June 4, 2014 to June 4, 2019 termination window, and was served on June 27, 2016 by First Class Mail, postage pre-paid (per 37 C.F.R. § 201.10 (d) and its June 27, 2016 service date is "not less than two or more than ten

years" before its July 1, 2018 termination date.  Toberoff Decl., ¶ 11, Ex. J; 17 U.S.C. §§ 203(a)(3), 203(a)(4)(A). The Second Amended Termination Notice, also done in an abundance of caution, set forth an effective termination date of July 15, 2018, which falls within the June 4, 2014 to June 4, 2019 termination window, and was served on July 14, 2016 by First Class Mail, postage pre-paid (per 37 C.F.R. § 201.10 (d)) and, in addition, by Certified Mail, Return Receipt Requested to Plaintiff Horror, Inc. and its principle Robert Barsamian, and its July 14, 2016 service date is "not less than two or more than ten years" before its effective July 15, 2018 termination date. Toberoff Decl., ¶¶ 13-14, Exs. L, M; 17 U.S.C. §§ 203(a)(3), 203(a)(4)(A).

• Section 203(a) requires that a copy of the termination notice be "recorded in the Copyright Office before the effective date of termination," 17 U.S.C. § 203(a)(4)(A), and that it comply "in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation," 17 U.S.C. § 203(a)(4)(B).  Each of Miller's termination notices (identical in form with the exception of the recipients and their addresses) fully complied with 37 C.F.R. § 201.10, the regulations issued by the Register of Copyrights regarding termination under the Copyright Act.  The Termination Notice has been recorded with the Copyright Office. Toberoff Decl., ¶ 10, Ex. I.  The First Amended Notice of Termination and Second Amended Notice of Termination, like the Termination Notice were duly filed with the Copyright Office, but given that this was done over six months later than the original Termination Notice, Miller has not received the respective recordation notices from the Copyright Office yet.  Toberoff Decl., ¶¶ 12, 15, 16. Exs. K, N.

Because Miller's Termination Notice met all of the statutory requirements of Section

203(a), his Termination should be deemed effective as of its January 25, 2018 termination date.[5]

On January 25, 2018, the U.S. copyright in and to Miller's original Treatment and Screenplay will revert to him. 17 U.S.C. § 203(b)(1), (5).  Accordingly, Miller's termination simply and effectively allows him to finally participate in the true market value of his creation, just as Congress intended.[6] *See* H.R. Rep. No. 94-1476, at 124 (1976)(emphasizing that the termination right was enacted to give authors and their families a second chance to obtain a more equitable portion of a copyright's value when it is no longer conjectural.)

## II.    PLAINTIFFS' WORK FOR HIRE DEFENSE FAILS AS A MATTER OF LAW

### A.    "Work for Hire" Analysis Under Section 101 Of The Copyright Act

Plaintiffs have the burden of establishing by admissible evidence that Miller's Treatment and Screenplay are "works made for hire" under Section 101 of the Copyright Act. 17 U.S.C. § 101. As Plaintiffs completely fail to meet this burden, under the statute and binding precedent, Miller's Termination is valid under Section 203(a) as a matter of law.

The Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "1976 Act" or "Act") which became effective on January 1, 1978, applies to the Screenplay written by Miller in 1979. 17 U.S.C. § 101 *et seq.*  Pursuant to Section 203(a), Miller, the author of the Screenplay, held the inalienable right to recapture its copyright. 17 U.S.C. § 203(a); *Stewart v. Abend*, 495 U.S. 207,

---

[5] In the unlikely event this Termination Notice is held defective, the First Amended Termination Notice or Second Amended Termination Notice should be held effective as of their respective July 1, 2018 or July 15, 2018 termination dates.

[6] Notwithstanding Miller's statutory termination, "derivative works" (*e.g.*, all existing Friday the 13th films) "can continue to be" distributed as before. 17 U.S.C. § 203(b)(1). In addition, because the U.S. Copyright Act has no extra-territorial application, the foreign rights to Miller's Screenplay would remain with Manny's successors. *Update Art, Inc. v. Modiin Pub., Ltd.,* 843 F.2d 67, 72 (2d Cir. 1988). As a result, a new derivative work would require a license from both Manny's successors and Miller, enabling Miller to fairly participate with others at a level reflective of his work's market value.

218-219 (1990).

"Works for hire" are the only exemption from the Act's termination rights. 17 U.S.C. §§ 203(a), 304(c).  Plaintiffs' entire complaint is thus premised on conclusory allegations that the Screenplay is Manny's "work for hire." This is the sole alleged ground for Plaintiffs' federal count requesting a declaratory judgment that the Termination Notices are invalid (Complaint ¶¶ 29, 34), and, in turn, Plaintiffs' three state-law counts. Complaint, ¶¶ 35-54.  If Plaintiffs' purported "work for hire" defense fails, Plaintiffs' entire Complaint fails.

Copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). Generally, "the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989), *citing* 17 U.S.C. § 102. A work is "fixed" when it is embodied in a copy that is "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101. The Supreme Court's description of an author as a "person" is not insignificant, as it is a person who has ideas and gives them expression.  However, the Act also provides that "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title."  *Id.* § 201(b).

"Work for hire" is a statutorily defined term (*id*. § 101), and is universally described as an "exception" to the general rule that the person who creates a work is its legally recognized author, *id*., § 201(a); *Reid*, 490 U.S. at 737.  It is likewise a statutory exception to the fundamental termination rights so important to authors. 17 U.S.C. §§ 203(a), 304(c).

