# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HORROR INC., a Massachusetts corporation;
and MANNY COMPANY, a Connecticut
Limited Partnership,

                Plaintiffs,

      vs.

VICTOR MILLER, an individual; and
DOES 1 through 10,

                Defendants.

Case No.: No. 3:16-cv-01442-SRU

**June 30, 2017**

VICTOR MILLER, an individual;

                Counterclaimant,

      vs.

HORROR INC., a Massachusetts corporation;
and MANNY COMPANY, a Connecticut
Limited Partnership; and DOES 1 through 10,

                Counterclaim-Defendants.

---

## DEFENDANT AND COUNTERCLAIMANT VICTOR MILLER'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Marc Toberoff (Federal Bar No. phv08515)
*mtoberoff@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Rd, Ste 50-363
Malibu, California, 90265
Telephone:(310) 246-3333
Fax: (310) 246-3101

Attorneys for Defendant and
Counterclaimant Victor Miller

## TABLE OF CONTENTS

**INTRODUCTION**................................................................................................. 1

**COUNTER-STATEMENT OF FACTS** ............................................................. 3

**ARGUMENT** ...................................................................................................... 10

   **I.**    **PLAINTIFFS' LABOR LAW ARGUMENT IS WITHOUT MERIT** ..................... 10

      A.   Contrary to Plaintiffs' Core Argument the NLRA Does Not Preempt
         The Copyright Act ................................................................................. 11

      B.   Contracts, Including Collective Bargaining Agreements, Also Do Not
         Override The Copyright Act .................................................................. 13

      C.   Courts Engage In An Analysis Of The *Reid* Factors As Required Even When
         The Hired Party Is A Union Member...................................................... 14

      D.   In 1938, When Screenwriters Were Allowed To Unionize By the NLRB,
         Both Labor Law and Employment Of Screenwriters Were Very Different
         Than In 1979 and Today…………………………………….......................... 16

          1.   In 1938, Screenwriters Primarily Worked As Regular Salaried
            Employees In the "Studio System"................................................. 16

          2.   In 1938, the NLRA Did Not Exclude Independent Contractors As It Did
            In 1979, and It Does Today......................................................... 17

      E.   Plaintiffs Ignored the WGA Agreement  In 1979 When It Mattered ....................... 18

 **II.**   **PLAINTIFFS' ARGUMENT THAT MILLER HAS NO TERMINATION
      RIGHTS BECAUSE THERE WAS NO EXPRESS TRANSFER OF RIGHTS
      FAILS AS A MATTER OF LAW** ............................................................... 21

**III.**   **PLAINTIFFS' ARGUMENT THAT MILLER'S NOTICES OF TERMINATION
      ARE BARRED BY THE COPYRIGHT ACT'S THREE YEAR STATUTE OF
      LIMITATIONS IS WITHOUT MERIT** ...................................................... 27

**IV.**   **MILLER'S WROTE HIS TREATMENT AND FIRST DRAFT SCREENPLAY
      "ON SPEC" PRECLUDING PLAINTIFF'S MOTION IN ANY EVENT** .............. 32

 **V.**   **PLAINTIFFS' CLAIM THAT CUNNINGHAM CO-AUTHORED THE
      SCREENPLAY AND FILM ARE BARRRED BY SECTION 507** ..................... 33

    **CONCLUSION** ........................................................................................ 40

## TABLE OF AUTHORITIES

### Cases

*118 E. 60th Owners, Inc. v. Bonner Prop., Inc.*, 677 F.2d 200, 202 (2d Cir. 1982) .................... 32

*Atkins v. Fischer*, 331 F.3d 988, 991–92 (D.C. Cir. 2003) .......................................... 24

*Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992) ........................................... *passim*

*Baisden v. I'm Ready Prod., Inc.*, 693 F.3d 491, 501 (5th Cir. 2012) ........................... 24

*Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*,
    522 U.S. 192, 201(1997) ......................................................................... 28

*Birchem v. Knights of Columbus,* 116 F.3d 310, 313 (8th Cir.1997)(ADA) ............... 12

*Brock v. Superior Care, Inc.,* 840 F.2d 1054 (2d Cir. 1988)(FLSA) .......................... 12

*Brower v. Martin*, 446 F.Supp.2d 232, 234 (S.D.N.Y. 2006) ...................................... 16

*Clackamas Gastroenterology Assoc., P.C. v.* Wells, 538 U.S. 440, 449 (2003)(Title VII) ........ 12

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) .................................. 1

*Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 41 (1st Cir. 2006) .................................... 34

*Effects Associates v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990) ............................ 23

*Foad Consulting Grp. v. Azzalino*, 270 F.3d 821, 828-829, (9th Cir.2001) .................... 24

*Garcia v. Google, Inc*., 786 F.3d 733, 743 (9th Cir. 2015) .......................................... 24

*Gilpin v. Siebert*, 419 F.Supp.2d 1288 (D. Oregon 2006) .......................................... 13

*Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1999) .................................................. 22

*Hanson v. Friends of Minn. Sinfonia,* 181 F.Supp.2d 1003 (D. Minn. 2002) ............... 15

*I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774-775 (7th Cir. 1996) ...................................... 23

*Jackson v. Gaylord Entertainment Co*., 2007 WL 4480704, (M.D. Tenn. 2007) ........................ 15

*Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753 (11th Cir.1997) .............................. 24

*Kennedy v. Nat'l Juvenile Detention Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999) ........................... 24

*Knight v. State Univ. of New York at Stony Brook*, 2014 WL 4639100 (E.D.N.Y. 2014),........... 16

*Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1293-94 (11th Cir. 1999)................................... 25, 26

*Larson* v. *Warner Bros. Ent., Inc.*, 504 Fed.Appx. 586 (9th Cir. 2013) ........................................ 31

*Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010) ........................................ 23

*Lerohl v. Friends of Minnesota Sinfonia*, 322 F.3d 486 (8th Circ. 2003) .................................... 14

*Luckenbach Steamship Co. v. United States*, 312 F.2d 545, 548-51, 552 n. 3 (2d Cir. 1963)...... 32

Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc., 128 F.3d 872, 879 (5th Cir.1997)........... 23, 24

*Marvel Characters v. Simon*, 310 F.3d 280, 290 (2d Cir. 2004) ................................................... 28

*Marvel Characters v. Simon,* 310 F.3d 280, 292 (2d Cir. 2002) ........................................... 14,21

*Mattel, Inc. v. Glutt*, 2014 U.S. Dist. Lexis 185180 (C.D. Cal. April 1, 2014) ........................... 31

*Merchant v.* Ivory, 92 F.3d 51, 56-57 (2d Cir. 1996) ...................................................... 29, 32, 33

*Mills Music, Inc. V. Snyder*, 469 U.S. 153, 172-73 (1985)................................................... 13, 28

*N.L.R.B. v.  United Insurance Co. of America*, 390 U.S. 254, 255 (1968) ................................... 18

*N.Y. Times v. Tasini,* 533 U.S. 483 (2001)................................................................................. 14

*Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318 (1992)(ERISA) ................................... 12,15

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S.Ct. 1962, 1969 (2014)................................. 28, 31

*Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir.2012).................... 9

*Scorpio Music v. Willis*, 2013 U.S. Dist. LEXIS 29141, 2013 WL 790940
(S.D.Cal. March 4, 2013).............................................................................................. 30

*Siegel v Warner Bros. Ent., Inc.*, 542 F. Supp.2d 1098, 1134 (C.D.Cal. 2008) .................... 31, 39

*Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992)......................................................... 15, 32

*United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948) ................................................. 17

*United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 72 (1956)............................................. 32

*Wight v. Bank America Corp.*, 219 F.3d 79, 89 (2d Cir.2000) ..................................................... 21

*Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996) ..................................................... 29, 30, 33

## **Statutes**

17 U.S.C. § 101 ..................................................................................................... 10, 21, 22

17 U.S.C. § 101(1) ..................................................................................................... 10

17 U.S.C. § 102 ........................................................................................................... 4

17 U.S.C. § 103(b) ..................................................................................................... 39

17 U.S.C. § 201 ......................................................................................................... 11

17 U.S.C. § 201(b) ..................................................................................................... 30

17 U.S.C. § 203(a)(3) ..................................................................................... 2, 27, 31

17 U.S.C. § 203(b)(1) ............................................................................................. 2, 22

17 U.S.C. § 204 ......................................................................................................... 22

17 U.S.C. § 304(c)(3) ................................................................................................. 27

17 U.S.C. § 304(c)(5) ................................................................................................. 14

17 U.S.C. § 410(c) ....................................................................................................... 9

17 U.S.C. § 507 ............................................................................................. 2, 8, 27, 34

17 U.S.C. § 507(b) ....................................................................................... 2, 8, 27

17 U.S.C. §§ 101, 102, 201(a) ..................................................................................... 7

17 U.S.C. §§ 304(c), 203(a) ....................................................................................... 25

17 U.S.C. 101(1) ....................................................................................................... 13

26 U.S.C. 3101 ......................................................................................................... 12

26 U.S.C. 3301 ......................................................................................................... 12

26 U.S.C. 3401 ......................................................................................................... 12

28 U.S.C. § 2201 ....................................................................................................... 28

29 U.S. §152(a) ......................................................................................................... 18

29 U.S.C. § 151 ......................................................................................................... 11

29 U.S.C. § 301 ......................................................................................................... 11

29 U.S.C. §§ 141-197 ............................................................................................... 18

29 U.S.C. §159(c) (1976) .......................................................................................... 18

29 U.S.C. 1001 .......................................................................................................... 12

29 U.S.C. 151 ............................................................................................................ 12

29 U.S.C. 201 ............................................................................................................ 12

29 U.S.C. 2601 .......................................................................................................... 12

29 U.S.C. 621 ............................................................................................................ 12

42 U.S.C. 12101 ........................................................................................................ 12

42 U.S.C. 2000(e) ...................................................................................................... 12

## Other Authorities

Alvin L. Goldman and Roberto L. Corrado, *Labor Law in the USA* (3rd Ed.) ............................. 18

Assaf Jacob, *Tort Made for Hire—Reconsidering the* CCNV *Case*, 11 YALE J.L.
   & TECH. 96 (2008) ............................................................................................. 12

Black's Law Dictionary 567 (6th ed.1990) ............................................................... 25

Federal Practice and Procedure § 2768, at 669 (3d ed.1998) ...................................... 34

Gerald Horne, <u>Class Struggle In Hollywood, 1930-1950: Moguls, Mobsters, Stars, Reds & Trade
   Unionists</u> (University of Texas Press, 2001) ....................................................... 17

H.R. Rep. No. 94-1476, at 125 (1976), S. Rep. No. 94-473, at 108 (1975) ................................ 14

H.R.Rep. No. 94–1476, at 124 (1976) ........................................................................ 28

Joseph North, *The New Hollywood,* 32 The New Masses 14 (July 11, 1939) .............................. 17

Julien Mundele, *Not Everything that Glitters is Gold, Misclassification of Employees: The Blurred Line Between Independent Contractors and Employees Under the Major Classification Tests*, 20 SUFF. J. TRIAL & APP. ADVOC. 253, 254 (2015) ......................... 12

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer On Copyright*"), § 11.08[A] ..... 22

1 *Nimmer On Copyright* § 3.03 ..................................................................................... 39

3 *Nimmer On Copyright*, § 10.03[A] ............................................................................. 22

3 *Nimmer on Copyright* § 10.03[A][7] ......................................................................... 26

Robert Sprague, *Worker (Mis)Classification in the Sharing Economy: Square Pegs Trying to Fit in Round Holes*, 31 ABA J. LABOR & EMPLOYMENT (2015) ...................................... 12

## INTRODUCTION

Plaintiffs' Motion for Summary Judgment is premised on unsound legal theories and disputed facts. Their central argument is rooted in an untenable interpretation of labor law. On this meritless basis, Plaintiffs ignore the multi-factor test mandated by *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) and *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992), to determine whether Victor Miller ("Miller") was an "employee" or independent contractor under Section 101, the Copyright Act's "work for hire" provision, when he wrote the treatment ("Treatment") and screenplay ("Screenplay") underlying the 1980 film, *Friday the 13th* (the "Film"). That alone is fatal to their Motion.