Plaintiffs therefore bear the burden of proving by admissible evidence that the Screenplay constitutes a "work made for hire" under Section 101 because "work for hire" is a statutory

exception. *See Woods v. Bourne Co.*, 60 F.3d 978, 993-994 (2d Cir. 1995) (burden of proving an alleged exception to the copyright termination statute falls on the terminated party under the "usual rule requiring a party claiming a [statutory] exception to bear the burden of proof). *See also FTC v. Morton Salt Co.,* 334 U.S. 37, 44-45 (1948) ("general rule of statutory construction" provides "that the burden of proving justification or exemption under a special exception to … a statute generally rests on one who claims its benefits").

Burdens of proof are critical on summary judgment, once discovery has been completed. If, as shown below, Plaintiffs "fail[] to make a sufficient showing on an essential element of [their] case with respect to which [they] ha[ve] the burden of proof," then summary judgment in Miller's favor is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  *See SHL Imaging v. Artisan House, Inc*., 117 F.Supp.2d 301 (S.D.N.Y 2000) (finding on summary judgment that plaintiff's photographs were not works for hire); *Vaad L'Hafotzas Sichos, Inc. v. Krinsky.*, 133 F.Supp.3d 527, 537 (E.D.N.Y 2015) (finding on summary judgment that religious pamphlets were not the publisher's work for hire). *Jou v. Accurate Research, Inc.,* 73 Fed.Appx. 964, 966 (9th Cir. 2003) (affirming summary judgment that programmer's software was not work made for hire).

Section 101 of the Act provides that a work is "made for hire" under only two mutually exclusive circumstances:

> (1) a work prepared by an employee within the scope of his or her employment; or
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101. The Screenplay does not qualify as a "work made for hire" under sub-section

(2), applicable to a "work specially ordered or commissioned … as part of a motion picture" because the parties failed to "expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." Manny's Agreement with Miller is devoid of any mention of "work made for hire" or "work for hire." Complaint, Ex. 1; Toberoff Decl., Ex. D. *See Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 560 (2d Cir. 1995)("This agreement does not mention a work-for-hire relationship . . . It does not, therefore, satisfy the writing requirement of § 101(2) that 'the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.'").

Plaintiffs have not produced (and did not allege) any "written instrument signed by [Miller and Manny]" where they "expressly agree … that the [Screenplay] shall be considered a work made for hire" or that even refers to "work for hire."[7] In its Complaint (¶ 24), Plaintiff points to a May 7, 1980 agreement between Manny and Georgetown Productions, Inc. which references Miller's Screenplay. First, this is not "a written instrument signed by [Miller and Manny]" 17 U.S.C. § 101. Toberoff Decl., Ex. D. Second, this third-party agreement nowhere refers to the Screenplay as a "work for hire." On the contrary, Manny "represent[ed] and warrant[ed]" among other things "[t]hat Victor Miller is the sole author of the Screenplay;" and "[t]hat the Screenplay is original". Toberoff Decl., Ex. D, p. 2, ¶ 2.

Similarly, the Verified Complaint in the case, *Manny Company vs. Georgetown*

---

[7] The routine copyright registration certificate for the Film (described therein as "motion picture photoplay in 90 minutes"), Complaint, Ex. 2, which unilaterally lists Georgetown Productions Inc. as the "author" of the Film does nothing to resurrect Plaintiffs' "work for hire" claim either. First, this self-serving registration by Georgetown does not qualify as a "written instrument signed by [Miller and Manny]" 17 U.S.C. § 101.  Second, under Plaintiffs' "work for hire" theory, Manny, the hiring party, is the putative "author" of the Screenplay, not Georgetown. Third, this registration certificate is for the Film not Miller's Screenplay. Moreover, a film based on intellectual property (*e.g*., a pre-existing novel or play) that is clearly not work for hire is commonly still registered as a "work for hire."

*Productions, Inc. et al.* in the Southern District of New York, 85 Civ. 7175 (MP), verified by

Cunningham on September 6, 1985, alleges: "On or about June 6, 1979, the Manny Co. entered

in an agreement (the "Screenplay Agreement") with Victor Miller (the "author") ...", Toberoff

Decl. Ex. E, at ¶ 8 (000369), and the Affidavit of Sean S. Cunningham in that action, sworn to on

May 25, 1986, states: "On June 6, 1979, Manny Co. entered into a screenplay agreement (the

"Screenplay Agreement") with Victor Miller (the "Author") pursuant to which the Author wrote

and delivered to the Manny Co. the screenplay for the Film."; attaching a copy of the Agreement.

Toberoff Decl., Ex. F at ¶ 3 (000561).  These statements, like the Agreement, itself, are devoid of

any mention of "work for hire" and run counter to any notion that Manny was the "author" of a

"work made for hire."