At the core of Plaintiff's Motion is the unsupported notion that the National Labor Relations Act ("NLRA") effectively preempts the Copyright Act. It reductively argues that because the NLRB certified the Writer's Guild of America ("WGA"), and Miller is a WGA member, that Miller is an "employee" under Section 101. As shown below, Plaintiffs' predicate argument fails for the following reasons: (1) one federal statute does not preempt another; (2) an author's inalienable termination right persists "notwithstanding *any* agreement to the contrary," 17 U.S.C. § 203(a)(5), including collective bargaining agreements; (3) Courts routinely apply the *Reid* test even when the hired party is a union member; (4) in 1938, when screenwriters were allowed to unionize, both the NLRA (prior to amendment by the Taft-Hartley Act in 1947) and their salaried employment in the "Studio System" were *very* different than in 1979 and today.

Plaintiffs heavily rely on the WGA's 1977 Minimum Basic Agreement ("MBA"); yet when it counted, Plaintiffs ignored Manny's obligations thereunder. It is undisputed that Manny did not pay Miller for Miller's Treatment. It is indisputable that Manny did not contribute a

percentage of even Miller's insufficient fees to the WGA's pension and health fund. Nor was Miller paid the MBA residuals and sequel payments which became due in 1980.

Plaintiffs' argue that even if Miller's Screenplay is clearly not "work for hire" under Section 101, *Reid* and *Aymes*, Miller has no termination rights because there was no express "transfer" of Miller's Screenplay. This places form over substance and fails as a matter of law. The termination right broadly applies to "[t]he *exclusive or non-exclusive* grant of a *transfer or license* of copyright or of any right under copyright." 17 U.S.C. § 203(a) (emphasis added). It is well-accepted that a non-exclusive copyright license is implied by an employment agreement that falls short of "work for hire," and the parties' cooperative conduct, and, at a minimum Miller's Agreement and his conduct resulted in an implied copyright license, subject to statutory termination. Illogically, under Plaintiffs' "no transfer" argument, they would have fewer rights (i.e., no rights) than the foreign rights and prior derivative works they would retain after the effective date of Miller's termination. 17 U.S.C. § 203(b)(1).

Similarly misguided is Plaintiffs' argument that Miller's termination notices are barred by the Copyright Act's three-year statute of limitations, 17 U.S.C. § 507(b), because the timing of Miller's notices of termination was expressly dictated by the statute's "termination window." 17 U.S.C. § 203(a)(3). If Plaintiffs are correct it would mean that every termination notice would be *time-barred* simply by an adverse party asserting "work for hire." Closer inspection reveals that Plaintiffs rely for their argument on readily distinguishable cases where years after a work's creation and accreditation someone asserts *co-authorship*. Ironically, such precedent is the nail in the coffin of Plaintiffs' fact-laden co-authorship claims regarding the Screenplay.

Accordingly, Plaintiffs' Motion for Summary Judgment should be denied, and the validity under the Copyright Act of Miller's notice of termination should be upheld.

## COUNTER-STATEMENT OF FACTS

Plaintiffs devote twenty-two pages of their brief to pitching so-called "Undisputed Facts" that are largely characterizations, highly disputed, and seldom referred to in their Argument section of their motion, which is bereft of any *Reid* analysis.  For instance, they portray Cunningham as a master filmmaker, tutoring Miller. Cunningham is described as a "successful and established" producer of "over twenty-seven feature films" that "have enjoyed both critical acclaim and box office success." Pl. Mot. 5.

*First*, Cunningham's success <u>*is*</u> all about the *Friday the 13th* Film, for which Miller received sole "Written by" credit. *See* Declaration of Victor Miller In support of Miller's Motion for Summary Judgment, Dkt. 45-1 ("Miller Decl."), ¶ 27, Ex. G. *See* Declaration of Julia Haye ("Haye Dec."), Ex. I. *Second*, this portrayal is a far cry from Cunningham in 1979 – the time in question. In reality, Cunningham was a producer/director of ultra-low-budget porn and sexploitation films, usually flat-broke and living hand-to-mouth. Declaration of Marc Toberoff In Opposition to Plaintiffs' Motion for Summary Judgment ("Toberoff Decl."), Exs. P at 90:20-22, Q, R. His various companies consisted of a room above his home's garage. Id., Ex. P at 18:20. And he was motivated principally by money. *Id*., Ex. Q at 1366 (Cunningham: "*I wasn't creatively invested in Friday the 13th*"), Ex. R. Before he met Miller, the first film Cunningham produced/directed was the $3,000 porno he slyly titled *The Art of Marriage* (1970).  Toberoff Decl., Ex. Q, at 1355 (Cunningham: "[T]hey allowed you to get away with showing hardcore XXX-rated movies as long as they were under the guise of freedom of speech. You billed it as an 'educational' or 'medical movie.'"). Then he wrote and produced the pseudo-documentary porno *Together* (1971) which was quite explicit. *Id*., Ex. P, at 38-41, Ex. R, at 382. Next was the $90,000 sexploitation horror film *The Last House on the Left* (1972) a.k.a. *Sex Crimes of the*

*Century*. *Id*., Ex. R, at 390. The theatre poster was of a naked woman with her throat slashed, and blood dripping down between her breasts. *Id*. After that was the porno *The Case of the Smiling Stiffs* (1973) and hardcore porno, *The Fireworks Woman* (1975).  *Id*., at 399, 499.

After Cunningham met Miller, he took a shot at low-budget family fare with *Here Come the Tigers* (1978), an intentional "rip-off" of the *Bad News Bears* (1976). *Id*., Ex. P, at 55:2-56:3. Plaintiffs highlight that Miller wrote this under the pseudonym "Arch McCoy," yet this was obviously because Cunningham sought to avoid the higher WGA minimums payable to Miller. *Id*. at 64:15-65:8. Miller then wrote, and Cunningham produced, the "union film" *Manny's Orphan's* because union films gave Cunningham access to better talent.  *Id*. at 65:11-23.

Plaintiffs' refer to Miller and Cunningham's "method of working together" (after one film), but as anyone involved in low-budget independent filmmaking knows, Cunningham's "method" was to get his projects financed and produced by hook or by crook. *Id*., Ex. P at 142:10-12, Ex. Q at 378, 392, 473. Throughout their motion, Plaintiffs also miss-focus on Cunningham purportedly having "ideas" for a movie, when this is outside the realm of copyright as a matter of law. *Reid*, 490 U.S. at 737 (1989); 17 U.S.C. § 102. Moreover, in many instances the "idea" to which they refer is something like "let's rip-off the *Bad News Bears*" or, in the case of *Friday the 13th* (1980) – *Halloween* (1978); or as Plaintiffs put it, Cunningham "[r]eflecting upon the surprising success of *Halloween* …". Pl. Mot. 8; Haye Decl., Ex. L at 7. According to Plaintiffs, Cunningham purportedly did not approach Miller because he needed a writer, but simply because he "want[s] to offer continuing employment opportunities to Miller." *Id*.

From there, Plaintiffs falsely portray Miller's work as having been under Cunningham's strict "direction" and control-- even something as natural as Miller seeing *Halloween* in early 1979 before he wrote his Treatment, "The Long Night at Camp Blood." Pl. Mot. 8. For instance,

Plaintiffs' make much ado about the choice of the initial venue for the Film when the evidence they cite reflects that *both* Miller and Cunningham rejected each other's (and even their own) ideas. Haye Decl., Ex. K ("Miller Depo.") at 162:24 -163:24. In reality, Miller and Cunningham had the normal free-flowing collaborative interaction between a film's screenwriter and director, rendered more casual by the parties' close friendship and the nature of low-budget filmmaking. In interviews before this lawsuit, as in his deposition, Miller consistently accredits *Halloween*, not Cunningham, as having given him the most important insights into the structure of a suspenseful horror movie. Miller Depo at 72:22 -73:11; Haye Decl., Ex. L at 144.

Plaintiffs describe some sort of purported "oral agree[ment]" that Miller would be engaged to right the Screenplay, but the cited testimony suggests *speculative* writing. Pl. Mot. 9 *citing* Miller Depo at 156:12-20 ("[L]ike the other projects before it, I would whip up a treatment and a screenplay, if possible, and Sean would find the money.")

Faced with the total absence of any reference to "Friday the 13th" in Miller's "The Long Night at Camp Blood" Treatment and first draft screenplay ("First Draft"); and the intentional references to "Friday the 13th" in Miller's second draft screenplay ("Second Draft") after the June, 1979 Agreement with the title "Friday 13" and multiple references to this date in the script, Plaintiffs present "alternative facts." They now say: "Cunningham told Miller that he thought 'Friday the 13th' would be a great title," but as "he was not sure if the title would be available to use, they also considered other title ideas." Pl. Mot. 10; Cunningham Decl. ¶ 11. For this Plaintiffs cite to Haye Decl., Ex. L at 9, but there Miller states the opposite.[1] This also does not

---

[1] "I came up with the highly unfavorable title of Long Night at Camp [Blood], and that was its working title until about the third or fourth draft, when Sean said, 'I've got the name of the movie.' Somewhere around there must have been when he was doing the marketing stuff about [] the fund raising." Note screenwriters write multiple internal drafts before presenting an official first or second draft to others.

jive with the fact that Cunningham designated the Film as "Friday 13" in Miller's June 4, 1979 Agreement filed with the WGA – *over a month before* Cunningham "cleared" the Friday the 13th title *after* his July 4, 1979 *Variety* Ad. Plaintiffs also involve Miller in the *Variety* Ad, when Miller had nothing to do with this. Haye Decl., Ex. L at 9. While Miller has been quite consistent regarding "The Long Night at Camp Blood," Cunningham has not been. Tob. Decl., Ex. R at 442-450. For instance, for years Cunningham repeatedly represented that when he ran the July 4 *Variety* Ad, he had no story, treatment or script, just his "Friday the 13th" title; this is false and contradicts his current convoluted story. *Id*; Ex. P at 110:12-16, 126:15-130:3, 177:22 -179:14.

Plaintiffs curiously assert that *prior* to the June 1979 Agreement, Cunningham spoke to "potential *financiers*" like "Phil Scuderi… although *financing* was *not* yet discussed" and that Cunningham barely described the film "idea" to obscure his submission of Miller's Treatment. Pl. Mot. 10 (emphasis added). Plaintiffs assert that Miller requested that the Agreement be governed by the WGA but none of the Miller testimony they cite says this. Plaintiffs label as "employment benefits": "minimum salary", "residuals" and "sequel payments" to squeeze under *Reid*.  *Id.* 10-12. But there was no "salary," only discrete payments for a "first draft" and "final draft screenplay"; and "residuals" and "sequel payments" are mere forms of contingent cash compensation, not the "employment benefits" (health insurance, paid vacation, pension, etc.) referred to in *Reid,* 490 U.S. at 750-52, as indiciae of "conventional" employment.