As the Screenplay plainly does not qualify under Section 101(2) as a matter of law this

entire case turns on Plaintiffs' argument that Miller is not a freelance writer, but Manny's

conventional "employee" under Section 101(1).[8]

In *Reid*, the Supreme Court addressed the question of whether an individual is an

"employee" under Section 101(1).  The Court *rejected* "Petitioners' argument that a work is

'prepared by an employee within the scope of his or her employment' [under § 101(1)] whenever

the hiring party retains the right to control, or actually controls, the work [a]s inconsistent with

the language and legislative history of the work for hire provisions," as this "would distort the

---

[8] The reference to "Employment Agreement" in Miller's contract is unavailing as independent contractors are routinely "employed" to create "a specially ordered or commissioned work" subject to Section 101(2). *See Marvel*, 310 F.3d at 291 ("[U]nder agency law, '[t]he manner in which the parties designate the relationship is not controlling, … the mere use of the word 'agent' by parties in their contract does not make one an agent who, in fact, is not such."; *quoting* 3 Am.Jur.2d *Agency* § 19 (2002)); *Carter v. Helmsley-Spear, Inc.*71 F.3d 77, 83 (2nd Cir. 1995)("One of the factors that did not persuade us was the appellants' simplistic contention that usage of the words 'employ' or 'employment' in the agreements … establishes that the plaintiffs were employees. The use of these terms does not transform them into 'magic words' imbued with legally controlling significance.").

19

provisions' structure, which views works by employees and commissioned works by independent contractors as mutually exclusive entities." 490 U.S. at 731. *See also id*. at 742 ("We therefore conclude that the language and structure of § 101 of the Act do not support either the right to control the product or the actual control approaches.").

Relying extensively on the legislative history of the Act, the Court concluded that the term "employee" in Section 101(1) referred to traditional hierarchical employment as determined by the common law of agency:

> To determine whether a work is a "work made for hire" within the § 101 definition, a court should first apply general common law of agency principles to ascertain whether the work was prepared by an employee or an independent contractor … Although the Act nowhere defines "employee," "employment," or related terms, it must be inferred that Congress meant them in their settled, common-law sense, since nothing in the text of the work for hire provisions indicates that those terms are used to describe anything other than the conventional relation of employer and employee.

490 U.S. at 731. Significantly, the Court concluded that "in using the term 'employee,' the parties and Congress meant to refer to a hired party in a conventional employment relationship." *Id*. at 743.  *See also id*. at 731(nothing in the text of the work for hire provisions indicates that those terms are used to describe anything other than the conventional relation of employer and employee.") The Court listed the factors to be considered in "determining whether a hired party is an employee under the general common law of agency":

> the hiring party's right to control the manner and means by which the product is accomplished … the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.[9]

---

[9] Of the *Reid* factors, Plaintiffs solely attempt to allege three factors, that Manny had the right to control the manner in which the Screenplay was written (Complaint, ¶ 21); that Manny is a business (Complaint,

*Id.* at 751-52 (footnotes omitted). While all of these factors are relevant "no one of these factors is determinative." *Id*. at 752.

The Second Circuit emphasizes the following five "factors [which] will almost always be relevant and should be given more weight in the analysis, because they will usually be highly probative of the true nature of the employment relationship":  "(1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party." *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992). *See also Graham v. James*, 144 F.3d 229, 235 (2d Cir.1998) ("We are persuaded by the district court's conclusion that James was an independent contractor. Almost all of the *Aymes* factors line up in favor of that conclusion: James is a skilled computer programmer, he was paid no benefits, no payroll taxes were withheld, and his engagement by Graham was project-by-project.")

"[T]he ultimate determination, on settled facts, of whether a work qualifies as a work-for-hire is a question of law." *Ulloa v. Universal Music and Video Distribution Corp*, 303 F.Supp.2d 409, 416 (S.D.N.Y 2004), *citing Aymes*, 980 F.2d at 861. *See also Berger Transfer & Storage v. Central States,* 85 F.3d 1374, 1377 (8th Cir.1996) ("[W]hether a given individual is an employee or independent contractor is a question of law, which must be decided by reviewing the particular facts of each case.")

### B.      Under *Reid*, *Aymes* and the Common Law of Agency, Miller Was An Independent Contractor

#### 1.      *Hiring Party's Right To Control The Manner And Means Of Creation*

First, it can hardly be said that Manny had "the right to control the manner and means of

---

¶ 11);  and that "on information Miller received employee benefits as a result of performing his screenwriting services …". (Complaint, ¶ 18).

[Miller's] creation" of the Treatment and Screenplay when Mr. Miller wrote most of this material prior to entering into the Agreement with Manny. Miller Decl., ¶¶ 5-12. Notwithstanding this, the totality of the evidence relevant to this factor strongly suggests a creative collaboration and exchange of ideas[10] between Miller, the writer, and Cunningham, the director/producer of the contemplated Film (coinciding with the fact that they were close friends) rather than control by Manny of the manner and means by which Miller wrote the Screenplay.[11] *See id.*, ¶¶ 4, 6, 15, 17, 19.

As shown below, the additional factors that are closely related to the manner and means of a work's creation such as whether the work was primarily created at Manny's or Miller's location; whether Manny or Miller provided the instrumentalities and tools of creation, and whether Manny or Miller controlled the hours Miller worked, all weigh against Plaintiffs on this factor as well. *Id.*, ¶¶ 15-17. The Agreement does not even contain a schedule for Miller's completion and delivery of the Screenplay. *Id.*, Ex. D.

Aptly, the district court in *SHL Imaging v. Artisan House, Inc.* found that "[the hiring party's] argument that [the hired party] was given explicit instructions and worked under the supervision of the [hiring party], at their premises is unavailing … [as] it is clear that defendants' instructions were so general as to fall within the realm of unprotectible ideas. Thus, they cannot substantiate a work-for-hire authorship defense." 117 F.Supp.2d 301, 314.