Cunningham then claims that he did not mention Miller's Treatment in the June, 1979 Agreement he filled out "because no Treatment existed" at that time. Pl. Mot. 12. This, of course, makes no sense because if no Treatment existed and Miller was still supposed to write a Treatment, Cunningham would have checked the box "[ ] Treatment", the same way he checked the boxes "[x] First draft screenplay" and "[x] Second draft screenplay. Miller Decl., Ex. D at 1.

But that would have meant that Cunningham would have had to pay for the Treatment under the WGA's MBA that Plaintiffs now rely upon. *See* Section I D., *infra*. When Cunningham filled out the form Agreement he also conspicuously left blank the portion of the form which calls for *the date* to be typed in. Miller Decl., Ex. D at 1; Tob. Decl. II, Ex. P, at 155:2-155:15.

Plaintiffs mislabel as an "admission" Miller's misestimate in a casual 2003 interview, 24-years after writing the Film: "*My impression* is that we did not get started on the project until *about* June or July of 1979, *but I am willing to be told otherwise*." Haye Decl., Ex. L, at 8 (emph. added). This does not contradict that Miller is able in this lawsuit to pin down the time-frame to April – May, 1979, with the relevant documents and events before him. Miller Decl., ¶¶ 5-12. Miller's recollection is quite clear that before he entered into the "Friday 13" Agreement he had already written his Treatment and First Draft, "The Long Night at Camp Blood." *Id.*, ¶¶ 6, 7, 12.

Plaintiffs then assert that Miller wrote "The Night at Camp Blood" Treatment pursuant to the "Friday 13" Agreement that expressly does not cover the Treatment, and conflate this with Cunningham's use of Miller's *spec* Treatment to raise financing. Pl. Mot. 13. They "protest too much" that the Treatment was the product of Cunningham's "tutorials, guidance and instruction," and cite to Miller testimony that says nothing of the kind. *Id*. Plaintiffs' emphasis that Miller put no copyright notice on his Treatment, nor registered it, is also of little moment. A statutory copyright subsists in the author of a work the moment it is fixed in tangible form, 17 U.S.C. §§ 101, 102, 201(a), and Miller's mere provision of his Treatment to Cunningham did not constitute "publication." *Id*. § 401. Plaintiffs point to the Treatment's copyright notice in the name of Manny's general partner, Sean S. Cunningham Films, Ltd. ("SSF"), the same notice slapped on Miller's Second Draft; but a general partner of a limited partnership does not own the assets of the partnership, and Plaintiffs inconsistently claim that Manny, not SSF, purportedly

7

owned the copyright to Miller's material. Complaint, ¶ 2.

Plaintiffs claim that Cunningham restructured Miller's Treatment, and refer to this as a "second draft Treatment", but other than cleaning it up a bit ("it was not polished enough to present to investors"), it follows Miller's Treatment quite closely. Pl. Mot. 14; Cunningham Decl., Exs. B, C. As with the Treatment, Plaintiffs exaggerate Cunningham's involvement in the Screenplay while conceding, as they must, that "Miller physically wrote the Screenplay." Pl. Mot. 15. They point to Cunningham's "uncredited" "story by" credit on *imdb.com* (inadmissible hearsay), but it's well known that *imdb.com*, like *Wikipedia.com*, can be freely edited by users.

Plaintiffs assert that "Miller used Cunningham's assistant, copy machine and office facilities during the course of his work on the Screenplay." Pl. Mot. at 15. First, other than the occasional use of the copy machine, there is no evidence of use of "office facilities." It is undisputed that Miller wrote the Treatment and Screenplay on his IBM Selectric in the study of his home. Miller Decl., ¶ 15. Plaintiffs go so far as to emphasize that the Second Draft "was typed by Cunningham's assistant," when the Miller testimony they cite to plainly states that this exhibit was a "retyped" re-formatted copy (with scene nos. in the margins) of the Second Draft *Miller* wrote. Miller Depo at 212:16-18; Miller Decl., ¶ 10, Ex. C.

Plaintiffs even claim that Scuderi, a theatre owner, provided "ideas", but Plaintiffs' thinly veiled *co-authorship* claims in the face of Miller's sole writing credit, are long time-barred by 17 U.S.C. § 507(b). *See* Section V., *infra*. Plaintiffs' characterizations of Miller's literary material also carry little weight as the material speaks for itself.  Plaintiffs misleadingly state "Miller admits that he had absolutely no involvement in creating Jason," citing to testimony where Miller does not say that.  Pl. Mot. at 17 *citing* Miller Depo 265:13-266:1-12.

Plaintiffs emphasize the May 7, 1980 agreement between Manny and Georgetown, but as

pointed out in Miller's Motion (at 7), this document actually hurts their case as therein Manny "represent[ed] and warrant[ed]" "[t]hat <u>Victor Miller is the sole author</u> of the Screenplay;" and "[t]hat the Screenplay is <u>original</u>". Toberoff Decl., Ex. D, p. 2, ¶ 2 (emphasis added).  Like Miller's Agreement, it nowhere states that the Screenplay is Manny or Cunningham's "work for hire." *Id.* Nor does Georgetown's registering the *Film* as *Georgetown's* purported "work for hire" support Plaintiffs' repeated claim that the *Screenplay* was *Manny's* "work for hire." Georgetown's unilateral registration and the resulting certificate are devoid of any mention of Miller's Screenplay. Thus, Plaintiffs' assertion that the certificate "constitutes prima facie evidence of the facts stated" therein, including Georgetown's original authorship of … the Screenplay" is frivolous. Pl. Mot. 18.[2] Production companies and studios automatically register completed *films* as "work for hire," and this certainly does not mean or indicate that the film's underlying individual components (*e.g.*, songs on the film's soundtrack, an underlying play or "spec script") are "works for hire." Moreover, even if the registration certificate listed the Screenplay as Georgetown's "work for hire" (it does not), that would completely contradict Plaintiffs' entire theory of the case that *Manny* is the putative "author."

Plaintiffs end with two pages of snippets from Miller's interview in 2003 for Peter Bracke's entertaining book on *Friday the 13th*. Though dubbed "critical admissions", a closer look reveals Plaintiffs just retread what they had argued above, and *none* are particularly relevant to a proper legal analysis of the issues presented. We address only those not addressed above. Plaintiffs refer to disjointed "pieces of wisdom" from Cunningham, *citing* Haye Decl., Ex. L at 8, 10, which does not reflect this. Miller did not say that he had nothing to do with Jason being a

---

[2] A certificate of registration give rise to a rebuttable presumption of the validity of the registered copyright, here the Film's copyright. 17 U.S.C. § 410(c); *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir.2012).

"Mongoloid;" consistent with his deposition testimony, he said he conceived Jason as "not a normal kid, he was slow," and humbly gave credit to Tom Savini, in charge of special effects. *Id*. at 12; Miller Depo at 228:14-21. Miller freely testified that the only scene in the Film he did not write was one, short, inconsequential motorcycle scene, which was added later. Miller Depo at 228. Plaintiffs' statement that "Miller received the money that was owed to him under the MBA" is misleading. The lawsuit Miller refers to in the cited passage (Haye Decl., Ex. L at 22-23) was for residual and sequel payments; it had nothing to do with contributions to the WGA pension and health fund, which were never made. *See* Miller Mot. at 29; Toberoff Decl. I, Exs. C, E; Miller Decl. I, ¶ 25. Lastly, Plaintiffs make much of Miller's casual interview criticisms of the *Friday the 13th* sequels featuring Jason. That this sequelized character is derivative as a matter of copyright law is clearly demonstrated by Miller's literary material, and is not a question of Miller's personal opinions regarding the sequels' artistic merits. *See* Section V. infra.

## ARGUMENT

## I.    PLAINTIFFS' LABOR LAW ARGUMENT IS WITHOUT MERIT

Plaintiffs' labor law argument is the central ground for their Motion. It reductively asserts that because screenwriters were permitted to unionize by the National Labor Relations Board ("NLRB") in *Metro-Goldwyn-Mayer Studios*, 7 NLRB 662, 1938 WL 9377 (1938), and Miller is a member of the collective bargaining entity known today as the Writer's Guild of America ("WGA"), this "mandates" that Miller be adjudged an "employee" under Section 101(1) of the Copyright Act, 17 U.S.C. § 101(1) "as a matter of law." Pl. Mot., 26-30, 30 n.14. ("In the case of a union member … the NLRA has ***already dictated*** the [copyright] issue of employment …" (emphasis in original)). As shown below, this argument fails for a variety of reasons, and in relying on it, Plaintiffs fatally ignore the multi-factor analysis required by *Reid*, 490 U.S. at 737

and *Aymes*, 980 F.2d at 861. *Id.*, 30 n.14. For that alone Plaintiffs' Motion must be denied.

> **A.    Contrary to Plaintiffs' Core Argument the NLRA Does Not Preempt the Copyright Act**

Although Plaintiffs talk around the issue, the crux of their labor law argument is that federal labor law under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, somehow preempts federal copyright law under the Copyright Act. More specifically, it is an assertion that the NLRB's 1938 determination that screenwriters could collectively bargain preempts this Court's authority to determine Miller's status under Section 101 of the Copyright Act pursuant to copyright law, *Reid* and its progeny. This is erroneous and wholly unsupported.

It is axiomatic that one federal statute does not preempt another federal statute. Federal statutes and law preempt *state* statutes and law pursuant to the Supremacy Clause of the United States Constitution. U.S. Const. art. IV, cl. 2.[3]  The respective preemption sections of both the NLRA and the Copyright Act reflect this. 29 U.S.C. § 301; 17 U.S.C. § 201. Nowhere in the Constitution or elsewhere is it written that one federal statute preempts another. The notion, inherent in Plaintiffs' argument, that a 1938 decision by the NLRB under the LMRA (as it then existed) preempts this Court decision-making authority in a copyright case under the Copyright Act, has no basis in the law.

The NLRA and the Copyright Act are animated by different legislative policies and objectives, and provide separate and different forms of protection. The absence or presence of

---

[3] The Supremacy Clause of the U.S. Constitution (art. IV, cl. 2) thus states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

protection in 1938 under the NLRA via the classification for collective bargaining purposes of workers as "employees" does not, and should not, preclude protection under the Copyright Act. Labor law and copyright law are separate and distinct fields that are not mutually exclusive, and more than capable of separate co-existence.

The Supreme Court in *Reid* turned to agency law to interpret the legal concepts of "employee" and "scope of employment" in Section 101(2). *Reid*, 490 U.S. at 741. In turn, the agency law factors are derived from tort law and the doctrine of *respondeat superior*, not from an independent analysis of labor law. *See generally* Assaf Jacob, *Tort Made for Hire— Reconsidering the* CCNV *Case*, 11 YALE J.L. & TECH. 96 (2008). The absence of employment law from the legal construction of Section 101 of the Copyright Act is striking.