---

[10] In this regard, one is reminded that copyright protects the translation of ideas into fixed tangible expression, 17 U.S.C. § 102, and it is beyond dispute that Miller wrote the Treatment and Screenplay in question and consequently Miller received sole writing credit on the Film.  Miller Decl., ¶ 26, Ex. G.

[11] It is worth noting that this factor does not appear to be particularly well suited to creative writing. The "means of creation" is always a typewriter or PC, and paper, and the "manner" of creation is either equally simplistic as to where/how the work was accomplished or creatively complex; whereas it may be more relevant to the work in *Reid*, 490 U.S. at 733-35 (choice of materials, dimensions and execution of "a sculpture of a modern nativity scene") or *Aymes*, 980 F.2d at 858 (computer programs).

The same applies to Cunningham and Miller's exchange of ideas, which is no substitute for Miller's *writing* of the Treatment and Screenplay. *See also Quintanilla vs. Texas Television, Inc*., 139 F.3d 494, 498 (5th Cir.1998) (finding no "employee" status and no "work for hire" as a matter of law where plaintiff "had control over the concert, but did not control the manner" in which defendant taped the event); *Marco v. Accent Publ'g Co*., 969 F.2d 1547, 1551–52 (3d Cir.1992) (holding that a photographer is not a work-for-hire employee where the hiring party "controlled only the subject matter and composition of the images").

Finally, *Reid* cautions against placing too much weight on the right of control. *Reid*, 490 U.S. at 741-742.[12] *See Hi–Tech Video Prods., Inc. v. Capital Cities/ABC, Inc*., 58 F.3d 1093, 1099 (6th Cir.1995) ("neither the right to control nor actual control alone can turn an otherwise independent contractor into an employee").

On balance, this factor either weighs in favor of Miller as an independent contractor, or is

---

[12] In fact, *Reid* was prompted by attempts to shoe-horn specially commissioned works covered by Section 101(2) into Section 101(1) covering traditional employees, just as Plaintiffs do here:

> Section 101 plainly creates two distinct ways in which a work can be deemed for hire: one for works prepared by employees, the other for those specially ordered or commissioned works which fall within one of the nine enumerated categories and are the subject of a written agreement. The right to control the product test ignores this dichotomy by transforming into a work for hire under § 101(1) any "specially ordered or commissioned" work that is subject to the supervision and control of the hiring party. Because a party who hires a "specially ordered or commissioned" work by definition has a right to specify the characteristics of the product desired, at the time the commission is accepted, and frequently until it is completed, the right to control the product test would mean that many works that could satisfy § 101(2) would already have been deemed works for hire under § 101(1). Petitioners' interpretation is particularly hard to square with § 101(2)'s enumeration of the nine specific categories of specially ordered or commissioned works eligible to be works for hire, *e.g.,* "a contribution to a collective work," "a part of a motion picture,"…The unifying feature of these works is that they are usually prepared at the instance, direction, and risk of a publisher or producer. By their very nature, therefore, these types of works would be works by an employee under petitioners' right to control the product test.

*Id.* at 741. *Reid* similarly disavowed any sort of actual control test. *Id.* at 742.

indeterminate.

### 2.      *Writing Screenplays Is A Skilled Profession*

Writing a fictional screenplay is a skilled occupation that is not fungible.  *In re Brown*,
743 F.2d 664, 668 (9th Cir. 1984) ("The free-lance writers['] work involve[s] uncommon
skills."). *See also Marco v. Accent Publ'g Co.,* 969 F.2d 1547 (3d Cir. 1992)  (analyzing for
purposes of a § 101 determination the spectrum of skill of a photographer). While the Film may
not have been high art, something considerably more than owning a typewriter was required to
write it.  *See* Miller Decl, ¶¶ 2-3. Thus, Cunningham, though intending to direct and produce the
Film, approached Miller to write it.  In 1979, when Miller wrote the Screenplay, he had already
written several published novels and three produced films. Miller Decl., ¶ 3. The skill required to
do so weighs heavily in favor of Miller's independent contractor status. *See Aymes*, 980 F.2d at
862 ("Aymes was clearly a skilled craftsman. Consequently, this factor weighs heavily in his
favor."); *Ulloa,* 303 F.Supp.2d at 415 ("In evaluating whether skill is required to create a work,
the skill necessary to perform the work—not the relative inexperience of the individual—is
relevant.").

Numerous other courts have stressed the hired party's level of skill in finding he/she to be
an independent contractor.  *See Graham*, 144 F.3d at 235 (computer programmer); *MacLean
Assocs., Inc. v. Wm. M. Mercer–Meidinger–Hansen, Inc.,* 952 F.2d 769, 777 (3d Cir. 1991)
(same); *Marco,* 969 F.2d at 1547 (3d Cir. 1992)*,* (photographer); *M.G.B. Homes, Inc. v. Ameron
Homes, Inc.,* 903 F.2d 1486, 1492 (11th Cir.1990) (drafting service); *Johannsen v. Brown,* 797
F.Supp. 835, 841 (D.Or. 1992) (artist/printer); *Kunycia v. Melville Realty Co.,* 755 F.Supp. 566,
575 (S.D.N.Y. 1990) (architect).

The factor weighs strongly in favor of Miller being an independent contractor.