As with the Copyright Act, the determination of whether someone is an "employee" or an "independent contractor" has important and far-reaching consequences under numerous other federal statutes with widely varying policy objectives.[4] While the cases interpret many of these statutes under a version of the common law of agency test (*e.g*., ERISA, IRC NLRA, FUTA, Title VII, ADEA. ADA, FLSA)[5], and frequently cite *Reid,* each area of law unsurprisingly maintains its own evolving body of case law to guide it.[6]

---

[4] For instance, Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(e) *et seq.;* the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 621 *et seq.*; The National Labor Relations Act (NLRA), 29 U.S.C. 151 *et seq.*;The Fair Labor Standards Act (FLSA), 29 U.S.C. 201 *et seq.*; the Federal Insurance Contributions Act (FICA), 26 U.S.C. 3101 *et seq.*; the Employment Retirement Income Security Act (ERISA), 29 U.S.C. 1001 *et seq.;* the Federal Unemployment Tax Act (FUTA), 26 U.S.C. 3301 *et seq.;* the Internal Revenue Code, 26 U.S.C. 3401 *et seq.*; The Americans With Disabilities Act (ADA), 42 U.S.C. 12101 *et seq.*; and The Family and Medical Leave Act (FMLA), 29 U.S.C. 2601 *et seq.*

[5] *See Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318 (1992)(ERISA); *Brock v. Superior Care, Inc.,* 840 F.2d 1054 (2d Cir. 1988)(FLSA); *Birchem v. Knights of Columbus,* 116 F.3d 310, 313 (8th Cir.1997)(ADA);*Clackamas Gastroenterology Assoc., P.C. v.* Wells, 538 U.S. 440, 449 (2003)(Title VII).

[6] *See* Robert Sprague, *Worker (Mis)Classification in the Sharing Economy: Square Pegs Trying to Fit in Round Holes*, 31 ABA J. LABOR & EMPLOYMENT (2015); Julien Mundele, *Not Everything that*

Plaintiffs, unsurprisingly, can cite no support for the crux of their argument. Instead, Plaintiffs cite a single inapposite case, *Gilpin v. Siebert*, 419 F.Supp.2d 1288 (D. Oregon 2006), involving the publication of an instructional manual created by a school counselor. Plaintiffs falsely claim that *Gilpin* stands for Plaintiffs' theory "that someone who is employed pursuant to a collective bargaining agreement is necessarily an employee for purposes of a work for hire analysis." Mot. at 29, 31 n.14 (*cont'd from* p. 30). The *Gilpin* Court adopted a Magistrate Judge's recommendation, and the Magistrate never concluded anything remotely like this. *Gilpin*, 419 F.Supp.2d at 1288. Whether the plaintiff was an "employee" or "independent contractor" was not at issue in *Gilpin* because the plaintiff *admitted* that she was an "employee" under 17 U.S.C. 101(1); thus, solely "[a]t issue was whether Plaintiff created her literary works within the scope of employment." 2005 WL 3285543, at *3 (D. Or.) (Trial Motion, Memorandum). The Magistrate therefore only analyzed this "scope of employment" issue; concluding that issues of fact precluded summary judgment thereon. *Gilpin*, 419 F.Supp.2d at 1295, 1303.[7]

For the above reasons, Plaintiffs' argument that this Court's determination under the Copyright Act is governed by labor law is both erroneous and legally unsound.

### B. Contracts, Including Collective Bargaining Agreements, Also Do Not Override The Copyright Act

"The principal purpose of the [Copyright Act's termination right] was to provide added benefits to authors." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172 (1985). It was "obviously

---

*Glitters is Gold, Misclassification of Employees: The Blurred Line Between Independent Contractors and Employees Under the Major Classification Tests*, 20 SUFF. J. TRIAL & APP. ADVOC. 253, 254 (2015).

[7] That *Gilpin's* employment contract "was subject to the provisions of an agreement between [the college] and its teachers union" was only considered because the union agreement had specific terms relating to when a teacher would own the copyright and when the college would own the copyright. *Id.* at 1293.

intended to make the rewards for the creativity of authors more substantial." *Id*. "More particularly, the termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative" bargains made before the author had "a fair opportunity to appreciate the true value of his work product. That general purpose is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself." *Id*. at 173.

Thus, when Congress enacted the remedial termination right it expressly sought to *protect* it by unequivocally mandating that termination "may be effected notwithstanding any agreement to the contrary."  17 U.S.C. § 203(a)(5), *see also* § 304(c)(5). The termination right quite simply "cannot be waived in advance or contracted away." H.R. Rep. No. 94-1476, at 125 (1976), S. Rep. No. 94-473, at 108 (1975). *See Stewart v. Abend,* 495 U.S. 207, 230 ("[The]1976 Copyright Act provides … an inalienable termination right."); *N.Y. Times v. Tasini,* 533 U.S. 483, 496 n.1 (2001)(referring to the Act's termination right as an "inalienable authorial right").

Plaintiffs' nonetheless argue that Miller' Screenplay Agreement, by incorporating the terms of a collective bargaining agreement (the WGA's 1977 Minimum Basic Agreement ("MBA")) disposes of Miller's termination right. Both the Screenplay Agreement and the MBA *are contracts*. Leaving aside that the MBA never so much as mentions "work for hire" or termination under the Act, in cannot be read, as Plaintiffs do, to eliminate Miller's statutory termination right. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280,292 (2d Cir. 2002) (holding that to the extent the parties' settlement agreement is read to nullify the defendant's termination right it is void as an "agreement to the contrary.") When Congress stated unequivocally that termination may be effected "notwithstanding *any* agreement to the contrary", it meant "any" agreement, not "some" agreements. 17 U.S.C. § 203(a)(5)(emphasis added).

### C.    Courts Engage In An Analysis Of The *Reid* Factors As Required Even When The Hired Party Is A Union Member

Even when a hired party is a member of a union, Courts still routinely apply the *Reid* factors to determine whether that union member is an "employee" or independent contractor under the statute in question.

For instance, in *Lerohl v. Friends of Minnesota Sinfonia*, 322 F.3d 486 (8th Circ. 2003), two musicians sued the Sinfonia chamber orchestra under the American Disabilities Act and Title VII of the Civil Rights Act of 1964, respectively. *Id*. at 487. "Both statutes protect employees but not independent contractors." *Id.* at 489. Both individuals, like all orchestra musicians, were "members of Local 30-73 of the American Federation of Musicians." *Id*. at 488 ("All Sinfonia players … are paid on a per-concert basis at union scale.") Furthermore, for nine years, "[f]rom 1990 to 1999, [the plaintiffs] were 'regular' players at Sinfonia concerts."  On cross-motions for summary judgment in both cases, the district court determined after a detailed *Reid*-factor analysis that both musicians were independent contractors *not* employees, granted the orchestra's motion and dismissed their complaints. *Hanson v. Friends of Minn. Sinfonia,* 181 F.Supp.2d 1003 (D. Minn. 2002); *Lerohl,* 322 F.3d at 488. After a similarly detailed *Reid* analysis, the Eighth Circuit affirmed, notwithstanding the fact that both plaintiffs were union members who were hired pursuant to its collective bargaining agreement. *Id.*at 489 - 493.

In *Lerohl*, the plaintiffs argued that the court should give primary consideration to the defendant's control over the plaintiffs' work. The Eighth Circuit "emphatically reject[ed] this approach, reasoning that "[w]ork by independent contractors is often, if not typically, performed to the exacting specifications of the hiring party." *Id.* at 490 (citing *Darden*, 503 U.S. at 325-26 and *Reid*, 490 U.S. at 735-36, 752). Instead, the court found "highly significant" that the defendant withheld no income or FICA taxes, and provided no employee benefits *other than contributions to an independent union pension fund*. *Id.* at 491.

15

In *Jackson v. Gaylord Entertainment Co*., 2007 WL 4480704, (M.D. Tenn. 2007), plaintiff Stone Jackson, a regular performer at the Grand Ole Opry, and a member of the American Federation of Television and Radio Artists ("AFTA") sued under the federal Age Discrimination Employment Act ("ADEA"). *Id*. at *1. To qualify under ADEA as an "employee," Jackson, like Plaintiffs here, heavily relied on the fact that his work was governed by his union's collectively bargained agreement, *i.e*., the AFTA/Opry contract, which provided:

> The Opry recognizes the American Federation of Television and Radio Artist as the sole and exclusive collective bargaining representative in respect to rates of pay, wages, hours or other conditions of employment for the employees who are members of the Grand Old Opry whose principal function is that of featured artists or "stars" of the Grand Ole Opry broadcast.

*Id.* Notwithstanding this, the district court applied the requisite common law of agency test in denying defendants' motion for summary judgment. *Id.* at *3.

In *Brower v. Martin*, 446 F.Supp.2d 232, 234 (S.D.N.Y. 2006), where the plaintiff *union member* sued for copyright infringement of his songs and the defendant asserted a work for hire defense, the Court nonetheless applied the *Reid* factors in denying defendant's summary judgment motion. Similarly, in *Knight v. State Univ. of New York at Stony Brook*, 2014 WL 4639100 (E.D.N.Y. 2014), though it was undisputed that the plaintiff electrician was a "Union" worker (*id*. at *1, 7), the Court denied defendant's motion to dismiss after engaging in an analysis of the *Reid* factors. *Id*. at *2-3.

### D.   In 1938, When Screenwriters Were Allowed To Unionize By the NLRB, Both Labor Law and Employment Of Screenwriters Were Very Different Than In 1979 and Today

In 1938, the NLRB certified the Screen Writers Guild ("SWG"), later re-named the Writers Guild of America, as the union of Hollywood screenwriters. *Metro-Goldwyn-Mayer Studios*, 7 NLRB 662, 1938 WL 9377 (1938). The decision is noteworthy for its detailed

recitation, after lengthy hearings, of screenwriters' working conditions at the time, but the NLRB failed to provide any legal analysis. *Id.* at 669-92; 701.

       1.     In 1938, Screenwriters Primarily Worked As Regular Salaried Employees In the "Studio System"

The 1938 NLRB decision was necessarily made in the context of how screenwriters worked at that time in what is commonly known as the "Studio System."  This was the Golden Age of Hollywood (1927-1954) when a small number of large hierarchical vertically integrated motion picture studios produced movies primarily on their own filmmaking lots with creative personnel, including screenwriters, on long-term employment contracts[8]; and they dominated the exhibition of their pictures in the theaters they owned.[9] In this environment most writers worked from 9 to 6 in back-lot offices just like any other employee adapting stories, plays and novels, and churning out treatments and screenplays. It was a creative assembly line; screenwriters "punched a clock, sat in cubbyholes, writing to order like tailors cutting a suit."[10]

In 1938, when the NLRB permitted screenwriters to unionize, the large majority of working screenwriters were employed within this Studio System. By contrast today, and in 1979 when Miller wrote *Friday the 13th*, nearly all screenwriters are independent freelancers, like Miller, working project to project from home, notwithstanding their membership in the WGA.

       2.     In 1938, the NLRA Did Not Exclude Independent Contractors As It Did In 1979 and It Does Today

---

[8] *See* Gerald Horne, Class Struggle In Hollywood, 1930-1950: Moguls, Mobsters, Stars, Reds & Trade Unionists (University of Texas Press, 2001).

[9] *United States v. Paramount Pictures, Inc*., 334 U.S. 131 (1948), which held that the Studios' ownership of theatres violated U.S. antitrust laws, led to the demise of the Studio System by the mid-1950's.

[10] Joseph North, *The New Hollywood,* 32 The New Masses 14 (July 11, 1939) (quoted in Gerald Horne, Class Struggle In Hollywood, at 45).