### 3.    *Miller Provided His Own Instrumentalities and Tools*

Miller wrote the Treatment and Screenplay on his own IBM Selectric typewriter on his own paper. Miller Decl., ¶ 15. The Agreement unsurprisingly contains no provision regarding the provision to Miller of paper, writing utensils, or any other materials, instrumentalities or tools. *See* Complaint, ¶ 17, Ex. 1.  This likewise supports that Miller was "an independent contractor" governed by Section 101(2) because "the instrumentalities and tools of the job belonged to [him]." *Keller v. Niskayuna Consol. Fire Dist. 1*, 51 F. Supp. 2d 223, 229 (N.D.N.Y. 1999).

### 4.    *Miller Worked At Home*

Miller wrote the Treatment and Screenplay in his study at his home in Stratford, Connecticut without daily supervision from Cunningham, not in Manny's alleged "office" above Cunningham's garage in Westport.  Miller Decl., ¶¶ 4, 15, 19; *Reid*, 490 U.S. at 731, 752. This also weighs in favor of the conclusion that Miller acted as an independent contractor not as Manny's "conventional" employee.  *Id*., *see also Aymes*, 980 F.2d at 865; *Jou,* 73 Fed.Appx. 964, 966 (weighing fact that "often programmers worked from their own homes on their own equipment" in affirming summary judgment that programmers were independent contractors).

### 5.    *Miller Worked On The Treatment And Screenplay Over A Short Duration*

Miller wrote the Treatment and Screenplay in approximately two months.  Miller Decl., ¶18; Complaint, ¶ 22, and "two months" is a "relatively short time," according to *Reid,* 490 U.S. at 752-753. *See Jou*, 73 Fed.Appx. at 966 (finding independent contractor status where "[t]ypically [] hired … for short periods of time and for discrete projects"); *Recht v. Metro Goldwyn Mayer Studio, Inc.,* 580 F.Supp.2d 775, 783 (W.D. Wis. 2008) (that composer's "work was estimated to be for three months" weigh[ed] in [] favor" of independent contractor status).

As with all such freelance writers, Miller's "engagement was project by project." *Graham*, 144 F.3d at 235. As alleged by Plaintiffs and evident from the Agreement, Miller's engagement was for a discrete project, which again supports Miller's status as an independent contractor. Complaint, ¶¶ 2, 16; Miller Decl., Ex. D. "Independent contractors are typically hired only for particular projects." *Aymes*, 980 F.2d at 863. Miller's "position was expressly temporary." *Talbert v. Am. Risk Ins. Co.*, 405 F. App'x 848, 856 (5th Cir. 2010) (finding hired party was an independent contractor); *Thibault v. Bellsouth Telecomm., Inc.*, 612 F.3d 843, 849 (5th Cir.2010) (noting that a "temporary, project-by-project, on-again-off-again relationship" points to the conclusion that the hired party was an "independent contractor"); *Christians of California, Inc. v. Clive Christian New York*, LLP, 13-CV-275 KBF, 2014 WL 4743422, at *2 (S.D.N.Y. Sept. 15, 2014) (holding that the hired party was an "independent contractor" as he was "hired to perform a specific short-term project.").

Both these related factors weigh heavily in favor of Miller's independent contractor status.

6.      *Manny Did Not Have the Right to Assign Miller Additional Projects*

Like the hiring party in *Reid*, Manny "had no right to assign additional projects to" the hired party. *Reid*, 490 U.S. at 753; Miller Decl., ¶ 20. Plaintiffs do not allege this, and based on the Agreement, cannot allege this. Miller Decl., Ex. D. "There is no claim in this case that the defendants had the right to assign, or in fact assigned additional projects."  *SHL Imaging, Inc.* 117 F. Supp. 2d at 314 (holding that this supports a finding that the hired party was an independent contractor under Section 101(2)). *See also Graham*, 144 F.3d at 235 (emphasizing that the engagement of the hired party was "project by project") ;*Ulloa v. Universal Music and Video Distribution Corp*, 303 F.Supp.2d 409, 416 (S.D.N.Y 2004) ("Even assuming Defendants 'assigned' this project to her, they did not have the right to "assign" other projects."); *Recht,*

*supra,* 580 F.Supp.2d at 783 (that "the producer had no right to assign additional work to petitioner," weighs in favor of independent contractor status).

This factor also weighs strongly in favor of Miller's independent contractor status.

### 7.     *Miller Determined When and For How Long He Worked*

Plaintiffs do not allege that Manny controlled the days or hours when Miller was to write the Treatment or Screenplay, nor does the Agreement contain any provisions regarding this. *See* Complaint, ¶ 20, Ex. 1. It did not even include a schedule for Miller's completion and delivery of the first and final drafts of the Screenplay purportedly commissioned. To the extent any rough schedule possibly even existed, Miller "had absolute freedom to decide when and how long to work in order to meet his deadline," which once again strongly supports the conclusion that he worked as an independent contractor, not as a conventional "employee".  *Reid*, 490 U.S. at 731.

### 8.     *Miller Was Paid Discrete Sums Upon Completion Of Specific Work*

According to the Screenplay Agreement, Manny was to pay Miller $ 5,569 upon delivery of a first draft and $ 3,713 upon delivery of a final draft screenplay.  Miller Decl., Ex. D, ¶ 4 (c), (d).  Thus, like the sculptor in Reid, Miller was to be paid sums dependent on "completion of a specific job, a method by which independent contractors are often compensated." *Reid*, 490 U.S. at 749 (internal quotation marks and citations omitted).  This also weighs strongly in favor of Miller's independent contractor status.