To the extent that a minority of screenwriters worked as independent contractors at the time *Metro-Goldwyn-Mayer Studios*, *supra*, was decided, the NLRA did *not* exclude independent contractors from the collective bargaining process, as it did in 1979 and does today.  Thus, the NLRB found it unimportant that some writers worked on a "free-lance basis". 7 NLRB at 687.

Congress thereafter passed the Labor Management Relations Act of 1947, 29 U.S.C. §§ 141-197, better known as the "Taft-Hartley Act," which amended the NLRA, and specifically *excluded* "any individual having the status of an independent contractor" from the definition of "employee" contained in Section 2(3) of the NLRA. 29 U.S. §152(a). "The obvious purpose of [Congress'] amendment was to have the Board and the courts apply general agency principles in *distinguishing* between employees and independent contractors under the Act." *N.L.R.B. v. United Insurance Co. of America*, 390 U.S. 254, 255 (1968). Thus, were the NLRB to decide the matter today, the result would be very different, as under current labor law nearly all screenwriters would be excluded from the NLRA as independent contractors.

Notwithstanding the above, the WGA legally persists to this day because once private-sector unions are certified by the NLRB, federal law requires that they remain *indefinitely* unless, pursuant to Section 9(c) of the Taft-Hartley Act, employees vote to remove the union; or an employer proves that the majority of employees no longer support the union. 29 U.S.C. §159(c) (1976). *See* Alvin L. Goldman and Roberto L. Corrado, *Labor Law in the USA* (3rd Ed.), at 441-442 ("A basic principle affecting the rules concerning withdrawal of recognition is the doctrine that once recognized as a bargaining agent, a labor organization is presumed to have the continued support from the majority of the bargaining unit employees … .").

### E.    Plaintiffs Ignored the WGA Agreement in 1979 When It Mattered

Notwithstanding that their labor law argument is erroneous, Plaintiffs rely on the WGA's

1977 Minimum Basic Agreement ("MBA").  Yet bothet Cunningham and Georgetown (Plaintiff

Horror's closely related predecessor) *disregarded* Manny's obligations to Miller under the MBA.

*First*, it is undisputed that Manny did <u>not</u> pay Miller for his Treatment that Cunningham

nonetheless used to raise financing for the Film. At the time of Miller's Agreement (June, 1979),

the fee under Art. 13 A. of the 1977 MBA for an "Original Treatment" (for a "Low Budget"

film) was $6,409, and the fee for a "Screenplay, including treatment" was $12,377; neither of

which were paid. Haye Decl., Ex. N at 198; Cunn. Decl., Ex. B. As stated, the Agreement

Cunningham gave Miller ignored the Treatment Miller wrote and Cunningham used. *Id.*, Ex. D.

*Second*, it is indisputable that Manny did <u>not</u> contribute a percentage of even Miller's

insufficient fees to the WGA's pension and health fund, as required by Art. 17 of the MBA.

Hayes Decl., Ex. N at 247-250; Tob. Decl., Ex. C, Tob. Decl. II, Ex. O. Nor did Manny's

assignee Georgetown, Horror, nor any other predecessor of Horror, make these pension and

health contributions required by the MBA. *Id.*[11] Plaintiffs misleadingly assert that "over the past

thirty-eight years, Horror has paid … *employee benefits* provided by the MBA, including without

limitation residual and sequel payments …" Pl. Mot. at 18 (emphasis added).[12] But Plaintiffs

never made pension and health contributions (noticeably absent from this statement and their

_____

[11] Although the WGA is now touted as the primary basis for Plaintiffs' Motion, it was treated by Manny,
Cunningham and Horror's predecessor, Georgetown, as inconsequential. Cunningham used Manny, a
vestigial WGA signatory he had formed for *Manny's Orphans* to sign Miller's "Friday 13" Screenplay
Agreement, but immediately put "Sean Cunningham Films, Inc.," a non-WGA signatory, on Miller's
Treatment (which he did not pay for) and Miller's Screenplay. Tob. Decl. II, Ex. P at 41-43; Cunn. Decl.,
Exs. D, G., The production of *Friday the 13th* was financed and controlled by Georgetown, which was
also not a WGA signatory. Cunn. Decl., ¶ 27, Toberoff Decl., Ex. E at ¶ 14. Thus neither Manny,
Cunningham nor Georgetown bothered to comply with the WGA's MBA as shown herein.

[12] Robert M. Barsamian ("Barsamian"), the principal of Plaintiff Horror, Inc., falsely swears that "[o]ver
the past thirty-eight years, Horror has paid all sums due Miller under the … MBA," when this is
demonstrably untrue. Tob. Decl., Ex. C, Tob. Decl. II, Ex. O. Barsamian is the son of Robert P.
Barsamian, Georgetown's principal, along with Philip J. Scuderi. Tob. Decl. II, Ex. S at VM388, VM392.

Motion); and as Plaintiffs well know residual and sequel payments are contingent compensation, not the customary "employee benefits" (*e.g.*, medical/dental insurance, paid vacation, life insurance, etc.) referred to in *Reid*, 109 S.Ct. at 2079, and *Aymes*, 980 F.2d at 865, as a key indicia of conventional employment. Further, as shown below, even standard residual and sequel payments were only paid years later by a third-party Studio in 1987, and only after Plaintiffs were forced to do so. *See* Haye Decl., Exs. W, X.

    *Third*, neither Manny nor Georgetown even paid Miller the residuals and/or sequel payments required by MBA Arts. 15 A.3. and 16 A.5., respectively, which became due in 1980, starting with *Friday the 13th, Part 2*. Hayes Decl., Ex. N at 215, 239; Ex. V. When Manny failed to make these payments, Miller demanded them. *Id.*  Cunningham prevaricated and passed the buck, claiming that Manny's assignee Georgetown (Horror's predecessor) was responsible; but Georgetown also repeatedly ignored the requests for residual and sequel payments. Manny, as the WGA signatory (trumpeted in Plaintiffs' Motion) could and should have responsibly made these payments to Miller, and thereafter sought reimbursement from Georgetown. Instead, the problem dragged on for years and years. *See* Tob. Decl., Ex. F. The WGA repeatedly demanded that Cunningham pay these residual and sequel payments from 1980 to 1985, but Cunningham either ignored these requests or provided false promises that the payments would soon be made. *Id.* at ¶ 11, p.5.  Finally, in mid-1985 the WGA commenced a grievance and arbitration proceeding against Manny, whereupon Manny sued Georgetown. *Id.*; Haye Decl., Ex. W. The matter was finally settled in 1987, but even after that Miller still did not receive these basic payments until 1989. Haye Decl., Exs. V, W. Certain documents resolving this matter refer to "all amounts due Miller pursuant to the WGA Basic Agreement," which should not be taken out of context (as Plaintiffs' misleadingly do), as this matter *solely* related to residual and sequel

payments; not, for instance, to pension and health contributions which are simply calculated as a percentage of Miller's payments under the Agreement and, as shown above, were *never* paid. *See* Tob. Decl. Ex. F at ¶¶ 2, 6; Haye Decl., ¶ 17, Exs. X, W, V, N at 247-250.

Given Plaintiffs' less than appealing track record under the MBA, it is ironic that they now claim that Miller is judicially estopped from asserting his rights under the Copyright Act based on the MBA. Pl. Mot. at 35. Notwithstanding this, Plaintiffs do not even begin to satisfy the elements of judicial estoppel[13] or equitable estoppel (not asserted by Plaintiffs). *See Marvel Characters v. Simon,* 310 F.3d 280, 292 (2d Cir. 2002).[14]

For all the reasons stated above, Miller's membership in the WGA does not bar him from asserting his inalienable termination rights under the Copyright Act.

## II.    PLAINTIFFS' ARGUMENT THAT MILLER HAS NO TERMINATION RIGHTS BECAUSE THERE WAS NO EXPRESS TRANSFER OF RIGHTS FAILS AS A MATTER OF LAW

As an author will usually be required to part with rights in his/her creative work before its market value can be tested, an author's termination right is, from a practical perspective, *the* most important authorial right in the Copyright Act, after copyright itself. Plaintiffs nonetheless

---

[13] Miller neither played "fast and loose with the Courts" nor gained an unfair advantage. *See Wight v. Bank America Corp.,* 219 F.3d 79, 89 (2d Cir.2000) ("Judicial estoppel is designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits."). "A party invoking judicial estoppel must show that: (1) his adversary 'advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner.' '[T]here must be a true inconsistency between the statements in the two proceedings. If the statements can be reconciled there is no occasion to apply an estoppel." *Id*. Miller did not advance an inconsistent factual position in any court, adopted by such court.

[14] "Under federal law, applicable because [Plaintiff's] claim involves a federal statute, a party can be estopped from pursuing a claim where: (1) the party makes a misrepresentation of fact to another party with reason to believe that the other party will rely on it; (2) the other party relies on the misrepresentation to his detriment." *Id*. Here, there is no record evidence of a misrepresentation by Miller nor of Plaintiffs' reliance on same to their detriment.

argue that even if Miller's Screenplay is clearly not "work for hire" under Section 101, *Reid* and *Aymes*, Miller has no termination right because there was purportedly no terminable transfer or license regarding Miller's Screenplay. Opp. 23-26. This argument is contrary to Plaintiffs' own interests because as the Treatment and Screenplay do not qualify as "work for hire" under the statute, 17 U.S.C. § 101, Plaintiffs would have no rights or fewer rights in the Screenplay than they would have once the Termination is declared effective.[15] Fortunately for Plaintiffs, their argument is incorrect as a matter of law.

Section 203(a) of the Copyright Act provides that its termination right broadly applies to "[t]he *exclusive or non-exclusive* grant of a transfer or *license* of copyright or of any right under copyright." 17 U.S.C. § 203(a) (emphasis added).

As the Screenplay simply does not qualify as Manny's "work for hire" under 17 U.S.C. § 101 and *Reid* (*see* Miller Mot. incorporated herein by reference), that naturally leaves two legal alternatives. Either the parties' Agreement (1) is viewed to effectively function, despite its form, as a purchase of exclusive rights to Miller's Screenplay for the sums stated therein, or (2) more likely, it constituted, along with Miller's cooperative conduct, an *implied non-exclusive license* of the Screenplay's copyright. *Both* are clearly subject to termination under 17 U.S.C. § 203(a) (applicable to "[t]he exclusive or non-exclusive transfer or license of copyright").

Section 204 of the Copyright Act provides that transfers of copyright must be in writing. 17 U.S.C. § 204. Section 101 defines transfers of copyright ownership broadly to include an "assignment, mortgage, exclusive license, or any other conveyance, alienation or hypothecation

---

[15] As discussed in Miller's Motion for Summary Judgment, Dkt. No. 46-1 ("Miller Mot."), because the Copyright Act has no extraterritorial application, statutory termination leaves intact a licensee's foreign rights. 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer On Copyright*"), § 11.08[A], n.6. Furthermore, the licensee may continue to freely exploit existing derivative works, after statutory termination, prepared under the authority of the original license. 17 U.S.C. § 203(b)(1).

of a copyright or any of the exclusive rights comprised in a copyright … *but not including a nonexclusive license*." 17 U.S.C. § 101 (emphasis added).