### 9.     *Miller Could Hire and Pay His Own Assistants If He Wished To*

There was nothing to restrict Miller from hiring and paying his own assistants to assist him with his work at home if he chose to do so.  The Agreement does not so restrict Miller. Miller Decl., Ex. D. This factor is not particularly relevant to screenwriters who usually write on their own anyway. *See Aymes*, 980 F.2d at 861("the authority to hire assistants will not normally

be relevant if the very nature of the work requires the hired party to work alone"). If nonetheless considered relevant, it weighs in favor of Miller's independent contractor status.

> 10.    Whether Manny Was "In Business" And Whether Writing Screenplays Was Part of That Business Is Indeterminate

These two related factors likewise do little to inform the Court's determination as businesses routinely hire *both* independent contractors and employees. "This factor will generally be of little use" and "carries very little weight, because most companies hire numerous support personnel." *Aymes*, 980 F.2d at 863. In practice, "courts rarely even address this factor." *Tagare v. Nynex Netowrk Sys. Co.*, 994 F. Supp. 149, 158 (S.D.N.Y. 1997). If considered relevant, it is actually questionable that Manny itself was "in business."  Manny, an alleged limited partnership, was a shell entity for its general partners, Cunningham and Sean Cunningham Films, Ltd. ("SCF"), formed for the singular purpose of producing the film *Manny's Orphans*, not *Friday the 13th*.  Toberoff Decl., ¶ 8, Ex. G at PL000896. Although Manny entered into the Screenplay Agreement, Cunningham tellingly slapped "Sean Cunningham Films, Ltd." on the cover of Miller's Second Draft, even though there is no record of any assignment of Miller's material from Manny to SCF, and Manny later purported to assign the Screenplay to Georgetown.  Miller Decl., Ex. C; Toberoff Decl., Ex. D.  While Plaintiffs will argue that screenplay development was a part of Manny's alleged film "business", it can hardly be said that Manny was in the business of *writing* screenplays[13] – the work at issue.

On balance, these two factors are indeterminate and negligible in weight, as they do not do much to advance the analysis.

---

[13] To elucidate this point with examples, a writer who hires another to ghost-write or a lead writer/showrunner of a weekly television series who hires additional writers to write episodes *are* both in the business of writing.

### 11.    *Manny Did Not Provide Miller Any Employee Benefits*

Manny provided Miller with *no* employee benefits whatsoever; without limitation: no health insurance or medical or dental plan, no paid vacation, no pension, nor life insurance. Miller Decl., ¶ 24. Nor did Manny contribute on Miller's behalf to unemployment insurance or worker's compensation insurance as required for employees.  *Id*.  Plaintiffs, who have the burden of production and persuasion as to their alleged work for hire defense/statutory exception, have produced no evidence of Manny providing Miller *any* such employee benefits.

The Complaint makes the rather carefully worded allegation that "on information and belief [] Miller has received employee benefits *as a result of* performing his screenwriting services on the Screenplay." Complaint, ¶ 28. This alludes to Plaintiff's argument that because Miller was a member of the WGA and Manny was a signatory to the WGA's 1977 Minimum Basic Agreement, contributions by Manny or by his assignee or by his assignee's successor to the WGA's health and pension fund in connection with Miller's Screenplay constitutes the provision by Manny of these employee benefits. As this factor is used to weigh the actual relationship between *Manny* and Miller, it is doubtful that alleged actions down the road by an assignee or successor sheds any light on a *Reid* analysis regarding the Manny/Miller relationship.

The Court need not enter this thicket, however, because the WGA's records demonstrate that no one made any contributions to the WGA's pension and health funds.  Toberoff Decl., ¶ 4, Ex. C.  The failure of Manny to provide Miller with any conventional employment benefits weighs heavily against "employee" status under Section 101(1). *See Aymes*, 980 F.2d at 863.

12.     *The Tax Treatment of the Hired Party*

Miller was treated by Manny as an independent contractor, not as an employee, for tax purposes.  Manny simply paid Miller the full flat sums set forth in paragraph 3 of the Screenplay Agreement and did not withhold from such compensation any federal or state income tax, social security and/or medicare (nor pay an employer's matching amount), nor did Manny report or pay Federal Unemployment tax (FUTA) or FICA taxes, all as required by law for conventional employees.  Miller Decl., ¶ 22, Ex. F.  Manny, which has the burden of production and persuasion as to its "work for hire" exception/defense, provided no evidence that Manny did not treat Miller for tax purposes as the independent contractor he was.

Manny's indisputable failure to treat Miller as an employee for tax purposes weighs heavily in Miller's favor on this issue. *Aymes*, 980 F.2d at 862. The Second Circuit reasoned that the choice to treat a worker as an independent contractor for compensation and tax purposes was entirely inconsistent with an employer-employee relationship.  *Id*. "The nonpayment of . . . payroll taxes to or on behalf of the creator support[s] the conclusion that the creator was an independent contractor rather than an employee." *Graham v. James*, 144 F.3d 229, 235 (2nd Cir. 1998). "In virtually every case, a strong indication of a worker's employment status can be garnered through examining … how the employer treats the worker for tax purposes." *Hi–Tech Video Prods., Inc. v. Capital Cities/ABC, Inc*., 58 F.3d 1093, 1096-7 (6th Cir. 1995); *Jou*, 73 Fed.Appx. 964, 966 (9th Cir. 2003)(holding that the hiring party could not establish ownership of the software as works for hire where "[m]ost compellingly, Plaintiff did not treat the programmers as "employees" for tax purposes. Except for a brief period in 1995, she did not withhold any taxes from the staffers' pay.").