It is well accepted, however, that "[u]nder federal law 'nonexclusive [copyright] licenses may be … implied from conduct.'" *Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1999) *quoting Nimmer On Copyright*, § 10.03[A], at 10-43. Thus, the Second Circuit in *Graham v. James* found that the plaintiff had an implied copyright license from the defendant, after concluding that the defendant was an independent contractor under *Reid* and *Aymes*, and that his work did not qualify as plaintiff's work for hire under Section 101. 144 F.3d at 234-236, 235, *citing I.A.E., Inc. v. Shaver,* 74 F.3d 768, 774-775 (7th Cir. 1996)(stating that "the courts… universally have recognized that a nonexclusive license may be implied from conduct" in finding implied copyright license under a contract employing architect to create schematic designs for an airport.) *See also Latimer v. Roaring Toyz, Inc.,* 601 F.3d 1224, 1235 (11th Cir. 2010)(finding several consecutive implied copyright licenses).

If, as here, there is no assignment provision in an agreement hiring someone to create a work, which is not "work for hire" under the statute, courts *routinely* determine that there is an implied nonexclusive copyright license as it would be unfair to deprive a customer of all rights in a work he has paid for. Such a license arises by implication where (1) the author creates a work at another's request, (2) delivers the work to that person, and (3) intends that the person copy and distribute it. *Effects Associates v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990); *Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.,* 128 F.3d 872, 879 (5th Cir.1997)(applying this test in holding that the hiring of an independent contractor to create advertising jingles gave the hiring party an implied license to use the copyrighted works in derivative works).

All three elements apply in the instant case as shown by the parties conduct, including

that Miller created the Screenplay at Cunningham's request, gave it to Cunningham, executed the Agreement, and was paid for the Screenplay in the amount set forth in the Agreement.

That the Agreement purported to hire Miller to write the Screenplay is no impediment to, and, in fact, supports the conclusion that Miller granted Manny an implied copyright license to exploit the Screenplay. *See id.; Kennedy v. Nat'l Juvenile Detention Ass'n,* 187 F.3d 690, 694 (7th Cir. 1999)(finding company's *written employment agreement* with an independent consultant entailed an implied license to exploit the copyrighted work created thereunder, including in derivative works); *Foad Consulting Grp. v. Azzalino,* 270 F.3d 821, 828-829, (9th Cir.2001)(finding *contract* employing firm to create development plan for a shopping center and payment for such services "granted [company] an implied copyright license"); *Atkins v. Fischer,* 331 F.3d 988, 991–92 (D.C. Cir. 2003) (remanding on the issue of whether "formal agreements" hiring an independent designer to create copyrighted designs for a company, under its direction, resulted in an implied copyright license).

Nor is it an impediment that the parties may have intended that Manny have exclusive rights to the Screenplay. *See Baisden v. I'm Ready Prod., Inc.,* 693 F.3d 491, 501 (5th Cir. 2012)(finding an implied non-exclusive copyright license to exploit author's novels in derivative works and holding that the parties' intent to grant "an exclusive license" does not foreclose the creation of an implied "nonexclusive license" by operation of law) *citing Jacob Maxwell, Inc. v. Veeck,* 110 F.3d 749, 753 (11th Cir.1997)(same). *See also Lulirama*, 128 F.3d at 879-80 (rejecting plaintiff's argument that the parties intent to grant exclusivity to jingles foreclosed the creation of a non-exclusive license); *Garcia v. Google, Inc.,* 786 F.3d 733, 743 (9th Cir. 2015) "[W]ork-made-for-hire doctrine govern[s] much of the big-budget Hollywood performance and production world. … Absent these formalities, courts have looked to implied licenses.").

24

Any other reading of the law would mean that when an independent contractor is hired to create a copyrightable work which turns out, as here, not to be a "work for hire" under the statute (*e.g.*, because it is not a contribution to one of the collective works itemized in Section 101(2) or, as here, the parties did not "expressly agree in a written instrument signed by them that the work shall be considered a work made for hire"),then either the hiring party has no rights in the work; or the work is, according to Plaintiffs, immune from statutory termination even though it is not a "work for hire," the sole exemption from the Act's termination provisions. 17 U.S.C. §§ 304(c), 203(a).  This could not possibly be the correct legal conclusion or result.

As Plaintiffs' "no terminable transfer" argument fails as a matter of law, Plaintiffs may try to argue improperly for the first time in their reply, that any implied license from Miller was not "executed by the author after January 1, 1978". 17 U.S.C. § 203(a). *First*, Miller's implied copyright license *is* derived from the Agreement "executed" by Miller, as in the many cases cited above where a party is contractually hired to create copyrighted material that falls short of "work for hire." *Second*, there is no dispute that the Screenplay and Agreement occurred "after January 1, 1978." *Third*, as shown below, even were there no signed agreement, courts *and* the Copyright Office have interpreted the use of "executed" in Section 203(a) to mean the carrying out or performance of the exclusive or nonexclusive transfer or license in question.

In *Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1293-94 (11th Cir. 1999) the Eleventh Circuit expressly held that termination under 17 U.S.C. § 203(a) applies to implied copyright licenses, which are neither written nor signed. The Court rejected the argument that an "executed" license under Section 203 must be in writing, holding instead that "executed" means "carried into full effect," and that an unwritten, implied nonexclusive license was executed when it went into effect based on the parties' conduct:

> The existence of a writing requirement in section 204 [*supra*] cuts against Korman's position that section 203 only applies to written licenses, because it shows that Congress knows how to impose such a requirement when it wants to do so. Congress did not do so in section 203. "Executed" means 'carried into full effect," *see* Black's Law Dictionary 567 (6th ed.1990), and nothing in section 203 or elsewhere in the Copyright Act requires that nonexclusive licenses be in writing before they can be carried into full effect.

*Id.* at 1294. The Court concluded that the implied nonexclusive license in question was within the scope of Section 203, and terminable, despite the lack of any signed writing. *Id.* at 1293; 1294 ("The nonexclusive license involved in this case went into effect when [the author] permitted WQBA to use the jingle notwithstanding the absence of a writing. She did that after January 1, 1978, the date of applicability set out in section 203, so that section does apply to this license. With that holding of the district court we are in full agreement.").

The Eleventh Circuit's holding in *Korman*, is further supported by Section 203(a)'s clear provision for the termination of "exclusive *or non-exclusive* … license[s] of copyright or of any right under copyright," 17 U.S.C. § 203(a), because implied non-exclusive copyright licenses are often granted orally. *See Nimmer on Copyright* § 10.03[A][7](Under federal law, "nonexclusive licenses may ... be granted orally, or may even be implied from conduct.").

The meaning of the undefined word "executed" in Section 203(a) was also front and center in the Copyright Office's efforts to deal with what has come to be known as the "Gap Grants" problem. Adhering to the interpretation that "executed" means "signed" would result in numerous works anomalously being outside the scope of *both* of the Act's two termination provisions – Section 304(c) (relating to pre-1978 transfers or licenses) and Section 203(a)(relating to transfers or licenses "on or after January 1, 1978") – where an anticipatory transfer or license was made prior to January 1, 1978 but the work, itself, was not created until after that date, as would be the case for numerous works,  particularly those under publishing and

songwriter's agreements. Although Section 304(c) applies to pre-January 1, 1978 licenses it would be inapplicable because it requires a subsisting pre-1978 copyright, and Section 203(a) would be inapplicable if its term "executed" were construed as "signed." In March 2010, the Copyright Office published a Notice of Inquiry requesting comments on this issue, and received analyses from the Songwriters Guild, the Authors Guild and leading copyright scholars. On December 7, 2010 the Copyright Office issued its Analysis of Gap Grants Under the Termination Provisions of Title 17 (which can be found at https://www.copyright.gov/reports/ gap-grant-analysis.pdf).  As to the "Executed v. Signed" conundrum the Copyright Office stated:

> No one responding to the notice of public inquiry argued specifically that Congress intended to exclude Gap Grants. . . . [I]n the context of section 203, the plain meaning suggests that "executed" means "concluded transaction," not "signed." The provision does not work otherwise, because nonexclusive licenses do not require written contracts or grants. . . . It would mean that Congress intended one four-word phrase ("executed by the author") in the first sentence of section 203 to have two distinct meanings, depending on whether the grant at issue was concluded orally or in writing.

For all of the above reasons, Miller's notices of termination are in compliance with 17 U.S.C. § 203(a), and are not technically deficient for lack of a terminable transfer or license.

## III. PLAINTIFFS' ARGUMENT THAT MILLER'S NOTICES OF TERMINATION ARE BARRED BY THE COPYRIGHT ACT'S THREE YEAR STATUTE OF LIMITATIONS IS WITHOUT MERIT

Plaintiffs' argument that Miller's notices of termination under the Copyright Act, 17 U.S.C. § 203(a) are barred by the Copyright Act's three-year statute of limitations, 17 U.S.C. § 507(b) is also erroneous.  The timing of notices of termination are expressly governed by the Copyright Act. The Act mandates clear "time windows" within which an author may serve and file notices of termination.  In the case of termination under Section 203(a), an author must wait at least *thirty-five* years. 17 U.S.C. § 203(a)(3); *see also* 17 U.S.C. § 304(c)(3) (fifty-six years before the termination window opens for pre-1978 works). Plaintiffs' exclamations that "Miller's

27

Termination Notices "have been time barred for over thirty years" (Pl. Mot., 38) are both counterintuitive and contrary to the statute.

Section 507(b) reads: "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). "A claim ordinarily accrues "when [a] plaintiff has a complete and present cause of action." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S.Ct. 1962, 1969 (2014) *quoting Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.,* 522 U.S. 192, 201(1997) (internal quotation marks omitted). "In other words, the limitations period generally begins to run at the point when "the plaintiff can file suit and obtain relief." *Id.* Miller certainly would have no reason to file and could not have filed suit for declaratory relief under 28 U.S.C. § 2201 as to the validity of his notice of termination until he served such notice and Plaintiffs' repudiated it, leading to the current "actual controversy." *See id.* ("In a case of actual controversy within its jurisdiction ... any court of the United States" may grant declaratory relief.)

As "works for hire" are the *sole* exemption from the Copyright Act's otherwise inalienable termination right, adversely affected parties seeking to challenge statutory termination notices invariably claim that the affected work(s) are "works for hire." If they can simply argue, like Plaintiffs do here (Pl. Mot. 37), that a purported work for hire defense time-bars the notices of termination under Section 504(b) by implicating "ownership", the remedial termination right that Congress found so important would be *illusory*.

Surely, Congress did not intend that the termination right could be so easily eradicated, when its "principal purpose" was "to provide added benefits to authors". *Mills Music, Inc. V. Snyder*, 469 U.S. 153, 172-73 (1985)(interpreting the comparable termination provisions of § 304(c)). *See also Marvel Characters v. Simon*, 310 F.3d 280, 290 (2d Cir. 2004)("the legislative

history of the termination provision reflects Congress's intent to protect authors") *citing*

H.R.Rep. No. 94–1476, at 124 (1976) ("A provision of this sort is needed because of the unequal

bargaining position of authors, resulting in part from the impossibility of determining a work's

value until it has been exploited."). Its clear objective is to ensure that authors can meaningfully

share in the success of their creative efforts. *Mills Music,* 469 U.S. at 172–73.

Indeed, as the Second Circuit observed in *Marvel*, a notice of termination "necessarily

contemplates the likelihood that long dormant copyright ownership issues will be awakened and

litigated . . . In fact, Congress's goal in providing authors with this termination right was to

enable them to reclaim long lost copyright[s] . . .".  310 F.3d at 292. The plain language of

Section 203(a) contemplates that authors have the right to serve and file notices of termination

with respect to copyrights so long as it is within the time period specified in the statute, and it is

undisputed that Miller's notices of termination were timely.