*******

30

The above analysis shows that nearly all of the common law agency factors set forth in *Reid* and, in particular, the five factors that the Second Circuit found most significant in *Aymes* (control, skill, right to assign additional projects, employment benefits and tax treatment) and its progeny weigh heavily in favor of Miller's status as an independent contractor and thus, the ultimate conclusion that his Treatment and Screenplay were not work for hire under 17 U.S.C. § 101.

While Miller and Cunningham bounced creative ideas off one another, Manny did not control "the manner and means of creation," nor is this factor readily applicable to the creative writing process. As a screenwriter, Miller was engaged in a skilled occupation; he wrote at home, using his own instruments and supplies; this discrete project was of very short duration (approximately two months); he was to be paid lump sums after completion of limited work (a first and final draft screenplay); Manny had no right to assign additional projects to Miller; who determined his own hours and days of work; Manny did not provide him with any employment benefits, and treated him as an independent contractor for tax purposes.

Manny's failure to pay standard employment benefits or payroll taxes "is *highly indicative* that [Miller] was considered an outside independent contractor by [Manny]. *Indeed, these two factors constitute virtual admissions of [Miller's] status by [Manny] [it]self.*" *Aymes*, 980 F.2d at 862. *See also Landman Fabrics v. Graff Californiawear Inc.,* 160 F.3d 106, 111 (2d Cir.1998) (same, *quoting Aymes*); *Kirk v. Harter,* 188 F.3d 1005, 1008 (8th Cir.1999) ("failure to provide employment benefits or withhold any payroll taxes is probative evidence of [defendant's] status as an independent contractor", *citing Aymes* 980 F.2d at 1863). "The importance of these two factors [tax treatment and employment benefits] is underscored by the fact that every case since *Reid* that has applied the test has found the hired party to be an

independent contractor where the hiring party failed to extend benefits or pay social security taxes." *Aymes*, 980 F.2d at 863 (citations omitted).

The Second Circuit has condemned the "basic inequity" of treating a person "like an independent contractor when it came to providing benefits and paying a percentage of his payroll taxes" but claiming that the person was an employee when it came to claiming to be the statutory "author" of that person's creative work. *Id. at 862.*

Analysis of the above factors mandates the legal conclusion under *Reid* and *Aymes* that Miller was not Manny's conventional "employee," but an independent contractor. As there was no "written instrument signed by" Miller and Manny (or Cunningham) in which they "expressly agree[d] … that the [Treatment and Screenplay] shall be considered a work made for hire," 17 U.S.C. §101, the Treatment and Screenplay are not works for hire as a matter of law. Miller should accordingly be allowed to finally reap the benefits of his creative works' commercial success as Congress intended in enacting the termination provisions of the Copyright Act. *See Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983-84 (9th Cir. 2008), citing *Stewart v. Abend*, 495 U.S. 207, 218-219 (1990) and *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-173 (1985).

## C. Miller's Treatment and First Draft Screenplay, Written "On Spec," Are Not "Work For Hire" In Any Event

### 1. *Miller's Treatment Entitled "The Long Night at Camp Blood"*

In early 1979 Cunningham suggested to Miller that they emulate the very successful low-budget slasher hit *Halloween* (1978). Miller Decl., ¶ 5. After seeing "Halloween" Miller swiftly wrote a detailed 15-page film treatment which he entitled "The Long Night at Camp Blood" (the "Treatment"). Miller Decl., ¶ 6, Ex. A. "Copyright protection subsists" in the Treatment as a "work[] of authorship fixed in a[] tangible medium of expression." 17 U.S.C. § 102(a), (a)(1), and such copyright "vests initially in the author [] of the work." 17 U.S.C. § 201(a).

The Treatment in no way qualifies as Manny's "work for hire." 17 U.S.C. § 101 is inapplicable because Miller was never hired to the write the Treatment. Miller wrote the Treatment "on spec," *i.e*., without any guarantee of compensation. *Id*., Miller Decl., ¶ 8. In fact, *at no time* was Miller even paid for the Treatment. *Id*., ¶ 21. The Screenplay Agreement that Miller and Manny later entered into[14] does not even purport to hire Miller to write the Treatment or to pay Miller for his Treatment. Toberoff Decl., Ex. D. Conspicuously, this form agreement supplied by Cunningham entitled "Writer's Flat Deal Contract" contains in the paragraph that purports to commission specified material, boxes entitled "[ ] Treatment" and "[ ] Original Treatment," neither of which were checked. *Id*., Ex. D at ¶1. The only boxes checked therein are: "[x] First draft screenplay" and "[x] Final draft screenplay", *id*., and under the Agreement. Miller is only entitled to lump sum payments for a "first draft screenplay" and "final draft screenplay", respectively. *Id*., Ex. D at ¶3.

The above leads to the inescapable legal conclusion that Miller's "The Long Night at Camp Blood" Treatment was either *not* owned or licensed by Manny, or, if construed to be have been transferred or licensed to Manny that this transfer or license was subject to Miller's termination under 17 U.S.C. § 203(a).