Right from the start of Plaintiffs' statute of limitations argument it is apparent that

something is amiss. Plaintiffs' assert that Miller's "claims" accrued when he "first knew or

should have known that he [] was not being credited as an author." Pl. Mot. 37.  Here, it is

undisputed that Miller wrote his Treatment and Screenplay and that Miller received sole writing

"credit" on the *Friday the 13th* Film ("Written by Victor Miller"). Miller Decl., ¶ 26, Ex. G.

Plaintiffs then cite "*Merchant v.* Ivory, 92 F.3d 51, 56-57 (2d Cir. 1996)('A co-author

knows that he or she jointly created a work from the moment of creation.')." This is also a non

sequitur as Miller makes no claim of *co-authorship*. It is quite the reverse: *Plaintiffs* assert (or

intimate) after thirty-seven years that Cunningham and/or others allegedly co-authored the

Screenplay, despite Miller's receipt of sole writing credit on the Film. *See e.g*., Pl. Mot. 38.

In *Merchant*, the plaintiffs sought a declaration of copyright co-ownership based on their

*alleged co-authorship* of the 1956 song *Why Do Fools Fall In Love?* 92 F.3d at 56. While we may never know the answer to the song's question, we do know that the case is inapplicable because Miller does <u>not</u> claim co-authorship of his material. Both *Merchant* and Plaintiffs cite *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996). *Zuill*, like *Merchant*, concerned claims of co-authorship of copyrighted material.  80 F.3d at 1368-69 ("[Plaintiffs] claims to be 'authors of a joint work,' so that copyright vested in them … as 'co-owners'. 17 U.S.C. § 201(b)."). It is in this clear context that *Zuill* held that "claims of co-ownership, as distinct from claims of infringement, accrue when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation." *Id.*

Plaintiffs rely heavily on a single out-of-Circuit unpublished (non-precedential) decision, *Scorpio Music v. Willis,* 2013 U.S. Dist. LEXIS 29141, 2013 WL 790940 (S.D.Cal. March 4, 2013) quoting sound bites from it out of context. In that case, the lead singer (Willis) of the *Village People* served a termination notice regarding 33 musical compositions he *co-authored*, including *Y.M.C.A. Id*. at *1. Scorpio filed an action seeking to invalidate the termination, arguing that a co-author cannot unilaterally terminate. *Id*. The Court granted Willis' motion to dismiss and upheld the validity of Willis' termination, but gave Scorpio leave to amend to seek a declaration of the "percentage of copyright interest [*sic*] Willis was entitled" to recover as a co-author. *Id*. Thereafter, plaintiffs filed an amended complaint alleging that Willis was entitled to a 1/3 share as it had long been recognized that there were *three co-authors* of the compositions by the parties and interested third parties. *Id*. at *1, 6. Willis counterclaimed that he was entitled to a 1/2 share, alleging for the first time that one of the credited co-authors was not a co-author. The Court simply held that the issue of whether the above constituted "plain and express repudiation" of co-authorship precluded Willis' Rule 12(b)(6) motion, citing *Zuill*.  *Id*. at *5, 6.

Like the other inapplicable decisions Plaintiffs cite, *Scorpio Music* concerns a co-authorship claim long after creation, a claim clearly not made by Miller. The Court decided the co-authorship claim *after* upholding the validity of the termination in its first decison, as it was irrelevant to that question. The Court itself highlighted this distinction in this second decision. *Id*. *5 ("The cases upon which Willis relies are inapposite. … the focus … was on the validity of termination notices … not a claim by an author regarding his percentage of ownership interest.").

Unlike the co-authorship cases cited by Plaintiffs, this case primarily concerns the validity of Miller's notice of termination.  Miller did not receive "plain and express repudiation" of his termination notice until Plaintiffs filed suit. Arguably, the statute of limitations as to *the validity* of a termination notice would not begin to accrue until the effective date of the terminative notice, here in 2018, although this Court need not resolve that issue.[16]

Plaintiffs then cite to just one other unpublished (non-precedential) decision, *Mattel, Inc. v. Glutt*, 2014 U.S. Dist. Lexis 185180 (C.D. Cal. April 1, 2014) which is inapposite. In *Glutt*, which did not concern termination under Act, neither side had kept any agreements or evidence, Mattel's key witnesses were all dead, and it was undisputed that the defendant had repeatedly asserted in 2001, 2010 and 2011, that the material in question was "work for hire." The Court held that the plaintiff's claim to the material was barred by evidentiary laches. *Id*. at *3.[17] None of this is applicable to the instant case, nor has evidentiary laches been asserted by Plaintiffs.

*Siegel v Warner Bros. Ent., Inc*., 542 F. Supp.2d 1098, 1134 (C.D.Cal. 2008) r*eversed in*

---

[16] Notices of termination can be served up to ten years in advance of their effective date. 17 U.S.C. § 203(a)(3). Triggering the statute before a notice's effective date would render it time-barred by mere "rejection" of the notice by any adverse party, long before the U.S. copyright in question was even subject to reversion under the Act.

[17] Shortly thereafter, the Supreme Court in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S.Ct. 1962, 1973 (2014) reversed the Ninth Circuit's use of *laches* to curtail copyright claims.

*part on other grounds*, *Larson* v. *Warner Bros. Ent., Inc*., 504 Fed.Appx. 586 (9th Cir. 2013), like this case, concerned claims and counterclaims as to validity of the Siegels' termination notices regarding *Superman*. *Id*. at 1117. The defendants, of course, that all Superman comics were "works for hire," and that the notices were barred by the statute of limitations, just as Plaintiffs do here. *Id*. at 1127. In a detailed published opinion the Court held that the statute of limitations was not triggered until *after* the termination notices were served and the terminated parties gave clear and express notice repudiating the terminations. *Id*. at 1134-35.[18]

Furthermore, "a declaratory judgment action is a procedural device used to vindicate substantive rights", here, Miller's termination right under Section 203(a), "it is time-barred only if relief on a direct claim based on such [termination] rights would also be barred." *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992) *citing 118 E. 60th Owners, Inc. v. Bonner Prop., Inc.,* 677 F.2d 200, 202 (2d Cir. 1982) ; *Luckenbach S.S. Co. v. United States,* 312 F.2d 545, 548 (2d Cir. 1963). The obvious direct claim is copyright infringement. It is well accepted that "a suit for infringement is timely if instituted within three years of each infringing act for which relief is sought." *Merchant*, 92 F.3d at 57, n. 8, *citing Stone*, F.2d at 1049-50. As the termination does not become effective until 2018, Miller's counterclaim would hardly be time-barred.

Finally, the statute of limitations cannot preclude Miller from *defending* his notice of termination against Plaintiffs' multiple claims that his termination notice is somehow invalid. [19]

**IV.    MILLER'S WROTE HIS TREATMENT AND FIRST DRAFT SCREENPLAY
        "ON SPEC" PRECLUDING PLAINTIFF'S MOTION IN ANY EVENT**

---

[18] The Court surmised that the statute may not be triggered until the effective termination date. *Id*. at n.7.

[19] *United States v. Western Pacific R.R. Co*., 352 U.S. 59, 72 (1956) ("To use the statute of limitations to cut off the consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation."); *Luckenbach Steamship Co. v. United States*, 312 F.2d 545, 548-51, 552 n. 3 (2d Cir. 1963) ("The law is well settled that limitations do not normally run against a defense.")

As described more fully in Miller's motion for summary judgment (at 33-35), incorporated herein by reference, and as asserted in Miller's Rule 56(a)2 Response and Statement of Disputed Material Facts filed herewith, there is significant evidence that Miller wrote his Treatment, and First Draft Screenplay "on spec" in the hope that Cunningham could come up with financing, but no *guarantee* of compensation. Miller Decl., ¶¶ 6-12; Exs. A-C; Cunningham Depo., at 177:16 -178:13, Miller Decl. II, ¶ 12. Although Miller was eventually paid for his Screenplay, Miller was never compensated for his Treatment. Miller Decl., ¶ 21, Ex. D, ¶ 1; Haye Decl., Ex. N at 198; Miller Decl. II, ¶ 12; Cunningham Depo. at 155:2 -156:15; 160:5-15. Both aspects preclude a finding that the Treatment and Screenplay were "works for hire," even in the unlikely event the Court determined Miller to be an "employee" under the Act and *Reid*. Because, at a minimum, genuine issues of material fact exist regarding the timing and speculative nature of Miller's writing, Plaintiffs' Motion must be denied in any event.

The "expert report" of Plaintiffs' alleged expert William Cole, a labor layer, does nothing to change this result.  Haye Decl., Ex. J.  (the "Report"). *First*, though couched as an opinion on the custom and practices in the entertainment industry, the Report is improper under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrel Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).  It consists of a labor lawyer opining on the meaning and application of a collectively bargained agreement, the WGA's MBA, and then interpreting a WGA Arbitration decision, thereby either acting as an attorney advocat in expert's clothing or improperly usurping the role of the Court. *Second,* the single arbitration decision it cites and attaches is easily distinguishable because there the writer began work *after* deal terms had been set and drafts of the writer's agreement had been exchanged by counsel, none of which is present here.

V.  **PLAINTIFFS' CLAIM THAT CUNNINGHAM CO-AUTHORED THE SCREENPLAY AND FILM *ARE* BARRRED BY SECTION 507**

Plaintiffs pose a peculiar final argument for a summary judgment motion: that "in the event that Miller's Termination Notices are deemed valid, a *factual* determination must be made as to which, if any elements, of the Screenplay the Termination Notices apply." Pls. Mot. 39. Apparently, Plaintiffs would have this Court invalidate Miller's Termination to avoid having to make that determination altogether. Even if Plaintiffs' assertion were true as to the alleged need for "a factual determination," Plaintiffs suggestion ignores their three involved state-law claims, all based on the purported *invalidity* of Miller's Termination. Complaint, ¶¶ 35-54, Dkt. No. 1.

Plaintiffs argue that "Miller's termination would be limited solely to the creative elements in the draft Screenplays which were created by Miller, and not the entirety thereof[]", and throughout their brief they suggest that Cunningham and/or others, co-authored the Screenplay with "ideas." As to this, Plaintiffs are hoisted on their own petard: the statute of limitations cases they cite, while inapplicable to Miller's counterclaim upholding the validity of his termination notice (*see* Section III, *supra*), are directly on point as to Plaintiff's stale *co-authorship* claim in the face of Miller's sole writing credit for the 1980 Film. Miller Decl., ¶ 26, Ex. G; Pl. Mot. 37 ("Claims of copyright ownership accrues when the party seeking ownership first knew or should have known that he or she was not being credited as an author.") *citing Merchant*, 92 F.3d at 56-57("A co-author knows that he or she jointly created a work from the moment of creation") and *Zuill*, 80 F.3d at 1369; *see also* Miller Mot. 34-35.

Plaintiffs thereafter launch into an argument that the "Jason character" is not an element or character in Miller's Screenplay, and that this character was purportedly "created by Georgetown in sequels to the Film;" yet Plaintiffs do not cite to Miller's Screenplay nor offer any evidence as to the contours of this derivative character in such sequel films.

*First*, this lies well outside the scope of Plaintiffs' Complaint. The sole part of Plaintiffs' First Count for declaratory relief that touches upon any sort of determination of Screenplay elements states, as Plaintiffs do at the beginning of their argument: "Even if any of Miller's Termination Notices is deemed valid (which plaintiffs dispute), Miller's termination is limited solely to the creative elements contained in the Screenplay *which were created by Miller, and not the entirety thereof*, which will be determined after discovery in this matter." Complaint, ¶ 34f. (emphasis added). And as shown above *this* co-authorship claim is barred by 17 U.S.C. § 507.