### 2.    *Miller's First Draft Screenplay*

After writing the Treatment, Miller wrote the first draft of the Screenplay (the "First Draft"). Miller Decl., Ex. B. The First Draft was also entitled "The Long Night at Camp Blood" as it was written prior to the time Cunningham came up with the title "Friday the 13th." *Id*., ¶¶ 7, 9, 10. Whereas Miller hoped that Cunningham would succeed to raise money for their new

---

[14] "The Long Night at Camp Blood" Treatment was written by Miller well prior to the ScreenplayAgreement. The Screenplay Agreement refers to "a proposed motion picture … presently entitled … Friday 13," the title later introduced by Cunningham. Miller Decl., Exs. A, D.

horror film, the First Draft was likewise written "on spec," prior to entering into the Screenplay Agreement and without any guarantee of compensation. *Id.*, ¶ 8. While the Screenplay Agreement refers to "a proposed motion picture … presently entitled … Friday 13," no reference whatsoever to Friday the 13th appears in the pages of Miller's First Draft.  *Id.*, Ex. B. Tellingly, Miller's *Second Draft*, written closer to the June 4, 1979 date of the Agreement, contains several references to Friday the 13th.  Miller Decl., ¶ 10, Ex. C at pp. 6 (00023); 7(00024) and 67(00085).

As Miller wrote the First Draft "on spec" and prior to Miller's engagement by Manny it is not "work for hire" in any event under 17 U.S.C. § 101(1) or (2), and is therefore subject to statutory termination under 17 U.S.C. § 203(a).

## III.   PLAINTIFFS' VAGUE REMAINING CLAIM THAT OTHERS "CREATED" MATERIAL IN THE SCREENPLAY FAILS AS A MATTER OF LAW

Plaintiffs assert in their First Claim for Declaratory Relief that "[e]ven if any of Miller's Termination Notices is deemed valid … Miller's termination is limited solely to creative elements contained in the Screenplay which were created by Miller, and not the entirety thereof, which will be determined after discovery in this matter." Toberoff Decl., Ex. A at ¶ 34(f).

Plaintiffs' assertion muddies the line between creative ideas and the tangible expression of ideas protected by copyright. Of course, "the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Reid*, 490 U.S. at 737, *citing* 17 U.S.C. § 102. *See* 17 U.S.C. § 102(b)("In no case does copyright protection … extend to any idea … ."). No one "may copyright [] ideas. The copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 544 (1985). It is undisputed and serves as an admission by Plaintiffs that Miller was accorded

*sole* screenwriting credit on the Film (*i.e.*, "Written by Victor Miller") by Manny/Cunningham, and its successor, Georgetown. Moreover, it was "determined after discovery", Complaint, ¶ 34(f), that only one minor scene in the Film was not written by Miller.[15] Miller Decl., ¶ 26.

Plaintiffs' unsupported co-authorship claim embedded in its claim for declaratory relief is also barred by the Copyright Act's three year statute of limitations. 17 U.S.C. § 507(b)("no civil action shall be maintained … unless it is commenced within three years after the claim accrued.").[16] A claim accrues when the plaintiff knows or has reason to know of the claim and "a co-author knows that he or she jointly created a work from the moment of its creation." *Merchant v. Levy*, 92 F. 51, 56 (2d Cir. 1996), *cert denied*, 519 U.S. 1108 (holding that the Copyright Act's three-year statute of limitations barred a suit seeking a declaration of copyright co-ownership rights). *See also Margo v. Weiss*, 213 F.3d 55, 60 (2d Cir. 2000) (same); *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000) (holding that a claim for a declaration of co-authorship is time-barred because it accrued on repudiation of authorship and that (as here) "th[e] movie credits plainly and expressly repudiated authorship").

## CONCLUSION

For all the foregoing reasons, Defendant and Counterclaimant Victor Miller respectfully requests that the Court grant summary judgment in his favor or, in the alternative, partial summary judgment in favor of his Counterclaim and against Plaintiff's First Count. In this regard Miller respectfully requests a declaratory judgment that his termination is valid under the Copyright Act, and that he will thereby recover on the effective termination date – January 25,

---

[15] This is a brief scene in which a policeman on a motorcycle visits Camp Crystal Lake and cautions some of the Camp counselors to behave.  *Id.*

[16] In contrast, Miller's Counterclaim as to the validity of his Termination under the Copyright Act is not time-barred due to the termination time windows specified by the statute. 17 U.S.C. § 203(a)(3). *See* Section I, *supra*.

2018 – the U.S. copyright to the original Treatment and Screenplay he authored. Miller further

requests that he be awarded attorneys' fees and costs incurred in defending against Plaintiffs'

unwarranted claims.

Respectfully Submitted,                          Defendant and Counterclaimant Victor Miller

  Dated: June 9, 2014                    By:_____/s/ Marc Toberoff_____
                                              Marc Toberoff (FBN phv08515)
                                              TOBEROFF & ASSOCIATES, PC
                                              23823 Malibu Rd.Ste. 50-363
                                              Malibu, CA 90265
                                              Telephone: (310) 246-3333
                                              Facsimile: (310) 246-3101
                                              Email: mtoberoff@toberoffandassociates.com

                                              His attorneys.

36

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing Defendant and Counterclaimant's Notice of Errata, dated June 11, 2017, was served electronically by the Court's ECF system on said date and that all interested parties in this case are registered CM/ECF users.

The undersigned declares under penalty of perjury under the laws of the United States that the above is true and correct.


Dated: June 11, 2017                              /s/ Marc Toberoff
                                                           Marc Toberoff