The *ad hoc* "Jason" aspect of Plaintiffs' motion "violates the usual rule that the scope of declaratory relief cannot exceed the issues raised by the pleadings and supported by the evidence."  *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 41 (1st Cir. 2006) *citing* 10B Wright et al., *Federal Practice and Procedure* § 2768, at 669 (3d ed.1998). Notwithstanding this, if the Court chooses to wade into this area, Plaintiff's assertion that "Jason" is not a character in the Screenplay or Film is false as a matter of law, as objectively demonstrated by the material itself.

"Jason Voorhees," the character created, named and expressed in Miller's writing is a fundamental literary element in Miller's Screenplay and thus the first *Friday the 13th* Film. Jason is fundamental to both the Film's back-story and story, the mystery and sole motivation for the killings which occur at Camp Crystal Lake. There would be no *Friday the 13th* without Miller's Jason Voorhees. From the very beginning of Miller's Screenplay, newcomer Annie is warned that the townspeople called it "Camp Blood" because of drownings. Miller Decl., Ex. C at 23. Then, in a critical scene between Mrs. Voorhees and Alice:

```
                    ALICE
         The killer is still out there.

                  MRS. VOORHEES
            I will protect you.
```

35

                    MRS. VOORHEES looks arouund the room.

                         MRS. VOORHEES (Contd)

              Oh, this place ... It should never have been a camp.
              Not for children. They had so much trouble here.

        The fire glimmers slightly in the fireplace. A log burns through and
        rolls off, throwing up a small shower of sparks.


                         MRS. VOORHEES (Contd)

                         Camp Blood.

        MRS. VOORHEES has almost completely calmed the girl down. Strokes her
        soft hair.
                         MRS. VOORHEES (Contd)

              You know a boy drowned the year before those two other
              were   killed? An accident? It was inadequate supervision.
              The counsellors weren't paying enough attention . . .
              They were making love when that boy drowned.

                    ALICE looks up as the WOMAN strokes her hair

*Id.*, Ex. B at 83 (VM000201), Ex. C at 82 (VM00097).  Shortly thereafter, the boy who drowned

is revealed as Mrs. Vorhees' son!  And Jason appears to have possessed her.

        ANOTHER ANGLE: MRS. VOORHEES opens the door and walks in a few feet.
        She carries a machete in her hand. We see this instrument in CU as we
        hear OVER the sound of her son, JASON, calling to her.

                         JASON (VO)

              Help, mommy, I'm drowning! Oh, mommy,please ....

        The CAMERA PANS UP to her face and we see that the voice of JASON is
        coming from within her in LIP SYNC. She is both characters--though the
        child's voice is authentically dubbed.

        ALICE can just make out what is happening and can hear the VOICE OF
        JASON. ALICE is very still. Her eyes widen as she listens to MRS.
        VOORHEES rave.

                         JASON (Lipsync)

        Don't let me die, mommy ...! Can't breathe...Help me, breathe ...

        MRS. VOORHEES is having trouble catching her own breath. She strokes
        her throat with her free hand and the voice of the child stops.

                         MRS. VOORHEES(in her own voice)

              I can't let them kill any more children. Come out now.

                                   36

*Id.*, Ex. B at 83-4 (VM000204-205), Ex. C at 86 (VM00100-101).  After more menacing action

with Mrs. Vorhees, machete in hand:

```
                We can hear JASON'S VOICE.

                         JASON (VO)
                  Kill her, mommy! Kill her!
```

*Id.*, Ex. B at 84 (VM000205), Ex. C at 87 (VM00101).  Shortly thereafter Jason reappears as the

driving force behind the killings:

```
     ALICE relaxes a little bit now that she is locked inside. As soon as
     she relaxes, we hear the front screen door slam. Then we hear some
     shuffling around outside. The lights are turned on.

                         JASON (VO)

     Please kill her, mommy ... Help me, please. Kill her, mommy.

     There is the sound of pots being rustled through. Then the sound of
     another door being slammed.

     ALICE relaxes again.

     Then there is a silence. ALICE thinks about unlocking the door now. She
     reaches out for the lock. Then thinks better of the idea. She eases
     down the door frame to the floor. On all sides are the cans of food and
     cooking implements. There is a large skillet, some bags of flour, etc.

     ALICE covers her head with her arms.

     The doorknob above her head (a few inches away) turns very slowly. We
     see it, but she does not. MRS.VOORHEES' hand finishes turning and now
     starts to push gently. There is almost no give, but we see that the
     door is being tested.

     The voice on the other side is very young, very singsong.

                         JASON (O.S.)

     Come out, come out, wherever you are ...
```

*Id.*, Ex. B at 90 (VM000208), Ex. C at 90 (VM00104).  In the second to final scene, Jason again

appears to have possessed his mother, his voice coming from her mouth, driving her to kill:

```
     MRS. VOORHEES pushes the canoe to one side, wading through the waist-
     high water as fast as she can. She screams with rage. Her face goes
     through a horrifying transformation. From her mouth comes the VOICE OF
```

```
JASON .
                       JASON (LipSync)

                  Mommy! Mommy! Mommy!

ALICE can't move fast enough to get away from MRS.VOORHEES, who is
slashing the air with her big knife trying to hit ALICE. ALICE slips,
falls in the water, gets her footing back and has to turn and block the
blow of the machete with the paddle, using it like a staff to ward off
the blow. The machete cuts the paddle neatly in half. MRS. VOORHEES
raises the knife for another blow and ALICE lunges for her knees and
succeeds in throwing MRS. VOORHEES into the water. The machete flies
out of her hand and lands in the water. The two women roll in the
water. MRS. VOORHEES is trying to strangle ALICE, her hands stretching
to reach around her throat. They roll over and under the water. We
cannot see who is winning. Suddenly MRS. VOORHEES finds her footing and
stands up, looking for ALICE. She is screeching madly.

                       JASON (LipSync)

                 Kill her, mommy! Kill her, mommy!

ALICE shoots up out of the water holding the machete, and in one, wild
swing, decapitates MRS. VOORHEES, whose head flies off into the water.

The body stands for a minute, then falls heavily into the lake.
ALICE drops the machete into the water and starts to wade to shore.
```

*Id.*, Ex. B at 93 (VM000211), Ex. C at 93 (VM00107). In the final scene written by Miller Alice climbs in the canoe, is drifting on the Lake, when suddenly *Jason leaps out of the water* throwing his arms around Alice, pulling her into the water screaming. In the last scene before the end-credits roll, we cut to Alice sitting up in a hospital bed screaming, and she asks:

```
                          ALICE

            Is anyone else alive? Are they all dead?

                         TIERNEY

          Yes, m'am. Two of my men pulled you out of the lake. We thought
          you were dead. Do you . . . (O.S.) ... remember very much?

                          ALICE

               The boy. Is he dead, too?

                      TIERNEY (O.S.)

                        Who?

                          ALICE
```

38

```
                         The boy, Jason!

                              TIERNEY

                             Jason?

                          ALICE (O.S.)

            In the . . . lake! The one – the one who attacked me!
            The one who pulled me underneath the water!

                              TIERNEY

              M'am . . . we didn't find any boy.

                            ALICE (LOW)

            But he . . . Then he's still there?

                            (MUSIC IN)
```

Miller Decl. II, ¶¶ 3-4, Ex. H at 2294 -2295, Ex. I; Tob. Decl. II, Ex. Q at 1360 ("Victor Miller's third draft … deviated unusually little from the final shooting script.")

In light of the above, Plaintiffs' statement that "Miller had absolutely no involvement in creating the character [Jason]" is frivolous. Pl. Mot. 39. In the Screenplay Jason is the *sine qua non* of the story – the mystery behind his mother's insanity. Jason himself appears to seek revenge, driving his mother to kill; and, at times, as the killer when Mrs. Vorhees speaks in Jason's voice. In the end, Mrs. Vorhees is decapitated, but we don't know if Jason is really dead. Jason attacks Alice, which follows naturally from his prior repeated refrain: "Kill her, mommy!" Alice ends the story after waking from a nightmare (or was it?) by asking "Then he's still there?" That Jason is the un-killable killer in derivative sequels follows from the original story.

Tellingly, Plaintiffs do not cite to Miller's literary material on which any copyright analysis must be based, nor place the sequel screenplays/films to which they refer into evidence. Plaintiffs' repeated arguments that "Miller did not create the adult Jason character … that kills people" or that "Jason is already dead" in the Film (Pl. Mot. 39) are silly given all of the above.

Copyright law regarding derivative works like the *Friday the 13th* sequels is also fairly

straightforward. If additional copyrightable material is contributed to a derivative work "then the copyright protection afforded to the author of that derivative work extends only to that additional material and in no way extends to the underlying pre-existing material. *See* 17 U.S.C. § 103(b) (specifying that a derivative work's copyright does not extend to any part of that work using 'preexisting material in which copyright subsists')." *Siegel*, 542 F.Supp.2d at 1124, *citing* 1 *Nimmer On Copyright* § 3.03, at 3-10. By way of example, if Jason's hockey mask introduced in a latter sequel film is deemed copyrightable, then that would be considered additional copyrightable material, contributed and owned by the author of such derivative work.

The related case *Siegel v. Time Warner, Inc*., 496 F.Supp.2d 1111, 1154 (C.D. Cal. 2007), decided by the same Judge as *Siegel*, *supra*, does *not* stand for the proposition attributed to it by Plaintiffs. Pl. Mot. 42 (stating it means that when a derivative character is further "'fleshed out' in a derivative work, it stands separate and apart from the copyright in the original work."). In that case, defendants argued that *Superboy* was merely *Superman* as a boy. The question before the Court was whether there were *any* aspects of the *derivative Superboy* which were "more than a trivial variation" of *Superman* and thus subject to additional copyright protection. *Siegel*, 496 F.Supp.2d at 1154 (referring to the "addition of material that will comprise more than a trivial variation … and, hence, be subject to copyright protection.")

Finally, it serves as an admission that on a number of Plaintiffs' sequels, Miller received the credit: "Based Upon the Characters Created by Victor Miller." Miller Decl. II, ¶ _, Ex. _.

## **CONCLUSION**

For each of the above reasons, Defendant and Counterclaimant Miller respectfully requests that Plaintiffs' Motion be denied, and that judgment be entered on the Complaint, Count I and the Counterclaim upholding the validity of his termination notice under the Copyright Act.

Respectfully submitted,

Dated: June 30, 2017                    Defendant and Counterclaimant Victor Miller

By: _____/s/ Marc Toberoff_____

    Marc Toberoff (FBN phv08515)
    TOBEROFF & ASSOCIATES, PC
    23823 Malibu Rd.Ste. 50-363
    Malibu, CA 90265
    Telephone: (310) 246-3333
    Email: mtoberoff@toberoffandassociates.com
    His attorneys.

41

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing Defendant and Counterclaimant's

Victor Miller's Notice of Errata, dated June 11, 2017, was served electronically by the Court's

ECF system on said date and that all interested parties in this case are registered CM/ECF users.

The undersigned declares under penalty of perjury under the laws of the United States

that the above is true and correct.


Dated: June 30, 2017                                  /s/ Marc Toberoff

                                            _____

                                                          Marc Toberoff